IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAMON ATKINS,<br>    Plaintiff,<br><br>v.<br><br>CITY OF READING, et al.,<br>    Defendants. | C.A. No. 5:23-CV-02732-JMG |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, by and through counsel, respectfully submits this Statement of Undisputed Material Facts in accordance with the Policies and Procedures of the Hon. John M. Gallagher and in support of Plaintiff's Motion for Partial Summary Judgment.

**DISCLAIMER.**

This Statement uses the terms, "asserted" and "contention," in order to report the assertions and contentions made by the Defendants, not to establish the truth of the matter asserted.

**FACTS.**

1. Prior to June 3, 2023, Enrique Castro, Jr., applied to the City of Reading and received a Special Event permit on behalf of the Reading Pride Celebration to conduct the 1st Reading Pride March & Rally. [App. 95-96; App. 67 (McClure Dep. Tr. 55:7-18)].

2. The 1st Reading Pride March & Rally was scheduled to take place on June 3, 2023, beginning with a flag raising ceremony at City Hall and followed by a march to 8th and Penn streets and then to City Park. [App. 93].

3. Defendant, Bradley T. McClure ("McClure" or "Sgt. McClure"), is employed by the Reading Police Department, with the rank of Sargeant, and was the supervisor of the traffic unit, responsible for oversight of the permitted 1st Reading Pride March & Rally. [App. 55

1

(McClure Dep. Tr. 6:19-25 to 7:1 and 8:25 to 9:1-13)].

4. The Defendants produced Sgt. McClure's body camera footage, marked "0055 McClure Body Cam," from June 3, 2023. [App. 97].

5. Beginning at the 0.20 mark in 0055 McClure Body Cam, Sgt. McClure approached a group of three protesters standing on the southside of Washington Street (opposite City Hall), that were holding signs. None of the protesters were holding a megaphone or sound amplification device and the 1st Reading Pride March & Rally had not yet begun. McClure used his hand to push one of them back and, with McClure speaking in a forceful tone of voice, the following exchange occurred:

> Protester: God resolved the inequity of us all. God bless you, sir.
>
> McClure: Stand back, I gotta talk to you. You are not going to stand here and yell. This is not going to be a thing. They have a permit to be here, whether you like it or not. You can cry about it all you want, cuz you're not going to disrupt this. You want to stand here, stand here. But if you think you're going to yell insults to them — SHUT UP! — ok, that's not gonna happen. This is not going to be a thing. If it is, then you'll get arrested. You guys all will. I don't care. They're having their event. Live with it. Does it really affect your life that much? No, it doesn't.

[App. 97 (0055 McClure Body Cam 0.20 to 1:18)].

6. In the foregoing exchange, the protester told McClure that he goes out of his way to avoid insults to others and McClure responded, "Well, get over it. Ok. There's other ways you can care. But you're going to end up getting arrested. Alright? If you're going to make this a thing, we'll make this a thing." [App. 97 (0055 McClure Body Cam 0.37 to 1:18)].

7. McClure admitted he had not observed any arguments between the two groups up to that point in time, but he prophylactically warned the protesters because he didn't want the situation to "turn into a circus" and, as to the protesters, "It was my interpretation that their purpose

was to get a reaction. Why else would you stand that closely holding signs with—clearly showing yourself to be antagonistic towards this group that's here." [App. 70-71 (McClure Dep. Tr. 69:7-25 to 71:17-25 and 72:7-22)].

8. McClure asserted he had discretion to arrest the protesters if they raised their voices so as to be heard by the event attendees, because the content of the protesters' speech was "clearly antagonistic towards people, designed to get a reaction from them," which he equated as "being disruptive to this event." [App. 72 (McClure Dep. Tr. 74:2-24)].

9. As to Atkins and the other protesters, McClure asserted he had "trouble understanding their point of view" because "I was never taught in my life ever at any level by a parent, father, sister, whatever to be hateful, that a part of Christianity is being hateful and judgmental, hateful of others, judgmental of others." In McClure's view, "I don't understand why they even showed up, why they felt it necessary to show up and berate people." [App. 79 (McClure Dep. Tr. 104:10-25 to 105:1-13)].

10. McClure, therefore, equated the content of the speech by Atkins and the other protesters as "hateful" and "judgmental." [See App. 79 (McClure Dep. Tr. 104:10-25 to 105:1-13)].

11. Paragraphs 4 through 10, particularly the foregoing portion of 0055 McClure Body Cam, as well as McClure's admissions in his deposition, support the following facts:

(a) McClure's demeanor and state of mind on June 3, 2023.

(b) McClure equated the religious viewpoints of the protesters as "insults," being any content that is "antagonistic," "hateful," and "judgmental" to the 1st Reading Pride March & Rally and its attendees.

(c) McClure equated as "disruption" the mere utterance by the protesters of their

religious viewpoints to a degree audible to attendees standing on the northside of Washington Street and where the 1st Reading Pride March & Rally had not yet begun.

(d) McClure's use of unnecessary force and intimidation tactics by (i) pushing a protester who was lawfully present on a public sidewalk, which were unnecessary under the circumstances given the absence of any indications of violent arousal by any person; and (ii) argumentative nature, where telling the protester to "shut up!" while then goading the protester to enter into a debate with McClure (e.g., "Does it really affect your life that much? No, it doesn't.")

(e) McClure's threat to arrest any protester who made "insults," without any further definition or illustration of what that meant, and where McClure made no effort to investigate the content of the protester's speech other than to observe the religious messages on the signs the protesters were holding.

12. Based on the foregoing, Sgt. McClure continued the same pattern of behavior on June 3, 2023 after Atkins' arrival.

13. A true and correct video recording of the events of June 3, 2023 is submitted to the Court with the Plaintiff's Appendix (the "Video"). [App. 001].

14. The protester who was pushed back by McClure in 0055 McClure Body Cam is the same protester who created the Video in App. 001 and whose name is Matthew Wear. [App. 015 (Atkins Dep. Tr. 53:12-17); compare App. 001 with App. 97].

15. The parties agree that the Video is a fair and accurate depiction of the events shown therein. [App. 79 (McClure Dep. Tr. 102:18-25)].

16. At the 1:09 to 1:12 mark on the Video, Damon Atkins ("Atkins") is seen walking on the south side of Washington Street, crossing 8th Street and walking towards City Hall. [App.

001 (Video 1:09 to 1:12); see also, App. 72 (McClure Dep. Tr. 76:25 to 77:1-4) (Washington Street is in front of City Hall)].

17. At the 1:42 to 1:47 mark on the Video, Atkins arrived, standing opposite of City Hall and on the southside of Washington Street, and near other persons who were protesting the 1st Reading Pride March & Rally. [App. 001 (Video 1:42 to 1:47)]. Persons who were gathered to support or participate in the 1st Reading Pride March & Rally were gathered on the northside of Washington Street, and Sgt. McClure and Reading police officers Paige Stuart and Courtney Dupree stood in Washington Street, in between both groups. [Id.; App. 69 (McClure Dep. Tr. 64:19-25 to 65:1-9) (identifying Courtney Dupree and Paige Stuart)].

18. At that moment, Atkins held a double-sided sign which contained the words, "Jesus Said Go and Sin No More," on one side and, "Jesus Said I am the Way, the Truth, and the Life" on the other side, which are quotes from the Bible. [App. 48 (Atkins Dep. Tr. 182:23-25 to 183:1-17); App. 001 (Video 1:42 to 1:47)].

19. The side of Atkins' sign, facing Sgt. McClure and the persons gathered for the 1st Reading Pride March & Rally, displayed the words, "Jesus Said Go and Sin No More." [See App. 001 (Video 1:42 to 2:12)].

20. Atkins was wearing a t-shirt which contained the words, "You must be BORN AGAIN," and a hat which reads, "I ♥ Jesus," containing the heart symbol. [App. 001 (Video 2:22 to 2:26)].

21. Immediately upon the arrival of Atkins, Sgt. McClure approached him and the two spoke with each other. [App. 001 (Video 1:42 to 2:12)].

22. During their conversation with each other, McClure told Atkins, "Let them have their day" and Atkins told McClure, "God cares, this is public property." [App. 001 (Video 1:42

to 2:12); App. 80 (McClure Dep. Tr. 108:23-25 to 109:1-18)]. McClure then asked Atkins to "respect" the event attendees, where Atkins sarcastically responded, "Oh, I'll respect them," while patting the sign he was holding with his hand. [App. 001 (Video 1:42 to 2:12)]. Atkins further said, "You know who's cheering for this? The people that are in hell. So you do you and I'm going to do me; this is public property." [Id.]. McClure then walked away from Atkins. [Id.].

23. In his deposition, McClure asserted that his instruction to "respect" the event attendees meant that he expected Atkins to refrain from "yell[ing] insults at them." [App. 80-81 (McClure Dep. Tr. 109:22-25 to 110:1-12)].

24. At that point in time, McClure had never met Atkins previously and had no prior interactions with him that day. [App. 79 (McClure Dep. Tr. 103:18-24)].

25. As soon as the foregoing conversation had ended, Atkins called out to the persons standing on the northside of Washington Street and said, "Yo, God is not—," and he was cut off from finishing his statement because Sgt. McClure charged at Atkins and arrested him. [App. 001 (Video 2:11 to 2:24)].

26. Atkins was arrested less than 30 seconds after arrival. [App. 001 (Video 1:42 to 2:11)].

27. At that moment, Atkins intended to say, "Yo, God is not the author of confusion," a paraphrase of a Bible verse. [App. 47 (Atkins Dep. Tr. 180:15-25)].

28. McClure agreed he did not hear Atkins say anything to the event attendees or counterprotesters other than "Yo, God is not." [App. 91 (McClure Dep. Tr. 150:22-24)].

29. In his Incident Report, McClure erroneously asserted that Atkins, previously, "began to yell to the people at the event" and had been warned to desist before being arrested for the subsequent statement, "Yo, God is not." [App. 102]. And McClure also asserted in the Incident

Report, "Less than a minute later [Atkins] resumed yelling derogatory comments to the people at the event," and was arrested because "I had already given him warnings . . ." [Id.].

30. McClure had no explanation how Atkins' statement, "Yo, God is not," is derogatory. [See App. 84 (McClure Dep. Tr. 122:2-16)].

31. No rational factfinder can accept the truth of the matter asserted in Sgt. McClure's Incident Report, based on the following evidence:

(a) Incontrovertible physical facts, namely, (ii) the Video clearly shows that Atkins arrived, holding a sign, without speaking to the event attendees when McClure approached him [App. 001 (Video 1:38 to 1:49)]; and (ii) as shown in Reading 0059 Building Footage, being surveillance footage from City Hall, Atkins arrived at the 40:16 mark and McClure approached him at the 40:20 mark. [App. ____]. Atkins did not address the crowd in the four seconds after his arrival and before McClure approached him for a conversation. [Id.].

(b) Atkins testified that he did not yell anything at the event attendees before Sgt. McClure initially spoke to him because "it happened so quick," where, "As soon as I got to the edge of that street, we started talking." [App. 20 (Atkins Dep. 72:18-25 to 73:1-22)].

(c) McClure admitted, "I don't recall" what Atkins allegedly said to the event attendees before McClure approached him and that McClure's intent was to give the same prophylactic warnings that he gave to Matthew Wear and the other protesters. [App. 29 (McClure Dep. Tr. 107:4-25 to 108:1-11].

(d) Atkins' statement is not derogatory: "Yo, God is not."

(e) McClure failed to turn on his body camera and microphone to record the alleged, earlier yelling by Atkins and that, had he done so, it would have given "a more accurate, complete picture." [App. 87 (McClure Dep. Tr. 136:8-25)].

32.     Instead of admitting that his Incident Report was mistaken during his deposition, McClure doubled down and falsely asserted under oath that Atkins had started yelling at the event attendees, immediately upon arrival, even though having no recollection of what Atkins had said, having no explanation how "God is not" can be construed as derogatory, and having failed to record the incident with his body camera and microphone. [See App. 29 (McClure Dep. Tr. 107:4-25 to 108:1-11].

33.     McClure asserted that he arrested Atkins because (1) the latter "raised his voice a little bit" and (2) "Clearly he's being antagonistic and trying to get a reaction from the crowd, and that's something that I just could not allow and that's why I made the decision to arrest him at this point." [App. 79: (McClure Dep. Tr. 105:14-25 to 106:1-6)]. McClure asserted that Atkins was "being loud enough to be heard by the crowd," and "yelling things which are clearly meant to be antagonistic towards the crowd," which McClure equated as disrupting the event. [App. 81 (McClure Dep. Tr. 111:1-25 to 18 and 113:20-25 to 114:1-4)].

34.     McClure agreed he would not have arrested Atkins for doing the same thing if the content of his speech was supportive of the event:

> Q.     If [Atkins] had been yelling in support, would you have arrested him?
>
> A.     If he had been yelling in support? Well, no. Then he's not disrupting the event.

[App. 84 (McClure Dep. Tr. 122:17-21)].

> Q.     So if [Atkins] had stood there and held his sign and not spoken up, he would not have been arrested. Is that correct?
>
> * * *
>
> A.     Partially. He could speak up. Just don't speak up in language that's designed to get a negative reaction from the crowd that's there which I thought I made clear to all of them.

[Id. (McClure Dep. Tr. 124:4-13)].

35. Defense counsel gave leading questions, in the nature of legal conclusions, to McClure whether the arrest was not viewpoint discrimination, after McClure had stated that it was:

> Q. The content of [Atkins'] speech was irrelevant to the reason that you arrested him for disorderly conduct. Is that correct?
>
> A. Well, I felt the content of his speech was designed to antagonize the crowd, which is why he was arrested.
>
> Q. Okay. I should clarify. It wasn't because of his viewpoint?
>
> A. No.

[App. 86 (McClure Dep. Tr. 133:21-25 to 134:1-4)].

36. In his Incident Report, McClure asserted that Atkins, at the time of the arrest, "was carrying a sign with an anti-gay slogan written on it." [App. 102].

37. McClure agreed that if a protester is "condemning" the event organizers "for their belief, I would consider that to be antigay." [App. 83 (McClure Dep. Tr. 119:15-23)]. Further, McClure inferred that Atkins was going to say an antigay statement from his conversation prior to arresting Atkins about people "burning" in hell. [Id. (McClure Dep. Tr. 119:24-25 to 120:1-7)].

38. McClure agreed that, at the time Atkins spoke, Atkins did not attempt to cross the street. [App. 81 (McClure Dep. Tr. 113:5-6 ("Atkins did not come out in the street.")].

39. McClure admitted that none of the event organizers had asked for Atkins to be arrested or that his speech had disrupted their event or prevented their event from starting on time. [App. 82 (McClure Dep. Tr. 114:5-11); App. 90 (McClure Dep. Tr. 149:7-12)].

40. After McClure placed handcuffs on Atkins, members of the crowd on the northside of Washington Street began clapping their hands in applause. Then Atkins attempted to speak a second time, but McClure jerked Atkins back and pushed him against the wall to a building of the

Reading School District Administration Building, preventing Atkins from speaking a second time. [App. 001 (Video 2:28 to 3:25)].

41. Atkins had intended to complete the same sentence that he attempted earlier, "Yo, God is not the author of confusion." [App. 47 (Atkins Dep. Tr. 181:1-18)].

42. While pressed against the wall, Atkins complained to McClure that the handcuffs were too tight on him. [App. 82 (McClure Dep. Tr. 114:18-21)].

43. While McClure adjusted the handcuffs on Atkins, a speaker for the 1st Reading Pride March & Rally began addressing the crowd through a PA System and said, "Good morning, ladies and gentlemen. We're going to get started. My name is Enrique Castro and I'm the Executive Director of Reading Pride Celebration." [App. 001 (Video 3:24 to 3:36)].

44. McClure, with the assistance of Officers Dupree and Stuart, arrested Atkins and began moving Atkins on foot in the direction of the Reading Police Station. [App. 001 (Video 3:24 to 5:25)].

45. During that time, a speaker for the 1st Reading Pride March & Rally stated to the crowd that when the protesters "get themselves in trouble, the police are going to deal with it." [App. 001 (Video 3:24 to 5:25); App. 82 (McClure Dep. Tr. 115:2-25) ("I heard it on this video.")].

46. McClure agrees that the event organizers began speaking with the PA System after McClure had placed Atkins under arrest. [App. 82 (McClure Dep. Tr. 116:3-7)].

47. While McClure led Atkins away from the event, McClure's body camera was activated and that recorded him goading Atkins, "They're clapping for you, buddy! They're clapping for you! You made them more proud!" [App. 98 (McClure Body Cam. 1:10 to 1:30)]. Atkins, however, remained silent during that exchange. [Id.].

48. McClure wanted to make an example out of Atkins in order to show the other

protesters that "[o]bviously he means business." [App. 77 (Video 94:9-25)].

49. McClure transported Atkins to a police station for central processing. [App. 85 (McClure Dep. Tr. 126:9-25 to 127:1-21)].

50. McClure filed a Police Complaint, charging Atkins with a misdemeanor grading of Disorderly Conduct under Subsection (a)(1) of 18 Pa.C.S. § 5503, but the Berks County District Attorney withdrew the same prior to the scheduled preliminary hearing. [App. 103-15].

51. In forming the charging decision, McClure consulted with Sergeant Mangus from the Reading Police Department, who recommended that McClure grade the offense as a misdemeanor. [App. 85 (McClure Dep. Tr. 126:9-25 to 127:1-21)]. McClure asserted he was justified in the misdemeanor grading by reason of Atkins disregarding the warning to desist. [Id. (McClure Dep. Tr. 127:22-25 to 128:1-12)].

52. McClure had no conversations with the event organizers in the handling or control of event attendees, protesters, or counterprotesters, and gave no directives to the event attendees not to speak with the protesters or to stay on the northside of the sidewalk of Washington Street. [App. 73 (McClure Dep. Tr. 80:21-25 to 81:1-25)].

53. McClure admitted he failed to plan for the possibility of protesters at the event. [App. 76 (McClure Dep. Tr. 92:12-18)].

54. The City of Reading does not have any ordinance or policy on the minimum distance between protesters and counterprotesters at permitted events, and McClure agreed "this is the first time in my career that I've ever dealt with a protester/counterprotester situation, so it's not something that comes up." [App. 85 (McClure Dep. Tr. 128:25 to 129:1-9)].

55. The City of Reading does not have any ordinance or policy on how loud a person can be while standing on the street during daylight hours and McClure agrees, "That would be

kind of hard to monitor." [App. 85 (McClure Dep. Tr. 128:20-24)].

56. With the benefit of hindsight, McClure still maintains his contention that the arrest of Atkins was justified. [App. 77 (McClure Dep. Tr. 96:21-25 to 97:1-4)].

57. After the incident, Chief of Police Richard Tornielli spoke with McClure and confirmed on behalf of the Reading Police Department that McClure's arrest of Atkins was justified. [App. 59 (Video 24:20-25 to 25:1-2)].

58. As a result of this incident, Sgt. McClure did not receive any discipline for misconduct and was permitted by his immediate supervisor to have three days of paid administrative leave for the purpose of resting rather than as punishment. [App. 58 (McClure Dep. Tr. 19:5-25 to 21:1-21); App. 62 (McClure Dep. Tr. 37:14-16)].

59. At some point after the incident, Enrique Castro contacted McClure to thank him for arresting Atkins. [App. 90 (McClure Dep. Tr. 149:7-18)].

60. McClure admitted he could not recall any training he received from the police academy on the First Amendment of the U.S. Constitution, including differentiating protected versus unprotected speech under the First Amendment. [App. 63 (McClure Dep. Tr. 38:4-19)].

61. McClure admitted he could not remember receiving any guidelines, in his training as a police officer, as to the offense of Disorderly Conduct on recognizing protected conduct where a warning or order to desist is inappropriate. [App. 63 (McClure Dep. Tr. 41:3-25 to 42:1-18)]. He agreed that the Reading Police Department encourages officers "to use their discretion," but also admitted, "nobody is looking over their shoulder." [Id.].

Respectfully submitted,

**CORNERSTONE LAW FIRM, LLC**

Dated: May 17, 2024            By:   /s/ Joel A. Ready
                                     Joel A. Ready, Esquire

>Attorney I.D. #321966\
>8500 Allentown Pike Suite #3
>Blandon, PA 19510
>(610) 926-7875
>joel@cornerstonelaw.us
>*Counsel for Plaintiff*