**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAMON ATKINS,<br>　　　　　　Plaintiff,<br><br>　　　　v.<br><br>CITY OF READING, et al.,<br>　　　　　　Defendants. | C.A. No. 5:23-CV-02732-JMG |

**PLAINTIFF'S APPENDIX ON MOTION FOR PARTIAL SUMMARY JUDGMENT**

**CORNERSTONE LAW FIRM, LLC**

Joel A. Ready, Esquire
PA Attorney I.D. # 321966
8500 Allentown Pike, Suite 3
Blandon, PA 19510
(610) 926-7875

**MP4 Video File, Bates No. Atkins 000055 (approx. 43.0 MB) submitted to Judge Gallagher's Chambers via Thumb Drive and DropBox Link**

```
                                              Page 1

 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3      DAMON ATKINS,                 : Civil No.
        Plaintiff                     : 5:23-cv-02732-JMG
 4                                    :
 5              vs.                   :
 6                                    :
 7      CITY OF READING, EDDIE        :
 8      MORAN, RICHARD TORNIELLI,     :
 9      BRADLEY T. MCCLURE, and       :
10      COURTNEY DUPREE,              :
11      Defendants                    :
12
13                            - - -
14
15                   Friday, March 22, 2024
16
17                            - - -
18
19
20           Deposition of DAMON ATKINS taken in the
21      Law Offices of Cornerstone Law Firm, LLC, 8500
22      Allentown Pike, Suite 3, Blandon, Pennsylvania,
23      on the above date, commencing at 12:32 p.m.
24      before Lauren A. Buchak, Registered Merit
25      Reporter and Certified Realtime Reporter.
```

Plaintiff's App. 002

Page 2

```
1      APPEARANCES:
2          CORNERSTONE LAW FIRM, LLC
           By: JOEL A. READY, ESQUIRE
3          8500 Allentown Pike, Suite 3
           Blandon, PA  19510
4          610-926-7875
           joel@cornerstonelaw.us
5          -- For the Plaintiff
6          MacMAIN LEINHAUSER, P.C.
           By: BRIAN C. CONLEY, ESQUIRE
7          433 West Market Street, Suite 200
           West Chester, PA  19382
8          484-318-7106
           bconley@macmainlaw.com
9          -- For the Defendants
10
11
12
13
14
15
16
17
18
19
20
21
22     ALSO PRESENT
23
24
25          Bradley McClure
```

Page 3

```
1          INDEX TO WITNESSES
2
  WITNESS                 PAGE
  DAMON ATKINS
4    By Mr. Conley        5, 194
5    By Mr. Ready         178
6
7
8
          INDEX TO EXHIBITS
9
10                        PAGE
  EXHIBIT    DESCRIPTION       MARKED
11
  Atkins-1   Complaint      25
12
  Atkins-2   Police Criminal Complaint   90
13
  Atkins-3   Article Bates Stamp
14           Atkins000007 and
             Atkins000008   97
15
  Atkins-4   Plaintiff's Responses to
16           Defendants' First Set of
             Interrogatories   144
17
18
19
20
21
22
23
24
25
```

Page 4

```
1          DEPOSITION SUPPORT INDEX
2  Directions to Witness Not to Answer
3  PAGE          LINE
4
5
   Request for Production of Documents
6
   PAGE          LINE
7
8
9  Stipulations
10 PAGE          LINE
11
12
   Questions Marked
13
   PAGE          LINE
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1          DAMON ATKINS, after having been
2      affirmed, was examined and testified as
3      follows:
4                  * * *
5              EXAMINATION
6  BY MR. CONLEY:
7      Q.   Mr. Atkins, my name is Brian
8  Conley.  I am counsel for the defendants in this
9  lawsuit that you filed.  I am here to take your
10 deposition today.  I'm going to go into some
11 instructions, but before I do that, I want to ask
12 if you've ever had your deposition taken before
13 in any circumstance?
14     A.   No.
15     Q.   So I've got some instructions for
16 you about how this is going to be conducted and
17 what to expect.  As you can see, we have a court
18 reporter here to my right, your left.  She is
19 taking down everything that you and I say and
20 what your counsel may say.  Her job is a
21 difficult one, so to make it easier and to make
22 the transcript clearer, I ask a couple things.
23         First, I'm going to ask you some
24 questions, and you'll be giving me answers.  It's
25 normal conversation for you to either anticipate
```

2 (Pages 2 - 5)

1 what I'm going to say or maybe you know what the
2 question is going to be already and to kind of
3 jump in.
4          Normal conversation in a
5 deposition is kind of tough. It doesn't come
6 across well in the transcript. So I'm going to
7 ask you to let me finish my question and then
8 provide your answer. Your counsel also may
9 object. If he does so, you know, a little bit of
10 a gap helps him to do that so we're not all
11 talking over each other.
12          I ask that you listen to the
13 question that I ask and answer that question.
14 Your answers have to be verbal. Nods of the
15 head, shoulder shrugs, uh-huh, nuh-uh, things
16 like that, they don't come across clearly on the
17 transcript. Okay?
18     A.    Okay.
19     Q.    I ask that if at any point you
20 can't hear me or, like, I normally don't speak
21 softly, but if you can't hear me or you don't
22 understand my question, please just let me know.
23     A.    Yes.
24     Q.    And I can clarify it or speak
25 louder. I'm not asking for guesses from you. I

1 want to know what you know. So if you don't know
2 something, I don't know is a perfectly acceptable
3 answer. It's okay to estimate. For example, if
4 you have to estimate the length of this table,
5 that's fine. You can do so. Please just be
6 clear that it's an estimate. That way it comes
7 across better on the transcript. Okay?
8     A.    Yes.
9     Q.    All right. If you need to take a
10 break at any point, you're welcome to do that.
11 Just let me know, and that's fine. The one
12 caveat to that is that if I have asked you a
13 question and that question is pending, i.e., it
14 hasn't been answered --
15     A.    Yes.
16     Q.    -- just answer that question
17 first and then we can take a break. All right?
18     A.    Okay.
19     Q.    If at any point you need to go
20 back and correct your testimony or you feel that
21 you need to add something, please just let me
22 know, and I'm happy to do that for you. I say
23 that I'll try to give you an opportunity to do
24 that after we take breaks, but I'm not the best
25 at doing that. I'll try, but you're more than

1 welcome to do that at any time.
2     A.    All right.
3     Q.    Are you on any substances or
4 using any alcohol or any medications that would
5 prevent you from testifying truthfully today?
6     A.    No, sir.
7     Q.    Okay. Is there any reason that
8 you wouldn't be able to understand and respond to
9 my questions?
10     A.    No, sir.
11     Q.    Okay. Just some background
12 stuff. Let's start with your full legal name.
13     A.    Damon Frederick Atkins.
14     Q.    And any other names that you go
15 by?
16     A.    Well, when I was in a foster home
17 I applied for a credit card in the name of my
18 foster family which is Lafferty.
19     Q.    Lafferty?
20     A.    Yeah.
21     Q.    Do you go by Lafferty?
22     A.    No. I never used it since. It
23 was just that name, and my brother used my name
24 before, so I have his name attached to mine with
25 my name.

1     Q.    So your brother used your name --
2     A.    When he got in trouble.
3     Q.    Okay. So he told the wrong
4 name --
5     A.    Yes.
6     Q.    -- to authorities or something
7 like that?
8     A.    Yes.
9     Q.    Okay. And just to remind you,
10 let me finish my question before you answer.
11 You're jumping just a little bit.
12     A.    All right.
13          MR. READY: Damon, the reason we
14     got to do that is she has to write
15     down --
16          THE WITNESS: I understand.
17          MR. READY: So just anybody
18     talking, let them finish.
19          THE WITNESS: This is awkward, so
20     it might take me a little bit to --
21 BY MR. CONLEY:
22     Q.    I understand. It's your first
23 deposition. I completely understand that. If
24 you need to take a break and kind of recenter
25 yourself, perfectly acceptable. Also, you don't

3 (Pages 6 - 9)

Plaintiff's App. 004

1 have to answer my question immediately. You
2 can -- if you want to take a couple beats --
3      A.    Okay.
4      Q.    -- that's fine.  It's not a race,
5 and it's not going to come across any different
6 on the transcript.
7            Okay.  So you don't go by any
8 other names actively?
9      A.    No.
10     Q.    What's your current address?
11     A.    128 North 4th Street, Reading, PA
12 19601.
13     Q.    How long have you resided there?
14     A.    I have a healthy fear of not
15 telling the truth, so I want to say four years,
16 maybe.
17     Q.    Okay.  I understand that, and I
18 don't want you to guess, so it's okay to
19 estimate.
20     A.    I've been there for a few years.
21     Q.    Okay.  That's fine.  Do you live
22 with anybody at that address?
23     A.    Yes.
24     Q.    Who is that?
25     A.    My friend Sara.

1      Q.    What's Sara's name?
2      A.    Sara McCleery.
3      Q.    Can you spell that?
4      A.    M-C-C-L-E-E-R-Y.
5      Q.    Thank you.
6      A.    I'm not a hundred percent sure.
7 I think that's how you spell it.
8      Q.    Okay.  Are you in a romantic
9 relationship with her?
10     A.    No.
11     Q.    Have you been married at any
12 point?
13     A.    No.
14     Q.    Do you have any children?
15     A.    No.
16     Q.    How long have you lived with Ms.
17 McCleery at that address?
18     A.    The entire time.
19     Q.    Okay.  We're here to discuss an
20 event -- well, we're here to discuss your lawsuit
21 which concerns an event on June 3rd, 2023.  Were
22 you living at that 128 North 4th Street address
23 at that time?
24     A.    Yes, sir.
25     Q.    Have you filed any other lawsuits

1 in your lifetime?
2      A.    Well, I broke my neck at work,
3 and we settled, but yeah.  Yeah.  That's filing,
4 right?  Yeah.
5      Q.    Was it a workers' compensation
6 claim?
7      A.    Yeah.
8      Q.    I'm sorry to hear that.
9      A.    That's okay.
10     Q.    Are you recovered?
11     A.    Yeah.  I still have neck problems
12 and sometimes my back, but the doctors said I
13 should have came to him in a wheelchair, so I'm
14 doing fine compared to that.
15     Q.    When was that, the injury?
16     A.    I'm not -- it was a while ago.
17 '18, I want to say.
18     Q.    Okay.  And how old are you today?
19     A.    I'm 42 years old.
20     Q.    What's your birthday?
21     A.    8/8/81.
22     Q.    Easy to remember.  Okay.  Other
23 than that workers' compensation issue, any other
24 lawsuits that you have been involved in either as
25 a plaintiff, the person filing the lawsuit, or as

1 a defendant?
2      A.    No, sir.
3      Q.    Are you working currently?
4      A.    Yes, sir.
5      Q.    Where do you work?
6      A.    McDonald's.
7      Q.    And what's your position there?
8      A.    Maintenance.
9      Q.    How long have you been at
10 McDonald's?
11     A.    I just started.
12     Q.    Like, in the past week?  Past
13 month?
14     A.    The past week.  Yeah.  I've been
15 four days, I believe.
16     Q.    Were you working at the time of
17 the incident on June 3rd, 2023?
18     A.    No, sir.
19     Q.    Starting -- let's just start with
20 2020, January 1, 2020.  Can you walk me through
21 chronologically your employment since that time?
22     A.    I don't remember.  I can give you
23 my last three jobs.  So McDonald's is present
24 one.  Before that I worked at Walmart.  Before
25 that I worked at Reading Steel.

Plaintiff's App. 005

Page 14

1    Q.    Do you know the time frames when
2  you worked at Walmart or Reading Steel and/or
3  Reading Steel?
4    A.    No, sir.  Walmart was, I think,
5  November and December of this year, and the
6  Reading Steel place, I'm not sure.
7    Q.    When you say November and
8  December of this year, I assume you mean November
9  and December of 2023?
10    A.    Yeah.  I'm sorry.
11    Q.    Aside from the incident on June
12  3, 2023, have you ever been arrested?
13    A.    Yes.
14    Q.    Okay.  What other times have you
15  been arrested?
16    A.    I was in a foster home.  I was
17  young.  I got arrested for simple possession of
18  marijuana.
19    Q.    Was that in Pennsylvania?
20    A.    Yes.
21    Q.    Whereabouts in Pennsylvania?
22    A.    I don't know exactly, but my
23  foster home was in Norwood, PA, so it was around
24  there.  Delaware County.
25    Q.    Other than the simple possession,

Page 15

1  and you said that that was when you were in a
2  foster home, any other criminal -- any other
3  arrests aside from the June 3rd, 2023 incident?
4    A.    Yeah.  There was one other time I
5  was at a house party, and the neighbor called
6  'cause she smelled marijuana, and I was arrested
7  that time, but they gave me time served.  I was
8  in jail for, like, a couple days and then they
9  let me go.
10    Q.    You were in jail from the
11  original arrest from that incident?
12    A.    No.  From the house party I was
13  at.  It got dropped to a disorderly conduct, the
14  first arrest.  I was a young kid.  I was just,
15  you know, doing things I shouldn't have been
16  doing.  The first time I was inside a car, that
17  got dropped, I believe.  And then the second
18  time, the neighbor called the cops on us, and I
19  went to jail for that one.
20    Q.    About how long were you in jail?
21    A.    I don't want to misspeak, so it
22  was a little bit.  I got time served when I got
23  to the judge.
24    Q.    Was it more than a week?
25    A.    I would say yeah.

Page 16

1    Q.    More than a month?
2    A.    Not a month.  Kind of like in the
3  middle.
4    Q.    Okay.
5    A.    So more than a week but not quite
6  a month.
7    Q.    Okay.
8    A.    It seemed like forever, so that's
9  why I'm not sure exactly.
10    Q.    Understood.  About what time
11  frame was that second arrest where you spent some
12  time in jail?
13    A.    2004.  The first arrest was '98,
14  '99, I want to say.
15    Q.    Okay.  And between 2004 and 2023,
16  no other arrests?
17    A.    Uh-uh.
18    Q.    Any other arrests since June 3,
19  2023?
20    A.    No, sir.
21    Q.    I don't want to put words in your
22  mouth, so what would you call your activities
23  outside the Reading City Hall on June 3, 2023?
24    A.    Evangelizing.
25    Q.    Evangelizing.  Okay.  Have you

Page 17

1  ever used the term "street preaching"?
2    A.    What do you mean?  Like, do I
3  call myself a street preacher?
4    Q.    Either call yourself a street
5  preacher or say that you have been street
6  preaching?
7    A.    Well, yeah.  I mean, in a sense
8  that's what you are doing.  You're street
9  preaching, evangelizing, spreading the gospel.
10    Q.    Can you use those terms
11  interchangeably?
12    A.    Well, yeah.  They all go
13  together, I believe, for me.
14    Q.    Okay.  I don't want to, again,
15  put words in your mouth, but if you're
16  evangelizing and you're inside a building, I
17  guess it's not technically street preaching.
18  Would that be fair?
19    A.    Yes, sir.
20    Q.    Okay.  But if it's outside on the
21  street on a public roadway or something like
22  that, you would consider that street preaching?
23    A.    Yeah.  Any time you're lifting,
24  raising your voice up, that would be street
25  preaching to me.

Plaintiff's App. 006

Page 18

1      Q.   How long have you been doing
2  that, the evangelizing?
3      A.   Well, evangelizing I've been
4  doing for probably three years, I would say.
5  That's telling people about Lord Jesus Christ.
6  Street preaching, probably about two years, I
7  believe.
8      Q.   All right.  I'm going to jump
9  back just a little bit.  Please excuse me with
10  the cough.  I'm getting over some bronchitis, so
11  I want to ask you about your education.  What's
12  the highest level of education you have?
13      A.   I left school at 11th grade.
14      Q.   What school was that?
15      A.   Interboro High School.
16      Q.   Is that in Norwood?
17      A.   Norwood, PA.  Yes.
18      Q.   In your complaint you allege that
19  you have sincerely held religious beliefs.  Can
20  you describe to me your religious affiliation?
21      A.   To Jesus Christ.
22      Q.   However you want to describe it.
23      A.   I have a relationship with Jesus
24  Christ of Nazareth, and he's changed my life.
25      Q.   Are you a member of any church or

Page 19

1  congregation?
2      A.   I attend church, but I'm not
3  really a member.
4      Q.   Okay.  Of what church do you
5  attend?
6      A.   I just found, I think it's St.
7  James Church because I try to keep the Sabbath,
8  which is Friday sundown to Saturday sundown, so I
9  always like to find a church to go to on the
10  Sabbath, so I just found one.  It's St. James in
11  Reading.
12      Q.   And you said you keep a Sabbath
13  of Friday sundown to Saturday sundown?
14      A.   Yes, sir.
15      Q.   My understanding is that would be
16  an Old Testament of the Bible Sabbath?
17      A.   Yes, sir.  And New Testament,
18  too.
19      Q.   I think from what you told me I
20  know the answer to this question, but I'm going
21  to ask you, do you consider yourself a member of
22  any denomination of Christianity?
23      A.   No.
24      Q.   Okay.
25      A.   Just a follower of Jesus Christ.

Page 20

1      Q.   When did you become a follower of
2  Jesus Christ?
3      A.   My whole life, really, I felt his
4  presence, but I didn't really know.  When I
5  really became a follower is when I opened up the
6  Bible and began to read because I would do verses
7  of the day and little videos here and there, but
8  I did not expect what happened when I opened up
9  the Bible and read it.
10      Q.   When did that happen?
11      A.   It was about two and a half,
12  three years ago.  Maybe even less than that.
13      Q.   So earlier you told me that you
14  had been evangelizing for about three years?
15      A.   Yeah.
16      Q.   Is that about the time that you
17  started becoming really a follower of Jesus
18  Christ?
19      A.   Well, when I broke my neck and
20  the doctor told me I should be in a wheelchair,
21  it felt like I landed on a pillow, so that's what
22  started it.  Something was there, I felt, because
23  there's just -- how does that happen?  It
24  literally felt like I landed on a mattress.  I
25  had blood coming down off of me, and they were

Page 21

1  like, yo, what's wrong with you?
2           And at first I just shook it off
3  because I never had a work injury nor did I want
4  to get hurt at work.  That wasn't my intent.  I
5  didn't want to lose the job, so I didn't want to
6  say anything, but there was blood all over me, so
7  I had to say something.
8           Then they took me to urgent care,
9  and that's when I found out I broke my vertebrae,
10  but I knew when I left that building that
11  something helped me and then I began to look into
12  what it was.
13      Q.   So is it fair to say that that
14  neck injury was kind of an impetus for your
15  beliefs?
16      A.   It started it.  Yep.
17      Q.   I'm going to go back and come
18  back forward.  You were in foster care.  How long
19  were you in foster care?
20      A.   I was put in foster home when I
21  was 12.
22      Q.   What happened that placed you in
23  foster care?
24      A.   My mom.  She wasn't really -- she
25  was trying, but she wasn't really doing what she

6 (Pages 18 - 21)

Page 22

1 needed to do, I guess.  She was struggling with
2 drugs.  I think one year in fourth grade I went,
3 like, three days, so they came to my house to
4 find out why and then it just spiraled out of
5 control from there.
6      Q.   Do you need a break?
7      A.   No.
8      Q.   I understand these are sensitive
9 questions.
10      A.   I just haven't thought about that
11 in a while.  She tried, though.
12      Q.   Was it because your mother
13 couldn't care for you or did something happen to
14 her?  Did she pass away?
15      A.   She did pass after I was put in a
16 foster home, but that wasn't the reason.  I felt
17 the reason was because she was just so
18 overwhelmed.  I have six brothers and sisters,
19 and she was trying, but she had her first kid at
20 16, so, you know, I just feel she was
21 overwhelmed.  That, and she loved us.
22      Q.   And your father, did you have a
23 relationship with him?  Was he involved?
24      A.   No.  I seen him once or twice.
25 He came to my foster home one time and passed out

Page 23

1 in my driveway.  That was pretty embarrassing,
2 but I never really met him.
3      Q.   Did he have a drug problem?
4      A.   He had an alcohol and a drug
5 problem.  Yeah.  One time when he called me, he
6 called me Damian.  That kind of hurt because
7 that's not even my name, so that just lets you
8 know.
9      Q.   I'm sure.
10      A.   Again, I believe he tried.  It's
11 just he was from that, like, generation of using
12 drugs.  I wish he would have met Jesus Christ.
13      Q.   Your six brothers and sisters, do
14 they live around the area?  Do you have
15 relationships with them?
16      A.   I only speak to two, three
17 sometimes of my sisters.  My two brothers, I
18 don't know where they're at.  I plan on -- I'm
19 trying to pursue them.  And my three sisters I
20 try to talk to daily because I want them to Bible
21 study with me, so I -- and they live in -- I
22 don't want to misspeak.  I'm not even sure.
23      Q.   Are they in Pennsylvania?
24      A.   Yeah.
25      Q.   I'm not going to ask for their

Page 24

1 address.
2      A.   Yeah.  All right.  If I knew it,
3 I would tell you.  I don't have a problem.  My
4 main concern now when I talk to them is I want to
5 read the Bible, so I'm not really -- you know, I
6 just try and help them.
7      Q.   Have any of your sisters agreed
8 with you and read the Bible with you?
9      A.   Oh, yeah.  Yeah.
10      Q.   All three of them?
11      A.   I just read the Bible with my
12 sister last night.  My oldest sister, I'm trying
13 to get my other sister to bring her a Bible
14 today, so yeah.  They agree with me.  The
15 one -- two of them do.  One of them feels like,
16 you know, she's not ready yet.  So I just kind of
17 give her her space and let her know I'm there.
18      Q.   You filed a lawsuit against my
19 clients, the City of Reading, Mayor Eddie Moran,
20 Sergeant McClure over here to my left, Courtney
21 Dupree and Richard Tornielli.  Do you recall
22 filing that lawsuit?
23      A.   Yeah.  I contacted a lawyer.
24 Yeah.
25      Q.   Okay.  I don't want to know what

Page 25

1 you discussed with your lawyer.  I'm just asking
2 if -- I guess I should clarify that question.
3           To start the lawsuit we received
4 something that's called a complaint.  Do you
5 recall drafting or crafting that complaint with
6 the assistance of an attorney?
7      A.   Yes.  Yes, sir.
8      Q.   Thank you.  Did you review that
9 complaint before it was submitted?
10      A.   Unless I got an email that I'm
11 not aware of, I want to say no, sir.
12      Q.   Okay.  I'm going to show you a
13 document then.
14           MR. CONLEY:  Can I have this
15      marked as Atkins-1?
16           (A document was marked for
17      identification as Atkins Exhibit No. 1.)
18 BY MR. CONLEY:
19      Q.   Mr. Atkins, I have provided you a
20 document that I've marked as Atkins-1 in this
21 deposition.  It's a copy -- or I'm representing
22 to you it's a copy of the complaint that you
23 filed that initiated this lawsuit.  Have you had
24 a chance to look through that?
25      A.   Yeah.  I mean, do you want me to

1  read the whole thing?
2       Q.    I don't need you to read the
3  whole thing.  Do you recognize that document?
4       A.    I don't remember seeing this, but
5  I would refer to my lawyer.
6       Q.    Well, respectfully your lawyer
7  can't answer the question.  It's your answers to
8  the question.  If you would like to read through
9  the whole thing, I can certainly give you that
10 leeway.  I just didn't want to take the time, but
11 if you would like to read the whole thing before
12 answering that question, you're more than welcome
13 to do so.
14      A.    Yeah.  So the question is, am I
15 aware of this?
16      Q.    My question is:  Do you recognize
17 it?
18      A.    Yes.
19      Q.    Okay.
20      A.    Yes, sir.
21      Q.    And the second part of that
22 question is:  Does this accurately reflect -- let
23 me strike that.
24            Is this a copy of the -- have you
25 seen a copy of this document before today?

1       A.    No, sir.
2       Q.    So how do you recognize it?
3       A.    I recognize from the police
4  report.
5       Q.    What police report?  What are you
6  referring to?
7       A.    The police report that when I was
8  reading this looks like it explains what
9  happened.
10      Q.    Okay.  I'm not asking about the
11 police report.  I'm asking if you recognize this
12 document that I've presented in front of you?
13      A.    No, sir.
14      Q.    Okay.  I'll represent to you that
15 this is the complaint that you filed in this
16 matter.  I'm going to direct your attention to
17 paragraph 20.  It's on page 3 of 13.
18      A.    Okay.
19      Q.    Can you read that paragraph 20 to
20 yourself, please?
21      A.    This I remember.  I remember
22 reading this somewhere, so I just -- it was like
23 a whirlwind after this happened, so I remember
24 reading this which maybe I got in an email, but
25 okay, after reading it.

1       Q.    Okay.  Does this paragraph
2  accurately reflect your beliefs, your religious
3  beliefs?
4       A.    Yes, but it's all sin.
5       Q.    What's all sin?
6       A.    All sin is offensive to God.
7       Q.    Okay.
8       A.    Not just sexual because I feel
9  like that kind of puts some people in a corner
10 when you just -- you know, it's all sin.
11      Q.    All right.  So you agree with me
12 that where it says -- let's start with the first
13 phrase after the first semicolon.  It reads that
14 the practice and promotion of homosexuality is
15 sinful and highly offensive to God.  Do you agree
16 with that statement?
17      A.    Yeah, but it's all sexual conduct
18 in general.  It's not just specifically
19 homosexuality.
20      Q.    Okay.
21      A.    If you're not married to a woman,
22 it's highly offensive to God.
23      Q.    So this paragraph might reflect
24 your beliefs, but it's not the complete
25 reflection of your beliefs.  Is that fair?

1       A.    Yes, sir.
2       Q.    Okay.  But you do believe that
3  the practice and promotion of homosexuality is
4  sinful and highly offensive to God, correct?
5       A.    Yes, sir.
6       Q.    Okay.  And the next phrase that
7  all persons are created in God's image, but as
8  binary, quote, male and female he created them,
9  end quote.  Is that an accurate reflection of
10 your beliefs?
11      A.    Yes, sir.
12      Q.    And the final phrase there after
13 the last semicolon, that all sexual conduct
14 outside of a monogamous marriage between one man
15 and one woman is sin.  Do you believe that?
16      A.    Yes, sir.
17      Q.    Okay.  And the next paragraph,
18 paragraph 21, I'm going to quote it here for you.
19 Quote:  Atkins believes that those who commit sin
20 should be warned of the dangers of sin which
21 Atkins believes he learned, quote, the hard way,
22 end quote, through life experience rather than
23 through teaching and where the ultimate
24 punishment for unrepented sin is eternal
25 punishment in the afterlife, period, end quote.

Plaintiff's App. 009

Page 30

1        Is that an accurate reading of
2  paragraph 21?
3        A.    Yes, sir.  I also feel that you
4  can be born again so then that helps with the
5  sin.
6        Q.    Can you explain to me what born
7  again means to you?
8        A.    It means you have a change of
9  heart, and you don't know how that happened, and
10  the Bible calls it a circumcision of your heart,
11  and your desires, the things you used to want to
12  do, leave you, and they just go away.
13        Like, for example, I was addicted
14  to marijuana, and I just stopped.  Nobody forced
15  me.  I didn't go to rehab.  I didn't take
16  anything for it.  I just stopped, and that's why
17  I want to help people and tell them that there is
18  a way, that you can stop sinning because you
19  won't want these desires.
20        Q.    How did you come to hold these
21  religious views?
22        A.    By experience.  I'm blown away.
23  I never expected this to happen to me, and it
24  happened when I started reading the Bible.  I
25  used to do my verse of the day, and I would watch

Page 31

1  some videos.  I would go to church.  I was around
2  it only till I opened the Bible.  I am a
3  different person.  All I know is that I was one
4  way.  Then I met Jesus Christ of Nazareth, and
5  now I'm a completely different way.
6        Q.    So the beliefs that you hold, and
7  you indicated to me that you're not a member of a
8  congregation or you don't identify with any sect
9  of Christianity.  Would it be fair to say that
10  your beliefs, your religious beliefs are your own
11  interpretations of the Bible and your personal
12  experiences?
13        A.    Well, it's not my interpretation.
14  It's just -- it's just what it says.  Like, I
15  don't -- I don't interpret it.  I just read what
16  the Bible says and then what comes after that is
17  change.
18        Q.    So is it your belief that there's
19  only one way to interpret the Bible?
20        A.    No, sir.
21        Q.    Okay.  So if there are different
22  ways, can different people interpret it
23  differently?
24        A.    Well, the Bible says that the
25  Holy Ghost will come and teach you all things, so

Page 32

1  my path might not have been taught the way
2  someone else's path is going to be taught, but
3  that only comes from reading.
4        Q.    So somebody's personal
5  relationship with God and understanding of
6  religious beliefs may be different than yours?
7        A.    Well, I can't -- I can just say
8  my relationship.  I don't try to push it on
9  someone.  My main thing is to try to get people
10  to read the Bible.  That's one of the signs I
11  hold when I street preach.  It says please read
12  the Bible, because I know if you do read the
13  Bible, then you're going to go on your walk with
14  God.
15        Q.    And if somebody reads the Bible
16  and has a different interpretation than your
17  interpretation of the Bible, would that be okay
18  with you?
19        A.    Yeah.
20        Q.    Okay.  So if they read the Bible
21  and they were to say, well, I read the Bible, and
22  I don't think that, quote, the practice and
23  promotion of homosexuality is sinful, end quote,
24  would that be okay with you?
25        A.    I would like to talk about it.

Page 33

1        Q.    Why is that?
2        A.    Well, because I would like to see
3  where they saw that and where they came from,
4  like, where they're coming from and then I would
5  like to show them.  Like, it's not a pushing or
6  an aggressive because I look at -- when I see
7  people, I try to see Jesus Christ of Nazareth.
8  So everyone I speak to and I encounter, I try to
9  have that approach, and I'm open to sitting down
10  and going back and forth.  I can't force you to
11  see it one way, but I can ask if you want to sit
12  down and Bible study.
13        Q.    If somebody sees it a different
14  way than you, are they wrong?
15        A.    Well, according to the Bible and
16  what it says, it depends on how they feel about
17  it.  If they don't see the way I do, it's
18  not -- I can't force them to see it.  The best I
19  can do is evangelize, talk to them, ask if they
20  want to sit and read the Bible together.
21        Q.    Okay.  Fair enough.  Are there
22  any specific passages in the Bible that condemn
23  homosexuality in your view?
24        A.    Well, the Bible in general, God
25  tells us to go and reproduce and fill the world

9 (Pages 30 - 33)

Page 34

1 so that, you know, if you don't do that, then how
2 can you, you know, fill the world? Like, when I
3 street preach, I ask the Holy Ghost to help me.
4 So when I go out, I just -- it's almost like off
5 the cuff. Like, I just see what verses, you
6 know, come to me, but I'm not -- I'm not there to
7 push anyone down or push them away because I'm
8 going to have to give an account for everything I
9 say, do and think.
10        So I try to stick to three H's.
11 If you're homeless, I'll let you live in my house
12 rent free. It doesn't matter who you are, what
13 you're doing, anything. I'll help you get a job
14 so you can get your own place. This can be a
15 homosexual or someone that doesn't exactly agree
16 with me. Are you hungry? I will get you
17 something to eat. It doesn't matter who you are,
18 where you're from. Do you need help reading the
19 Bible? That's my main -- that's what I try to do
20 when I'm out there.
21    Q.    So I may have counted four H's.
22    A.    No. Three. Homeless. Do you
23 need somewhere to stay? Are you hungry? I will
24 get you something to eat. And do you need help
25 with reading the Bible?

Page 35

1    Q.    Okay. Understood. Thank you.
2 I'm going to ask you some general questions about
3 your evangelizing and/or street preaching. I
4 promise I will get to the event. I guess
5 generally when you got involved in evangelizing
6 and street preaching, did you do it alone or did
7 you do it as part of a group?
8    A.    Alone.
9    Q.    When you do that alone, do you
10 come with any supplies or literature that you
11 like to bring?
12    A.    Yes. I usually have -- I had a
13 sign shop make me cards that I hold. I usually
14 have a Bible with me, gospel tracts, food and
15 water in case anyone is hungry or thirsty. I
16 usually have an amplification, something that
17 goes on my belt, and it wraps around like a
18 microphone.
19    Q.    So the amplification -- go ahead.
20 I'm sorry.
21    A.    And Bibles, too. I really enjoy
22 handing someone a Bible.
23    Q.    Do you pay for these supplies
24 yourself?
25    A.    Yes, sir.

Page 36

1    Q.    How do you get the funds to pay
2 for these supplies?
3    A.    Through my job.
4    Q.    Okay. I guess my question to
5 that would be, it looks like there hasn't been a
6 lot of consistent employment. Are the jobs that
7 you've had sufficient to pay for those supplies
8 and your housing?
9    A.    Yes.
10    Q.    Do you get any other sort of
11 monetary assistance?
12    A.    No, sir.
13    Q.    No Social Security or anything
14 like that?
15    A.    No, sir. My roommate helps me
16 big time, so she kind of helps me get -- you
17 know, after I leave a job, my intent is to, you
18 know, find another one.
19    Q.    And was there -- you mentioned
20 that there was a settlement in that workers' comp
21 case?
22    A.    Yes. Yes, sir.
23    Q.    Is that part of your financial
24 stability?
25    A.    It was for a little bit. Yeah.

Page 37

1    Q.    Did that money run out?
2    A.    I gave a lot of it away.
3    Q.    To whom?
4    A.    To whoever. I just walked up to
5 random people and gave them money.
6    Q.    Okay.
7    A.    Like, I would walk through
8 Walmart and walk up to strange people and hand
9 them hundred-dollar bills because I was beginning
10 to change. I thought the money was going to make
11 me happy, and instead I was miserable.
12    Q.    The money didn't make you happy?
13    A.    Not at all.
14    Q.    Did it make you happy to give the
15 money away?
16    A.    That did, yes.
17    Q.    Approximately how often do you
18 evangelize and/or street preach? If you want to
19 do it by, like, a weekly, that's fine.
20    A.    Well, I like to -- it goes in
21 waves. Sometimes I go more towards Bible
22 studying with people and then when I do and when
23 I am out there, I like to do Friday, Saturday and
24 Sunday if I can and then if I can do it during
25 the week for a few hours, I will. My main days

Plaintiff's App. 011

Page 38

1  are those days normally.  Definitely Saturday and
2  Sunday if I'm able to.
3      Q.    Are there any specific locations
4  that you like to go to to evangelize and/or
5  street preach?
6      A.    Yes.
7      Q.    Can you describe those to me?
8      A.    Yeah.  5th and Penn Street.
9      Q.    That's in Reading?
10     A.    Yes.  And the Queen City Diner
11  which is closed on Lancaster Ave. and then I'll
12  go to 5th Street a few streets up from Penn
13  Street and then I'll work, kind of like
14  walk -- I'll work each corner.  Like, I'll start
15  a few streets up and then I'll preach there for a
16  little bit, go to the next corner, preach there
17  for a little bit and then I usually stop at 5th
18  and Penn Street.
19     Q.    Okay.  Is there any reason in
20  particular why you chose or why you choose these
21  locations to street preach?
22     A.    It's right next to my house.
23     Q.    So convenience?
24     A.    Well, no.  I feel like if
25  you -- sometimes even when I first started, I

Page 39

1  want to just go and just tell the world, but if
2  you start in your own town, then I feel like, you
3  know, you start street preaching on your corner
4  and then see where it goes from there.
5      Q.    Do you have an intent to spread
6  the breadth of where you street preach?
7      A.    Like, grow and get, like, wider?
8      Q.    Yes.
9      A.    I mean, I try to follow, you
10  know, if the Lord wants me to do that.  Sometimes
11  I'll feel like I need to move down when I was
12  just standing there and then that's when I move,
13  but as of right now, I feel like he put me there
14  for a certain reason because Reading really does
15  need evangelizing.
16     Q.    Why is that?
17     A.    Well, I think everywhere it does,
18  but there's a lot of -- there's a lot of, and to
19  me, homeless people and people that are lost and
20  might not know that there is a way to combat
21  this.
22     Q.    Do you find that those issues are
23  more prevalent or worse in Reading than other
24  places?
25     A.    No, because I've lived in Philly

Page 40

1  before, you know.  No matter where -- if you go
2  to any city, you're going to have, you know,
3  people that are struggling, and I just -- I feel
4  that -- I feel the presence of struggle in
5  Reading.
6      Q.    Do you believe that people that
7  are homosexual are struggling?
8      A.    Well, I feel we all struggle, so
9  I have to --
10     Q.    My question is specifically to
11  homosexuals or the LGBTQ community.  I apologize.
12  I cut you off.
13     A.    It's okay.  I think if anyone
14  doesn't know Jesus Christ of Nazareth, they're
15  struggling.
16     Q.    And is it your opinion that
17  people that are homosexual or LGBTQ don't know
18  Jesus Christ?
19     A.    Well, I can't speak for everyone.
20  That's why I try to get one-on-one with people so
21  that I can, you know, figure it out.
22     Q.    When you street preach, do you
23  ever choose specific events to street preach
24  and/or evangelize?
25     A.    Not normally, no.

Page 41

1      Q.    Can you explain when you might do
2  that outside of your normal practice?
3      A.    One time I was street preaching,
4  and this young man pulled up to me, and he's
5  saying things to me like a man says to another
6  man as if he wanted, you know -- he was
7  complimenting me in an uncomfortable way for me.
8  So as I was standing there street preaching, I
9  didn't engage him.  He rolled down his window and
10  started making comments towards me.
11     Q.    Sexual comments?
12     A.    Yes.  And he said, I was born
13  this way.  And I said, sir, did it ever occur to
14  you that you can be born again?  And I saw the
15  color in his face change.  He stopped talking to
16  me.  He rolled up his window, and he drove away.
17         That moment right there is when I
18  knew.  I was never a pride preacher.  I never
19  sought out to go to that, but after I spoke to
20  that young man, I knew if I can tell someone who
21  feels that they were born this way that they can
22  be born again, there's no better -- there's no
23  better saying.  So it wasn't my intent to seek
24  out anyone.  I want to talk to everyone.  Anyone
25  who wants to sit down with me and talk, I'm open

11 (Pages 38 - 41)

Plaintiff's App. 012

Page 42

1 to discussing it.
2    Q.   That event that you described
3 when the man rolled down his window, that was
4 before June 3, 2023?
5    A.   Yes.  Way before and then that's
6 what got me thinking, what if someone else
7 doesn't know that?  What if -- it wasn't like a
8 rude not talk to me.  Like, I saw him.  I saw the
9 color in this young man's face completely change,
10 and he was quiet.  He rolled up his window, and
11 he drove off.
12    Q.   And so how did you interpret that
13 when the color in his face changed --
14    A.   That he didn't know he could born
15 again.
16    Q.   Again, just --
17    A.   I'm sorry.
18    Q.   -- wait for my question to be
19 finished before you answer.
20    A.   I sometimes get excited that, you
21 know, that could happen.
22    Q.   I can tell.  Okay.  So you
23 interpret that, his reaction as agreeing with you
24 that he could be born again?
25    A.   Yes, sir.

Page 43

1    Q.   And was it your interpretation
2 that that was a positive for him?
3    A.   Yes, sir.
4    Q.   A good thing?  Okay.
5        And because of your
6 interpretation of that interaction that then did
7 you seek out more interaction with people of the
8 LGBT community to engender the same reaction in
9 others?
10    A.   Well, it's not that I sought it
11 out, if that's sort of rude to say, excuse me,
12 it's that I would street preach and then kind of
13 work my way there.  And my intent was to spend a
14 little time street preaching there and then work
15 my way there.  Like, it's not like I set out to
16 go to that place.
17    Q.   Which place?
18    A.   Any place.  I've only been to two
19 events.
20    Q.   Pride events?
21    A.   Yes.
22    Q.   So one was clearly on June 3,
23 2023.  Is that fair?
24    A.   Yes.
25    Q.   What was the other one?

Page 44

1    A.   The other one was a few days
2 before that where they raised another flag at a
3 town hall, and I went to that event as well, but
4 before I went to that event, I street preached
5 down the street from that for a little bit.  Then
6 I made my way up there and then I street preached
7 after that as well.  So I didn't set out to go to
8 that event.  It was in my -- where I was going.
9    Q.   And you're talking about the
10 event that's not June 3, 2023?
11    A.   Yes, sir.
12    Q.   Okay.  When was -- you said the
13 other event was a couple days before?
14    A.   Yeah, because it opened up pride
15 month, so I don't want to misspeak, but it was
16 before June 3rd.  A few days before that.  I was
17 at that event as well.
18    Q.   Okay.  And you said it was at
19 town hall?  Do you know what town?
20    A.   It wasn't City Hall where June
21 3rd was.  It was at -- I don't know.  I just -- I
22 know it's in Reading, and it's a town building.
23    Q.   So it was in Reading?
24    A.   Yes, sir.
25    Q.   Have you ever gone to West

Page 45

1 Reading to street preach?
2    A.   Well, isn't West Reading where
3 City Hall is?
4    Q.   Well, West Reading is a different
5 municipality than the City of Reading.  Are you
6 aware of that?
7    A.   I mean, I'm a little rough when
8 it comes to west, north and east.  Like, I just
9 know that I was in Reading.
10    Q.   Okay.  I'll try to describe it
11 this way.  The City of Reading -- and I guess I
12 should have clarified this.  When you're
13 referring to Reading, you're referring to what
14 you understand is Reading?
15    A.   Yes.
16    Q.   Is that fair?
17    A.   Yes.  Yes.
18    Q.   The City of Reading, which is one
19 of the defendants in this case, has a political
20 and geographic boundary and limit.  There is
21 another town, municipality that is adjacent to
22 the City of Reading which is called West Reading.
23 It's West Reading Borough.  It's a different
24 municipality.  It has its own police force,
25 governing body, things of that nature.  Are you

Page 46

1 familiar with that?  Do you know that West
2 Reading exists in that capacity?
3       A.   No.  Excuse me for my ignorance,
4 but yeah.  I just -- I lumped it all within
5 Reading, and now that you said that, I'm aware
6 of, like, Wyomissing and Sinking Springs and that
7 kind of stuff.  It might have been in Wyomissing,
8 but I thought I was in Reading before June 3rd at
9 that other event.
10      Q.   Okay.  So is it fair -- would it
11 be fair to say that you're not quite sure what
12 municipality you were in, but you were in an area
13 that you understood to be Reading which might
14 include Wyomissing and other adjacent areas?
15      A.   Yes, sir.
16      Q.   Okay.  So you're using Reading as
17 kind of a broad area?
18      A.   A broad, yeah.
19      Q.   Okay.  Thank you.
20      A.   You're welcome.
21      Q.   Have you ever obtained a permit
22 to street preach?
23      A.   No, sir.  I wasn't aware that I
24 needed one.
25      Q.   I'm not asking that.  I'm just

Page 47

1 asking if you have ever obtained one?
2       A.   No, sir.
3       Q.   Are you aware that there's a
4 process that you can engage in with
5 municipalities to obtain a permit for events,
6 public events?
7       A.   No, sir.
8       Q.   The pride event on June 3, 2023,
9 were you aware that they had a permit to have
10 their event outside of the Reading City Hall on
11 that day?
12      A.   No, sir.
13      Q.   Have you ever referred to a
14 person dressed in drag as a demon?
15      A.   If I see a demon, then I refer to
16 it, but I've never called someone -- the only
17 time I can recall calling anyone a demon is they
18 were -- they looked like a demon.
19      Q.   What does that mean to you?
20      A.   They had horns, and they looked
21 like a demon.
22      Q.   Horns growing out of their head?
23      A.   They're in a costume that has
24 horns on them, but I don't -- I don't refer to
25 someone's attire automatically is that they're a

Page 48

1 demon.  The only time that I can remember calling
2 anyone a demon was because they were dressed in a
3 demon outfit.
4       Q.   Do you recall somebody at the
5 June 3, 2023 Reading pride event -- or do you
6 recall calling somebody or referring to somebody
7 as a demon at the Reading June 3, 2023 pride
8 event?
9       A.   If they were dressed in a demon
10 outfit, I remember calling someone that was
11 dressed in a demon outfit.
12      Q.   Okay.  I'm asking specifically if
13 you remember.  You seem to qualify it with the
14 word "if."  If you don't remember, that's fine.
15 I'm asking if you remember?
16      A.   Yes, sir.
17      Q.   You do remember saying that?
18      A.   Yes, sir.
19      Q.   Do you recall going onto a news
20 broadcast and being interviewed by the Christian
21 News Network.  Christian Broadcast News Network?
22      A.   Yes, sir.
23      Q.   Did you review -- during the
24 course of that interview, did you review some
25 video that was taken by another individual that

Page 49

1 was at the pride event?
2       A.   Yes, sir.
3       Q.   Was it within that video that you
4 noted a demon?
5       A.   Yes, sir.
6       Q.   I know we talked about street
7 preaching, evangelizing individually, and you
8 said that you started that way.  Have you ever
9 joined a group to street preach and/or
10 evangelize?
11      A.   Not a group.  Another person.
12      Q.   Okay.  Who's that other person?
13      A.   I call him Brother Jose, and I
14 street preach with him sometimes at Queen City
15 Diner on Lancaster Ave.
16      Q.   Is that the only location that
17 you street preach with him?
18      A.   Yes, sir.
19      Q.   How often do you street preach
20 with Brother Jose?
21      A.   Once in a while.  It seems like
22 in the springtime it's more every week, but over
23 the winter it's once in a while.
24      Q.   It's cold outside?
25      A.   Yeah.  I mean, I try not to let

13 (Pages 46 - 49)

1 that be the reason, but yeah.  He's older, too.
2 He's an older gentleman.
3      Q.     Okay.  Do you know Brother Jose's
4 full name?
5      A.     No.  Just Jose.  He never told
6 me.  I just know him as Jose.
7      Q.     Do you know him as -- do you know
8 if Jose is his real given name?
9      A.     I believe so.  Yeah.
10      Q.     Was Brother Jose present with you
11 at the June 3, 2023 pride event?
12      A.     No, sir.
13      Q.     There was another man that was
14 there with you, and you had some of his
15 belongings in your backpack.  Do you recall that?
16      A.     Yes, sir.
17      Q.     Who was that?
18      A.     I met him street preaching, and I
19 want to say his name is Josh.
20      Q.     If you don't know, that's okay.
21      A.     Yeah.  I don't know.
22      Q.     I don't want you to guess.
23      A.     Yeah.  No.  I think for some
24 reason Josh is sticking out to me, but he moved
25 away.  I think he's in North Carolina or

1 somewhere right now, but I only met him once or
2 twice, and he stayed at my house because he was
3 homeless, so I said, do you want to come with me
4 to street preach, and he said yeah.
5      Q.     How did you meet him?
6      A.     I met him street preaching.
7      Q.     Was he street preaching and then
8 you were street preaching, and you kind of ran
9 into each other?
10      A.     He came up and wanted to keep me
11 company, he said, and then he wanted -- because I
12 was out there by myself, and he said he wanted to
13 stand with me.  And he sung, like, a gospel song.
14 Then I gave him my number and said if you ever
15 need anything, give me a call.  And then him and
16 his girlfriend were having trouble, and he needed
17 to stay with me for a few days.
18      Q.     Did he ever call you?
19      A.     After I gave him my number?
20      Q.     Yes.
21      A.     Yeah.  When him and his
22 girlfriend were having trouble, he called and
23 stayed with me.
24      Q.     Did you save his number in your
25 phone?

1      A.     No, sir.
2      Q.     Was it your cell phone that you
3 gave him?  Cell phone number?
4      A.     Yes, sir.
5      Q.     Do you have your cell phone here
6 with you?
7      A.     Yes, sir.
8      Q.     Okay.  Is it the same cell phone
9 that you had at the time that you gave Brother
10 Jose -- or that you communicated on a cell phone
11 with Brother Jose?
12      A.     Well, Brother Jose wasn't the
13 same guy that was from the June 3rd.
14      Q.     Correct.  I apologize.
15      A.     That's okay.
16      Q.     The man from June 3 --
17      A.     Yes.
18      Q.     -- that accompanied you and he
19 called you, the cell phone that you have now, is
20 that the same cell phone that he called you on?
21      A.     Yes, sir.
22      Q.     What's your cell phone number?
23      A.     484-769-0421.
24      Q.     Do you enter anybody's name into
25 your cell phone contacts?

1      A.     When I save it?
2      Q.     Yes.
3      A.     Yeah.  Like, I have names in my
4 contacts.  His name, I think I had it for a while
5 and then he moved away, and I kind of
6 just -- sometimes I'll just go through and clear
7 my contacts and then kind of start over.
8      Q.     Any reason for that?
9      A.     I just -- I don't know.
10 Sometimes I feel like if I'm meant to be speaking
11 to this person, they'll come back to me.
12      Q.     Do you know Matthew Wear?
13      A.     I'm aware of him.  Yes, sir.
14      Q.     Do you have his phone number?
15      A.     He sent me the video when I got
16 out of jail, and I had his number for a few
17 weeks, I want to say, but then I erased it.
18      Q.     Why don't you pull up your phone
19 and look for his number?
20      A.     All right.
21           (A short break was taken.)
22 BY MR. CONLEY:
23      Q.     With either Brother Jose or the
24 man who may be Josh that you met and you attended
25 the June 3, 2023 event with, did you ever plan

Plaintiff's App. 015

Page 54

1 with either of them attending specific events to
2 street preach?
3      A.     Brother Jose, I planned an event,
4 but he couldn't make it.  I didn't end up going
5 to that event anyway, but Josh, I'm not even sure
6 if that's his name.  Excuse me.  I just -- he
7 called me that morning and wanted to stay at my
8 house, so I said, I'm going here.  Do you want to
9 come with me?
10      Q.     You're referring to June 3, 2023?
11      A.     Yes.
12      Q.     Okay.  I'm going to stop saying
13 June 3, 2023, and I'm going to call it the
14 Reading pride rally.  Is that fair to you?
15      A.     Yes, sir.
16      Q.     Okay.  I'm going to go to that
17 event, the Reading pride rally.
18      A.     And there was -- I planned it
19 with the guy from the Lancaster Patriot who I
20 don't remember his name.  I went to the Lititz
21 pride festival with him.  That I planned with
22 him.
23      Q.     Is his name Dan?  Does that ring
24 a bell?
25      A.     I'm not sure.  I haven't talked

Page 55

1 to him in a while.
2      Q.     And he was with the Lancaster?
3      A.     Patriot.  Yes.  Yes, sir.  I
4 think I referred to his name in the video.
5      Q.     I believe you did as well.  I'll
6 get to that.  I'm going to show you that video
7 later.  I just don't want to jump around with you
8 too much.
9           Was that Lititz event that you
10 planned with this gentleman from the Lancaster
11 Patriot, was that before or after the Reading
12 pride event?
13      A.     It was after.
14      Q.     Do you know when it was?
15      A.     No, sir.
16      Q.     Was it within a month, within a
17 week, if you can estimate?
18      A.     I feel like it was a month after,
19 but it was a pride month thing, so I'm assuming,
20 you know, right about a month.
21      Q.     Okay.  So you're estimating.  You
22 don't know specifically?
23      A.     No.  No, sir.
24      Q.     Was it at least in the same year?
25      A.     Yes, sir.

Page 56

1      Q.     Did you end up going to that
2 Lititz event?
3      A.     Yes, sir.
4      Q.     And did the gentleman from the
5 Patriot come with you?
6      A.     Yes, sir.
7      Q.     Did he write an article about
8 that?
9      A.     I don't really follow the
10 Lancaster Patriot, so I'm not sure.
11      Q.     All right.  He didn't tell you
12 that he wrote an article?
13      A.     No, sir.
14      Q.     How are you doing?  Do you need a
15 break?
16      A.     No.
17      Q.     Did you have any plans on June 3,
18 2023 other than attending the Reading pride
19 event?
20      A.     Yes, sir.
21      Q.     What were your other plans?
22      A.     Street preaching.
23      Q.     Where were you going to go?
24      A.     I was going to go to start there,
25 and I actually evangelized to someone on my way

Page 57

1 there and then from there I was going to go to my
2 normal 5th and Penn Street.
3      Q.     Okay.  So your plan was to go to
4 the Reading pride event and then from there go to
5 the 5th Street location and kind of do your
6 rounds, like, up the street?
7      A.     Yep.
8      Q.     Okay.  And then on the way to the
9 pride event, you met some other individual?
10      A.     Yes.
11      Q.     And that was kind of off the
12 cuff?
13      A.     He was just sitting there, a
14 homeless man.  I told him about Lord Jesus, and
15 he ended up -- we were talking about sin, and he
16 ended up throwing his lighter and saying he
17 didn't want to do this no more, and that kind of
18 made me smile.  I gave him something to eat and
19 something to drink, and I told him if he needs
20 anything and he ever sees me, to let me know.
21      Q.     Did you give him your number or
22 anything?
23      A.     I'm not sure.  I thought I said
24 I'm around here if you ever see me because I see
25 the same people, you know, if you stay in the

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Plaintiff's App. 016

Page 58

1 same spot, and I told him if he ever sees me and
2 he needs anything, please let me know.
3      Q.   Okay.  When he threw away your
4 lighter --
5      A.   His lighter.
6      Q.   His lighter, did you interpret
7 that to mean anything to you?
8      A.   It just made me smile, you know,
9 'cause I don't know if he knew about who Jesus
10 was, but after we were having a good
11 conversation, and he was just like, I'm tired of
12 sinning and just threw his lighter.  And I was,
13 like, well, sir, you don't want to litter, you
14 know, but I'm appreciating what you're doing, but
15 he just -- I saw the passion in someone grow, and
16 that to me is just -- you know, I didn't expect
17 that.  It kind of threw me off.
18      Q.   Sure.  And I think I can
19 interpret what you're trying to say or what
20 you're saying, but why is throwing away the
21 lighter significant?  Why does that mean he
22 doesn't want to do something anymore?
23      A.   Well, because he's getting rid of
24 it.  He's taking the first step.  Most people dig
25 their heels in and say I'm not doing anything,

Page 59

1 but for him to throw his lighter told me that at
2 least he wants to do something about it.
3      Q.   Was there something sinful about
4 a lighter?
5      A.   Well, it's what he was using the
6 lighter for.
7      Q.   Okay.
8      A.   That's what -- I don't know, but
9 whatever he was telling me was not good.
10      Q.   So he didn't tell you
11 specifically what he was using it for?
12      A.   No.  He just said I'm tired of
13 sinning, and he threw his lighter, and that's
14 when I was like, well, sir, you might not want to
15 litter, but, you know, whatever is going on, I
16 can see that at least you're willing to talk
17 about it.
18      Q.   Did you believe it might have
19 been drugs or smoking cigarettes, something like
20 that?
21      A.   I thought it was a mixture.  I
22 didn't really, you know, get into that because
23 like I said earlier, I don't really -- I just
24 like to talk about sin in general, not a specific
25 person's sin because then I feel like that gets

Page 60

1 pushy.  So I was just letting him know of sin in
2 general, but I wasn't like, what are your sins,
3 you know, like trying to do that.
4      Q.   If somebody uses drugs, would you
5 consider that -- illegal drugs, would you
6 consider that a sin?
7      A.   Well, the Bible says that no
8 drunkard will inherit the Kingdom.  So if it's
9 making you intoxicated, I would like to talk to
10 you about it.
11      Q.   All right.  So marijuana use, is
12 that a sin?
13      A.   I would like to talk to you about
14 it.
15      Q.   Well, that's not my question.  Do
16 you consider it a sin?
17      A.   Yes, sir.
18      Q.   Okay.  Other illegal drug use,
19 would you consider that a sin?
20      A.   Yes, sir.
21      Q.   And if somebody stopped sinning,
22 would you forgive them?
23      A.   Well, I forgive them even in
24 their sin.  That doesn't stop me.  It just makes
25 me want to talk to you because we're all sinners.

Page 61

1 I struggle with sin every day.  My body wants to
2 do something that's contrary to what God wants me
3 to do.
4      Q.   You've sued the City of Reading,
5 Sergeant McClure, Chief Tornielli, Courtney
6 Dupree and Mayor Eddie Moran.  If you believe
7 that they had sinned, would you forgive them?
8      A.   Yes, sir.
9      Q.   If any of them made a mistake
10 that you would consider a mistake, would you
11 forgive them that mistake?
12      A.   Yes, sir.
13      Q.   So when you left that morning, I
14 assume it was the morning.  You left in the
15 morning on June 3, correct?
16      A.   Yes, sir.
17      Q.   When you left that morning and
18 you started on your day's events, did you tell
19 somebody that your goal was to spark a
20 confrontation at the pride event?
21      A.   No, sir.
22      Q.   If somebody had said that, would
23 they be incorrect?
24      A.   Yes, sir.
25      Q.   Did you first go to West Reading?

16 (Pages 58 - 61)

Page 62

1 I know you might not understand where
2 specifically that is. Did you go to another
3 municipality before going to the pride event to
4 protest or street preach?
5       A.    Yes, sir.
6       Q.    Where did you go?
7       A.    At the flag raising prior to June
8 3rd?
9       Q.    No. I mean, on June 3rd
10 specifically?
11      A.    No. I went straight to that
12 building.
13      Q.    Okay. From your current address
14 on 4th Street in Reading?
15      A.    Yes, sir.
16      Q.    How did you hear about the flag
17 raising ceremony on June 3, 2023?
18      A.    Online.
19      Q.    Did you stumble across it or were
20 you looking for it?
21      A.    I looked it up.
22      Q.    Why did you look it up?
23      A.    Because I wanted to let people
24 know that they can be born again.
25      Q.    Have you looked up other pride

Page 63

1 events?
2       A.    Just the two.
3       Q.    The two that you --
4       A.    That I attended. Yep.
5       Q.    So that one and the other one
6 that we're not quite sure about the date?
7       A.    Uh-huh.
8       Q.    I guess also the Lititz one?
9       A.    I didn't look that up. When I
10 got -- when the Lancaster Patriot interviewed me,
11 I started talking to the owner of that, and he
12 said, we're going to this event. Would you like
13 to come with us? And I said yes.
14      Q.    Understood. So aside from the
15 one prior to the Reading pride event and the
16 Lititz event, did you attend any other pride
17 events in 2023?
18      A.    No, sir.
19      Q.    So it would be a total of three,
20 two of which you looked up?
21      A.    Yes, sir.
22      Q.    What did you -- what search terms
23 did you use to look it up?
24      A.    Reading pride month, I believe.
25      Q.    Had you heard that there was a

Page 64

1 Reading pride month that would give you the
2 impulse to look that up?
3       A.    No. The young man gave me the
4 impulse to look it up.
5       Q.    Which young man is that?
6       A.    Remember the young man I was
7 talking to when I saw his face change, that's
8 who -- I didn't even -- I wasn't even aware of it
9 until I spoke with him. That made me want to go
10 tell other people.
11      Q.    Were you aware that other people
12 would be attending the Reading pride event to
13 protest it?
14      A.    No, sir.
15      Q.    When you arrived at the Reading
16 pride event, can you tell me what you saw?
17      A.    I saw an officer.
18      Q.    Okay. I'm asking --
19      A.    That's basically -- it's like it
20 almost went foggy. I didn't even see the
21 gentlemen that were on the sidewalk. As soon as
22 I came up, the only thing I saw was this
23 gentleman in front of me. I wasn't aware that I
24 was being recorded. I wasn't aware that there
25 were other people standing there.

Page 65

1       Q.    Go ahead. I'm sorry.
2       A.    The only thing I saw, it was
3 almost like it was like that. I just saw this
4 officer coming up to me as soon as I got there.
5       Q.    And when you say "like that,"
6 you're taking your hands, and you're kind of
7 placing them by the side of your head and moving
8 them forward?
9       A.    Yes. Yeah.
10      Q.    Are you trying to describe tunnel
11 vision?
12      A.    Like, that's what it seemed like.
13 I didn't -- I didn't see anything else but that
14 officer. Yeah.
15      Q.    Before you saw the officer, did
16 you happen to see the people that were
17 celebrating the pride event?
18      A.    I mean, I think I remember seeing
19 the one guy with the sign step out, but even
20 then, I was nervous walking up to that. I even
21 told that gentleman I was with that I just -- I
22 felt really nervous, almost like I had to shake
23 my hands.
24      Q.    Why would you feel nervous
25 walking up --

17 (Pages 62 - 65)

1      A.    I don't know because -- I don't
2 know.  That never happened to me before.
3      Q.    Okay.  Wait for my question.
4      A.    I'm sorry.
5      Q.    Why would you feel nervous
6 walking up to a pride event that you intend to
7 street preach at?
8      A.    I don't know.  I never felt that
9 way before.  I didn't feel that way when I went
10 to the flag raising event.  I just -- I felt like
11 I needed to shake my arms and then when I walked
12 up, all I saw was the officer.
13      Q.    What did you have with you on
14 that day when you arrived at the pride event?
15      A.    I had my bag.  I had a sign.  I
16 had a Bible.  I had gospel tracts.  I had my
17 phone.  I don't remember if I had my wallet with
18 my license and Social Security card in it.  I had
19 snacks and drinks in case anyone is hungry or
20 thirsty, and in that bag I had the guy, the
21 gentleman I was with, his belongings, too.
22      Q.    Why were his belongings in your
23 bag?
24      A.    Because he had a few phones,
25 which I wasn't sure why, and he had -- because

1 him and his girlfriend were splitting up, so he
2 was coming to my house after we got done street
3 preaching.  So I said, do you want to put your
4 stuff in my bag?  And he said, yeah.
5      Q.    You let him stay at your house,
6 but you didn't know his name?
7      A.    I knew his name at the time.
8      Q.    But you forget it now?
9      A.    Yeah.  Now.  And I noticed after
10 I broke my neck and I had a concussion, sometimes
11 my memory is -- like, it's spotty, it seems like,
12 because I was diagnosed with a concussion.  And
13 after that accident I noticed that sometimes my
14 memory, I just draw, like, a blank.  And I'm
15 severely scared of not telling the truth, so that
16 prevents me from just saying whatever.  So when
17 we were together, I knew his name.
18      Q.    Why are you severely afraid of
19 not telling the truth?
20      A.    I don't know.  Since I started
21 reading the Bible, I just don't want to misspeak.
22 I don't want to say something that isn't the
23 truth because I'm going to have to answer for it.
24      Q.    So that's something that
25 developed after the injury?

1      A.    Yes.  Because before that it
2 never crossed my mind.
3      Q.    I'm sorry.  Go ahead.
4      A.    I would even say I had a problem
5 with lying.
6      Q.    These episodes or these events,
7 these times when you have memory lapses, how
8 often do these occur?
9      A.    Well, I feel like the longer time
10 goes by, the more it happens.  Like, if it's
11 within a couple days or that, then I'm okay with
12 it, but it seems like it's up and down.  It's hit
13 or miss.  Sometimes I can remember things that
14 happened to me when I was six years old.  Other
15 times I can't remember a guy's name I was just
16 standing next to.
17      Q.    And it's worse now than before
18 the accident?
19      A.    I didn't notice it before, my
20 memory.  I thought it was pretty strong.  Like, I
21 could remember songs word for word, sports, teams
22 names, numbers, and after that happened, I
23 noticed it wasn't the same.  I couldn't remember
24 music like I used to.  I don't listen to music
25 anymore, but when I did, and it just seems like

1 it's spotty.  Sometimes I can remember, and
2 sometimes I can't.  And the doctor said that
3 could be because you've had a concussion.
4      Q.    That was my next question.  When
5 did you see a doctor about the memory issues?
6      A.    During the whole neck thing.  I
7 went to physical therapy.  They evaluated me.
8 They found that I have an aortic valve issue, and
9 he said, you know, if you had a concussion, this
10 could be, you know, a direct cause of it.
11      Q.    The aortic valve?
12      A.    No.  The memory.
13      Q.    Do you remember the name of that
14 doctor that told you that?
15      A.    No, sir.
16      Q.    Does the memory issue affect your
17 recollection of the events on June 3, 2023?
18      A.    No.  No, sir.  Mainly because
19 there's a video.
20      Q.    Does the video help refresh your
21 recollection?  And let me explain that.  Did it
22 help you fill in gaps in your memory by viewing
23 the video?
24      A.    Well, yeah.  Like, for example, I
25 don't remember exactly what I said to the

Plaintiff's App. 019

1 officer, but through the video I can kind of tell
2 a little of it, but outside of other things in
3 the video, it's foggy to me.
4     Q.   Would you agree with me that it's
5 hard to tell exactly what you said on the video
6 of the event?
7     A.   Yes, sir.
8     Q.   When you arrived at the Reading
9 pride event, you stood on one side of the street.
10 Do you recall that?
11     A.   Yes, sir.
12     Q.   Did you choose that side of the
13 street for a reason?
14     A.   It's the side I was walking on.
15     Q.   Okay.  It just happened to be the
16 side that you were walking on?
17     A.   Yes.
18     Q.   Did you know that when you
19 arrived that you stood next to other individuals
20 that were there to protest the Reading pride
21 event?
22     A.   Protest, I don't.  Preach maybe
23 is how I feel because I wasn't there to protest,
24 and I hope that they weren't there to protest
25 either, but I was aware that there were people on

1 the sidewalk.
2     Q.   Okay.
3     A.   But like I said, it kind of went
4 from -- to this.
5     Q.   And we'll get to that.  I want to
6 ask you if you spoke to any of those individuals
7 that were there, in your words, to preach, did
8 you speak to any of those people?
9     A.   No, sir.
10     Q.   How did you know that they were
11 there to preach then?
12     A.   Well, I didn't.
13     Q.   Did you assume?
14     A.   No.  I just -- I walked up.  I
15 was going to get to that eventually, I thought,
16 but I just thought they were together because I
17 saw the one guy step with his sign and face me.
18 So I just assumed that they were there to preach,
19 but I didn't have any contact with them because
20 you can see in the video he approached me as soon
21 as I...
22     Q.   So you mentioned a guy with a
23 sign.  Did you get a chance to read the sign?
24     A.   No, sir.
25     Q.   Not at the time?

1     A.   No, sir.
2     Q.   All right.  So your
3 understanding -- correct me if I'm wrong.  I may
4 be wrong, but your understanding that those other
5 people were there to preach, was that based upon
6 information that you learned after the incident?
7     A.   Well, yeah.  At the time I wasn't
8 really sure.  I didn't know why.  Obviously, if I
9 see someone with a sign step out and face me,
10 he's probably there to preach, but my -- what I
11 was thinking is I was going to get to figure out
12 what they're doing, but I didn't know any of
13 them.  I didn't know they were going to be there.
14 So I would have found out if they weren't there
15 to preach as soon as I started, they would have
16 probably let me know that they're not there to do
17 that.
18     Q.   Do you recognize the gentleman to
19 my left here?
20     A.   Yes, sir.
21     Q.   Okay.  Do you know who that is?
22     A.   Officer McClure, I think his name
23 is.
24     Q.   Sergeant McClure?
25     A.   Yeah.  Sergeant.

1     Q.   I'm just asking if you recognize
2 him visually from looking at him?
3     A.   Yes.
4     Q.   Is that the individual that you
5 said approached you?
6     A.   Yes, sir.
7     Q.   Okay.  Before he approached you,
8 did you say anything?
9     A.   No, sir.
10     Q.   You didn't say anything?
11     A.   No, sir.
12     Q.   You didn't yell anything across
13 the street?
14     A.   No, sir.
15     Q.   Totally mute.  No words
16 whatsoever?
17     A.   Well, it happened so quick.  When
18 I walked up, me and him started talking, so I
19 didn't say anything before he approached me.  As
20 soon as I got to the edge of that street, we
21 started talking.  That's when we started going
22 back and forth.
23     Q.   Tell me about your recollection
24 of that conversation with Sergeant McClure.
25     A.   I just -- I remember feeling,

Plaintiff's App. 020

Page 74

1 like, aggression. Like, it was aggressive
2 towards me. Either someone before me was
3 ignorant or aggressive, but I just showed up
4 there. So it just, like, went -- like, zoomed
5 in, and I just remember him -- I thought he said
6 that he didn't care about my beliefs or why I was
7 there.
8        So in the video I can see when I
9 say, sir, you don't have to say you don't care.
10 And then I remember him saying respect them, and
11 that's when I said, oh, I'm respecting them. Oh,
12 no. After I said you don't have to say you don't
13 care, I said, you know who cares? God cares.
14        That's when -- and then that's
15 when he said, respect them. And I said, oh, I'm
16 respecting them. And then we had a
17 back-and-forth and then I said yo across the
18 street to someone that was pointing at me and
19 pointing to their sign and then I said God is
20 not, and I was met with him.
21    Q.    When you say you were met with
22 him --
23    A.    Well, he came up to me.
24    Q.    Is that when he placed you under
25 arrest?

Page 75

1    A.    Yes, sir.
2    Q.    Did Sergeant McClure give you any
3 instructions or directions in your conversation
4 with him prior to him placing you in physical
5 custody?
6    A.    No, sir. If he did, I just
7 remember I felt like I had a right to be there
8 and that I had a right to stand on that street
9 and preach, but he didn't tell me -- he didn't
10 give me any orders that I'm aware of.
11    Q.    You don't remember any
12 instructions or orders?
13    A.    I don't remember him giving me
14 orders to do anything.
15    Q.    Did he give you any orders not to
16 do anything?
17    A.    No, sir. Well, now that -- I
18 think I remember him saying, you know, let them
19 have their day, but I'm not sure if that's an
20 order or, like, a command.
21    Q.    So you remember him saying
22 something about let them have their day?
23    A.    Yeah.
24    Q.    Do you remember anything else
25 that he might have said?

Page 76

1    A.    No.
2    Q.    Okay. You said that you felt
3 like somebody before you may have been
4 aggressive. Did you get that impression at the
5 time that you were there?
6    A.    No.
7        MR. READY: Object to form. I
8 don't think that's a characterization of
9 what he said.
10    Q.    I may be wrong in exactly what
11 you said, but you said something about somebody
12 before you had felt a certain way. Do you recall
13 that?
14    A.    No. I said that he was -- I felt
15 aggression from the officer, so I'm not sure what
16 took place before I got there, but when I -- when
17 he approached me, I felt aggressive --
18 aggression.
19    Q.    You felt aggression?
20    A.    Yeah. Like, it wasn't welcoming.
21 Like, come on, let's talk this out. You know,
22 you're not -- you can't do this, this and this
23 today. It just seemed like it was aggressive as
24 soon as I started talking to him.
25    Q.    What did you mean then by saying

Page 77

1 that somebody before you might have done
2 something?
3    A.    Well, because after I watched the
4 video, that's when I heard Matt say that he
5 encountered him. So I felt like maybe that was
6 the reason after looking back on it, but at the
7 time I had no clue what was going on.
8    Q.    And that's what I'm trying to get
9 at.
10    A.    Yeah.
11    Q.    At the time you didn't have any
12 inkling that there might have been some prior --
13    A.    No.
14    Q.    Again, just wait. You didn't
15 have any inkling that there might have been
16 something that happened before you arrived?
17    A.    No, sir.
18    Q.    Okay. And then subsequently you
19 viewed the video?
20    A.    Yes, sir.
21    Q.    And you viewed a video -- which
22 video was it that you viewed?
23    A.    It was the video posted to
24 YouTube.
25    Q.    The one posted by Matthew Wear?

20 (Pages 74 - 77)

Page 78

1     A.     Yes.  And he sent me a video of
2 it, too.
3     Q.     How did he send you a video?
4     A.     By my phone number.
5     Q.     Did he text it to you?
6     A.     Yes.  He texted, and I didn't
7 even know he had my number.
8     Q.     Well, according to Matt Wear, and
9 that's who we referred to as Brother Matt.
10 That's the same person?
11     A.     Yes.
12     Q.     And do you also understand that
13 his YouTube page is Barely Preacher Man?
14     A.     Yes, sir.
15     Q.     All the same person?
16     A.     Yes, sir.
17     Q.     All right.  According to him, he
18 met you a year prior to the event or
19 approximately a year prior to the event.  Does
20 that sound about right?
21     A.     Yes, sir.
22     Q.     What are the circumstances of
23 your -- how you met Matt Wear?
24     A.     I was preaching, street
25 preaching, and this guy comes out of nowhere and

Page 79

1 says, do you mind if I get on the mic and preach
2 for a couple minutes, and that's my first time
3 ever meeting him, and I said, yeah.  Sure.
4         And then when he left, I said,
5 well, take down my number, and if me and you ever
6 want to get together and street preach together,
7 then call me, but I never heard from him nor
8 contacted him myself because I didn't have his
9 number.  I gave him my number.  The first time
10 I'm aware of him using my number was to use it to
11 send the video he took which I was unaware of
12 that he took at the time.
13     Q.     Okay.  When you showed up, you
14 didn't see Matt Wear?
15     A.     No, sir.
16     Q.     And between the time that you had
17 met him and he asked to use your mic and the
18 Reading pride event in June 2023, did you see him
19 at any other events?
20     A.     Not that I recall.  No.  I think
21 I would have remembered, but no.  I didn't see
22 him.  I didn't even know it was him that was
23 standing there because it was a year before the
24 last time I saw him, so I don't really remember.
25 Yeah.

Page 80

1     Q.     Okay.
2     A.     But I saw him after that.  He
3 met -- he came to where me and Jose was at after
4 that happened and made a little video, I think,
5 for his YouTube channel.
6     Q.     What do you mean?
7     A.     After June 3rd he came to Queen
8 City where me and Brother Jose was and got out
9 and preached for a little bit, but I didn't
10 invite him or did I talk to him about it.  He
11 just showed up.
12     Q.     Okay.  Other than the cell
13 phone -- or the YouTube video that was posted by
14 Matt Wear on June 3, 2023 that showed the Reading
15 pride event, have you seen any other YouTube
16 videos of Matt Wear?
17     A.     Well, after that I watched a few
18 on his channel, so yes, sir.
19     Q.     Did you see another video where
20 he talked about your event -- or the event on
21 June 3, 2023?
22     A.     Yes, sir.
23     Q.     Was that the one where he was
24 kind of standing against a brick wall, and it
25 started to get darker?

Page 81

1     A.     Yes, sir.
2     Q.     Were you present with Matt Wear
3 when he made that video?
4     A.     No, sir.
5     Q.     According to Matt Wear in that
6 video that I was referencing where the sun goes
7 down, he's against a brick wall, Matt Wear
8 indicated that you knew that the pride event was
9 happening and came out purposefully.  You used
10 the word "purposefully."
11     A.     Well, like I said, I looked it
12 up, so I knew of it, but my purpose was to street
13 preach.  And like I told you, I was going to make
14 my -- you know, do my walk up and down the
15 street.  I was starting there first, but I looked
16 it up because of the young gentleman I had an
17 encounter with who encouraged me to look it up.
18     Q.     You had mentioned a microphone
19 and an amplifier or something of that nature?
20     A.     Yeah.
21     Q.     What's the purpose of that?  Do
22 you speak into the microphone and the amplifier
23 raises the volume of your voice?
24     A.     Yeah.  Like, I have a pretty loud
25 voice to begin with, so -- and to go back a

21 (Pages 78 - 81)

Page 82

1 little earlier, I did -- a police officer told me
2 I couldn't use my amplification on 5th and Penn
3 one time, and I turned it off, so I wasn't sure
4 if I misspoke on a question that you asked me. I
5 thought maybe you asked me if I've ever had an
6 encounter with them again, but yeah.
7        So I was on -- it goes around my
8 ears, and it comes -- you know, it's, like, right
9 here, and it just projects my voice. One time in
10 Reading, a Reading police officer said you can't
11 use amplification here. I took it off. And the
12 guy across the street said, I hear you louder and
13 clearer than you did when you were wearing it.
14 So I just have, like, you know, a loud voice, but
15 the purpose is to try to reach people.
16    Q.    Do you know that you raised a
17 claim against Sergeant McClure for assault and
18 battery?
19    A.    No, sir.
20    Q.    You're not aware of that?
21    A.    No, sir.
22    Q.    Do you think he assaulted you?
23        MR. READY: I'm going to object
24    to the form. Just calling for a legal
25    conclusion. You can answer.

Page 83

1    A.    No, sir.
2    Q.    Same question, probably --
3    A.    I feel like he assaulted my
4 rights.
5    Q.    I'm talking about physically?
6    A.    Yeah. Physically, yes, sir.
7    Q.    You think he physically assaulted
8 you?
9    A.    Yes, sir.
10    Q.    How so?
11    A.    Just his approach.
12    Q.    What does that mean?
13    A.    The way he threw me around and
14 the way he put the cuffs on extremely tight. The
15 way he threw my bag on the ground.
16    Q.    Do you think he assaulted you by
17 throwing your bag on the ground?
18    A.    Well, I feel like he was
19 aggressive.
20    Q.    Did he strike you?
21    A.    No, sir.
22    Q.    And you claim that he was
23 throwing you around?
24    A.    He threw me around.
25    Q.    How did he throw you around?

Page 84

1 What exactly happened?
2    A.    Did you see the video?
3    Q.    I'm asking you to describe how he
4 threw you around?
5    A.    When I said God again, he spun me
6 around and pushed me up against the wall.
7    Q.    Did it hurt when he pushed you up
8 against the wall?
9    A.    No, sir.
10    Q.    He didn't do it with excessive
11 force?
12    A.    No, sir.
13    Q.    Were you injured as a result of
14 that?
15    A.    No, sir.
16    Q.    Were your wrists injured as a
17 result of the handcuffs?
18    A.    No, sir.
19    Q.    Did you tell anybody that the
20 handcuffs were too tight?
21    A.    Yes, sir.
22    Q.    Did they loosen them?
23    A.    No, sir.
24    Q.    Nobody loosened them?
25    A.    At the prison they did. At the

Page 85

1 jail they did.
2    Q.    A female officer didn't loosen
3 the handcuffs when you were sitting on the curb?
4    A.    I don't recall.
5    Q.    Okay. After you were placed in
6 handcuffs, you were -- is it true that you were
7 led kind of around the corner of City Hall?
8    A.    Yes, sir.
9    Q.    And you were sat down?
10    A.    Yes, sir.
11    Q.    And at that point the officers
12 questioned you, and they went through your bag?
13    A.    Yes, sir.
14    Q.    Okay. Do you remember speaking
15 to Officer Courtney Dupree?
16    A.    Yes, sir.
17    Q.    Do you remember admitting to
18 you -- or do you remember admitting to her that
19 you were lifting your voice at the Reading pride
20 event?
21    A.    No, sir.
22    Q.    You didn't say that?
23    A.    I don't recall.
24    Q.    Do you recall saying that you
25 weren't yelling at people?

22 (Pages 82 - 85)

Plaintiff's App. 023

1    A.    Yes, sir.
2    Q.    I'm trying to understand what
3 that means, not yelling at people.  Were you
4 yelling?
5    A.    No, sir.
6    Q.    You don't believe you were
7 yelling?
8    A.    I wasn't yelling.
9    Q.    And you mentioned earlier that
10 you have a loud voice and how one gentleman heard
11 you even better without the amplification system.
12 Is it your belief that you have just a loud
13 voice?
14    A.    I have a loud speaking voice.
15 Yeah.  I feel like my voice is loud even now.
16    Q.    I don't think it's loud even now,
17 but what I think doesn't matter.
18    A.    But I notice there's a level
19 between yelling and me speaking normally, and I
20 don't feel like I was at that yelling level.
21    Q.    When you were at the pride event?
22    A.    Pride event, yes, sir.
23    Q.    So you were saying something?
24    A.    Yes, sir.
25    Q.    Approximately how long were you

1 detained on the street before -- let me go back.
2          After you were handcuffed and you
3 were taken around the corner, you were sat down,
4 did eventually vehicle transport arrive?
5    A.    Yes, sir.
6    Q.    And you were transported
7 somewhere?
8    A.    Yes, sir.
9    Q.    Where did you go?
10    A.    I'm not sure.  It went in, like,
11 a tunnel.
12    Q.    Did you go to get processed?
13    A.    Yes, sir.
14    Q.    All right.  How long -- were you
15 eventually released?
16    A.    Yes, sir.
17    Q.    And how long did it take for you
18 to be released?
19    A.    A couple hours.  It wasn't long.
20 They served lunch while I was there, so I want to
21 say a couple hours.
22    Q.    Were you in a cell?
23    A.    Yes, sir.
24    Q.    And did they serve you lunch?
25    A.    Just lunch and dinner.

1    Q.    Did you get some?
2    A.    I didn't eat.  No.
3    Q.    Did you refuse it or --
4    A.    No.  I just didn't want it.
5    Q.    What did you do that day after
6 you were released?
7    A.    I went home.
8    Q.    Was all your property returned to
9 you?
10    A.    It was given to the guy I was
11 with.
12    Q.    It was?
13    A.    Yes, sir.
14    Q.    Did he give it back to you?
15    A.    Yes, sir.
16    Q.    Was any of your property missing?
17    A.    No, sir.
18    Q.    On what charges were you brought
19 in to the police station?
20    A.    Disorderly conduct with engaging
21 fighting, I believe it was.
22    Q.    Do you understand what that
23 means?  Do you know what that means?
24    A.    Disorderly conduct I kind of
25 understand.  Engage in fighting, I thought it was

1 because it might look like I was trying to swing
2 my elbow at him, but he actually stepped on my
3 foot which caused me to, like, stumble, and I was
4 in no way trying to resist.
5    Q.    Do you think he intentionally
6 stepped on your foot?
7    A.    No, sir.
8    Q.    He was just -- your feet got
9 tangled?
10    A.    Tangled up together.
11    Q.    When you said you were being
12 thrown around, might you misinterpret that
13 tangling of the feet as him throwing you around?
14    A.    Well, no.  He threw me around.
15    Q.    Aside from your feet getting
16 tangled, he threw you around?
17    A.    Yes, sir.
18    Q.    Bear with me a second.
19    A.    Take your time.
20    Q.    Mr. Atkins, I'm going to show you
21 a document that was actually produced by your
22 counsel in discovery, so a copy of what's been
23 marked as Atkins 1-3.
24        MR. CONLEY:  I'll just have this
25        marked as Atkins-2.

Plaintiff's App. 024

1          (A document was marked for
2      identification as Atkins Exhibit No. 2.)
3 BY MR. CONLEY:
4      Q.    On this document that I have
5 marked as Atkins-2, do you recognize this
6 document?
7      A.    Yes, sir.
8      Q.    Can you tell me what it is?
9      A.    It's the police report.
10      Q.    Well, it says police criminal
11 complaint up here.
12      A.    Okay.
13      Q.    Does that change your
14 recollection of what it is?
15      A.    No.  I thought they handed me
16 this when I left the station.
17      Q.    All right.  I'll ask you that.
18 So you received this document when you left the
19 police station?
20      A.    Yes, sir.
21      Q.    Okay.  Did you receive anything
22 else from the police department or in the mail
23 about this incident?
24      A.    Yes, sir.
25      Q.    What did you receive?

1      A.    Them saying that the charges have
2 been dropped.
3      Q.    Okay.  Was that in the form of a
4 letter?
5      A.    Yes, sir.
6      Q.    On this police criminal
7 complaint, Atkins-2, I'm actually going to ask
8 you to turn to the next page.  At the bottom
9 there's some Bates numbers.  See where it says
10 Atkins, a bunch of zeroes and number two at the
11 bottom?
12      A.    Yes, sir.
13      Q.    Okay.  I want you to look at that
14 page, and do you see where it says PACC 503(A)(1)
15 disorderly conduct?
16      A.    Yes, sir.
17      Q.    Under that, would you mind
18 reading that paragraph?
19      A.    Out loud?
20      Q.    Yes, please.
21      A.    In that on or about said date,
22 the defendant, with intent to cause substantial
23 public inconvenience, annoyance or alarm or
24 recklessly creating a risk thereof, he engages in
25 fighting or threatening or in violent or

1 tumultuous behavior.  The defendant, despite
2 being warned by police just moments prior, yelled
3 derogatory comments at an organization that was
4 holding a permitted event in violation of Section
5 5503(A)(1) of the PA Crimes Code.
6      Q.    Thank you.  I'm going to direct
7 your attention to where it says on the second
8 line there "or recklessly creating a risk
9 thereof, he engages in."  Do you see that
10 portion?
11      A.    Yes.
12      Q.    Do you see where it says "engages
13 in fighting or threatening or in violent or
14 tumultuous behavior"?
15      A.    Yes, sir.
16      Q.    So when you testified earlier
17 that you had been engaging in fighting --
18          MR. READY:  Object to form.
19      Q.    -- does this change your
20 understanding of what you might have been charged
21 for?
22      A.    No.  No, sir.
23      Q.    Is it possible that you might
24 have been charged for not engaging in fighting
25 but engaging in threatening or in violent or

1 tumultuous behavior?
2      A.    No, sir.
3      Q.    That's not possible or is that
4 not your understanding?
5      A.    I wasn't doing that.
6      Q.    I'm not asking you that.  I'm
7 asking you what you were charged for.  If you
8 don't know, that's fine.
9      A.    I don't know.
10      Q.    Okay.  Were you aware that other
11 individuals outside of the Reading pride event
12 were holding signs?
13      A.    Yes, sir.
14      Q.    And I should clarify.
15 Individuals that were unassociated with the pride
16 event but were standing on the opposite side of
17 the street like you were?
18      A.    Yes, sir.
19      Q.    All right.  And they were holding
20 signs.  Do you know if any of them were arrested?
21      A.    No, sir.
22      Q.    Do you know why they weren't
23 arrested?
24      A.    No, sir.
25      Q.    Did you ignore or violate any

Page 94

1 directives from Sergeant McClure?
2     A.   No, sir.
3     Q.   You mentioned the video where you
4 were interviewed by CBN News.  Do you remember
5 that?
6     A.   Yes, sir.
7     Q.   How did you -- how did you come
8 in contact -- or how did that come about?  Did
9 someone ask you to do an interview?
10    A.   I'm not sure.  I think it might
11 have came from Matt who put me in touch with the
12 owner of the Lancaster Patriot who then said CBN
13 was trying to reach out to me, but WZM 69 News
14 knocked on my door.  That's how I interviewed
15 with them, but I don't really recall how I got in
16 touch with CBN.
17    Q.   Okay.  So let me back up a little
18 bit.  Did you do some interviews with news
19 organizations after the event?
20    A.   Yes, sir.
21    Q.   Did you do those voluntarily?
22    A.   Yes, sir.
23    Q.   Did anybody make you do those
24 interviews?
25    A.   No, sir.

Page 95

1     Q.   You could have refused the
2 interviews?
3     A.   Yes, sir.
4     Q.   And all of them you did
5 voluntarily?
6     A.   Yes, sir.
7     Q.   How many did you do?
8     A.   Two.
9     Q.   One of them was with WFMZ?
10    A.   Yes, sir.
11    Q.   Was an article released in
12 relation to the interview that you did with WFMZ?
13    A.   Not that I'm aware of.  I thought
14 it was just a news video.
15    Q.   Okay.  I'm going to show you a
16 document that's been produced as Atkins 78.  I'm
17 going to ask you to look at it.  I may put it in
18 evidence.  I may not.  Do you recognize this
19 document?  You can take a look at it.
20    A.   I recognize this.  Yes.
21    Q.   Have you seen this document
22 before or did you see this posted on the internet
23 somewhere before?
24    A.   I thought it was under or above
25 the video from 69 News, but I'm not sure.

Page 96

1     Q.   Okay.
2     A.   Because I felt like I was getting
3 a lot of stuff at once.  Like, people were
4 sending me stuff, and I just remember seeing
5 this, but I thought it was above or below the
6 video.
7     Q.   So 69 News, is that different
8 than CBN news?
9     A.   Yes, sir.
10    Q.   There was a video of an interview
11 with you.  Is that what you're saying?
12    A.   69 News used a video when they
13 came to my house.  He shot an interview video
14 with me, and that's what I thought -- I think I
15 remember someone sending me that video, and this
16 was above or below it, but once again, I'm
17 not -- I don't want to misspeak.  I'm not sure.
18    Q.   Do you know if that video was
19 ever aired on TV or the internet?
20    A.   I think it was on their online
21 internet, yeah, but I don't even think people
22 watch TV anymore, it seems like, so I'm not sure.
23    Q.   Was it on YouTube?
24    A.   Yeah.  It was online, I think.
25 Yeah.

Page 97

1     Q.   And you think that this document
2 was attached as, like, a hyperlink or something
3 that you could click on?
4     A.   Yeah.  Like, I thought I remember
5 reading this.  Like I said, there was so much
6 stuff people were sending me.  This was above or
7 below the video that I watched from 69 News.
8     Q.   Okay.
9          MR. CONLEY:  For the record and
10         clarity, I will have marked, the
11         discussion concerning Atkins -- what's
12         Bates-numbered as Atkins 7 through 8 I'll
13         have marked as Atkins-3.
14             (A document was marked for
15         identification as Atkins Exhibit No. 3.)
16             (A short break was taken.)
17 BY MR. CONLEY:
18    Q.   I was going to ask you about the
19 video that Matt Wear sent to you.  After he sent
20 it to you, are you aware that video was
21 posted to YouTube?
22    A.   Yes, sir.
23    Q.   Do you know who posted it to
24 YouTube?
25    A.   He posted it.

25 (Pages 94 - 97)

Plaintiff's App. 026

Page 98

1      Q.    Did you object to him -- let me
2  back up.
3            Did he tell you that he was going
4  to post it to YouTube?
5      A.    No, sir.
6      Q.    Did you tell him don't post that
7  to YouTube?
8      A.    No, sir.  I wasn't thrilled.
9      Q.    You weren't thrilled?
10     A.    No.
11     Q.    Why not?
12     A.    It's his video.  I don't know.  I
13  just -- I wasn't there to make a video.  That
14  wasn't my intent, so I just was hesitant.  He
15  didn't even ask me, but it's his video.
16     Q.    Okay.  Why wouldn't you -- was
17  there some reason that you didn't want it to be
18  posted online?
19     A.    Because I wasn't there to make a
20  video, so it just kind of caught me off guard.
21     Q.    Okay.
22     A.    It's something personal that
23  happened.  Maybe I just felt like we should have
24  talked about it first.
25     Q.    If you had talked about it, would

Page 99

1  you have agreed to post the video?
2      A.    I probably would have asked him
3  not to do it.
4      Q.    Why?
5      A.    I just feel like because I wasn't
6  there to make a video.
7      Q.    I understand that.  I understand
8  your intent was not to make a video.  I'm trying
9  to understand why you didn't want it posted?
10     A.    That's the reason why.
11     Q.    Just because you didn't want
12  it -- you weren't there for that intention?
13     A.    No.  I wasn't there to make a
14  YouTube video and then a YouTube video was made,
15  so I just would have maybe -- if we talked about
16  it, I probably would have asked him not to post
17  it.
18     Q.    Do you think he had a right to
19  videotape the events there?
20     A.    Yes.  Yes, sir.
21     Q.    You sued the defendants for
22  defamation and publicity of a private event.  Do
23  you know about that?
24     A.    Yes, sir.
25     Q.    And the raising -- what was the

Page 100

1  rationale for raising those complaints against
2  the city and the other defendants?
3            MR. READY:  Object to form, but
4      you can answer.
5      Q.    Do you understand?
6      A.    No, sir.
7      Q.    Why did you raise those
8  complaints?
9      A.    Why do I feel like defamation of
10  character?
11     Q.    Why did you raise the complaints
12  against the city for defamation and publicity --
13     A.    Because they said something that
14  was untrue.
15     Q.    Hold on.  Again, let me go back.
16     A.    I'm sorry.
17     Q.    Why did you raise the complaints
18  for defamation and publicity of a private event?
19     A.    Because they said things that
20  were untrue.
21     Q.    What was untrue?
22     A.    I saw an article where the cops
23  said I was there for an hour prior to the video
24  and there's more to this story, and it made feel
25  like that wasn't true.

Page 101

1      Q.    Did the police post that article?
2      A.    Yes.  On Fox News.
3      Q.    The police posted it?
4      A.    Yes.
5      Q.    They told Fox News to post the
6  article?
7      A.    It was posted to Fox News.  It's
8  the screenshot I have.
9      Q.    I understand, but Fox News posted
10  it, right?
11     A.    It says that that an officer told
12  Fox News, so yeah.  Fox News posted it.
13     Q.    So you're not saying that the
14  police published something online?
15            MR. READY:  Object to form.  You
16      can answer.
17     Q.    Is that something -- go ahead.
18     A.    I felt like they weren't telling
19  the truth.
20     Q.    You thought that it wasn't true
21  that you were there for over an hour?
22     A.    I wasn't there for over an hour.
23     Q.    Okay.  How was that harmful to
24  you?
25     A.    Well, because it makes me look

26 (Pages 98 - 101)

Plaintiff's App. 027

1 like I'm lying, and I told you earlier I have a
2 fear of not telling the truth.
3     Q.   How does it make you look like
4 you're lying if there's no counterreference to
5 you saying that you were there for a short amount
6 of time?
7     A.    Because I went on CBN and said
8 that I just got there and then they released
9 something that said I didn't just get there.  I
10 was there for an hour before Matt started
11 filming, and that made me feel like they were
12 trying to make it look like I'm lying.
13     Q.    Did somebody compel you to go on
14 CBN News?
15     A.    No.  He called me and asked me,
16 and I said yes.
17     Q.    And you agreed?
18     A.    Yes, sir.
19     Q.    Okay.  The other articles that
20 were released in this case, and you produced a
21 bunch of them in discovery, were any of them
22 published by the police department or the City of
23 Reading or any of the defendants in this case?
24         MR. READY: Object to form.  You
25     can answer.

1     A.    No.  I'm not understanding the
2 question.
3     Q.    Did any of the defendants place
4 something online or in the news print?
5     A.    There was one other article I
6 remember reading that the chief of police said
7 that he stood by the officer and that there was
8 more to the story.
9     Q.    Did the -- is it your contention
10 that the chief of police went out of his way to
11 make that statement?
12     A.    Yes, sir.
13     Q.    He wasn't asked that statement in
14 an interview?
15     A.    I feel he went out of his way to
16 say that.
17     Q.    How do you feel that?  Do you
18 have any facts to support that?
19     A.    Well, it's untrue.
20     Q.    Okay.  I'm not asking that.
21     A.    The fact is the video.  It's how
22 I feel.
23     Q.    I'm asking what facts do you have
24 that the chief of police went out of his way to
25 post -- or to say something and it wasn't an

1 interview question?
2     A.    The YouTube video.
3     Q.    What YouTube video?
4     A.    The YouTube video of the
5 incident.
6     Q.    How does that YouTube video of
7 the incident -- the one posted by Matt Wear?
8     A.    Yes, sir.
9     Q.    How does that have any bearing on
10 whether the chief of police chose to and went out
11 of his way to make a statement?
12     A.    Because the video shows me just
13 arriving.
14     Q.    I'm not sure you're understanding
15 my question.  I'm asking you -- you said that the
16 chief affirmatively on his own volition went out
17 of his way to make a statement?
18     A.    Yes, sir.
19     Q.    He wasn't compelled to do it.  It
20 wasn't in response to a question.  He did it on
21 his own.  How does that video have any relation
22 to the chief's choice as you're saying it to make
23 a statement?
24     A.    Because it shows it's not true
25 what he said, so then I feel he went out of his

1 way because he's not telling the truth.
2     Q.    So you feel that he went out of
3 his way?
4     A.    Yes, sir.
5     Q.    Okay.  You don't have any facts
6 to support that other than your own feelings?
7         MR. READY: Object to form.  You
8     can answer.
9     A.    I have the video.
10     Q.    Again, not my question.  My
11 question is that you feel that way.  You don't
12 have any facts to support it.
13     A.    I have the video.
14     Q.    Again, not my question.  My
15 question is different.  My question is:  You feel
16 that way, but you don't have any facts to support
17 it.  Is that correct?
18         MR. READY: You're
19     asking -- objection.  You're asking about
20     facts to support what?
21     Q.    What we've been -- what I've been
22 talking about this whole time, whether the chief
23 went out of his way on his own volition to make a
24 statement and it wasn't in response to a
25 question.

27 (Pages 102 - 105)

Page 106

1          MR. READY:  You can answer if you
2     know what the question is asking.  I'll
3     object to form of this.
4     A.    I'm not -- I'm not sure what
5 you're saying.  I'm not trying to be difficult
6 either.  Sorry.
7     Q.    That's okay.  If you don't know,
8 you can answer I don't know.  I get the feeling
9 that you don't understand the question which is
10 fine.  I'll get to those in a second.
11         When you interviewed with CBN
12 News, were you told that it would be posted
13 online?
14    A.    Yes, sir.
15    Q.    You knew that it was going to be
16 posted online at the time you did it?
17    A.    Yes, sir.
18    Q.    And you did it voluntarily?
19    A.    Yes, sir.
20    Q.    Okay.  Did you sue Matt Wear or
21 CBN News for defamation or release of private
22 information?
23    A.    No, sir.
24    Q.    Why not?
25    A.    Because I just felt once it was

Page 107

1 out, it was already out, and I wasn't upset with
2 him.  I just felt like I would like to have
3 talked with Matt before that, but then I kind of
4 felt like he has a right to video whatever he
5 wants.
6     Q.    So once it was out and it was
7 already out, you felt no need to say no to the
8 CBN News interview.  Is that fair?
9     A.    Well, no.  The reason I felt like
10 I wanted to do the CBN was because the police
11 report wasn't true, and I wanted to tell people
12 that it wasn't true.
13    Q.    So you wanted to tell people
14 that?  You wanted that information out?
15    A.    At the time I just -- I was
16 nervous, and it just happened.  Everything was
17 happening fast.  I just was going with the
18 Lancaster Patriot gentleman that said I should do
19 it, so then I just -- I did it, but looking back,
20 you know, I probably wouldn't do it.
21    Q.    You regret doing it?
22    A.    It's not that I regret it.  It's
23 just -- it was like a blur.  Everything was
24 happening so fast.  So many people were calling
25 me and wanting to talk to me.  Looking back now,

Page 108

1 I would have liked to talk to him first, my
2 lawyer.
3     Q.    Okay.  I don't want to get into
4 any discussions that you had about that.
5     A.    Yeah.
6     Q.    So people were calling you?
7     A.    Yes.
8     Q.    Who was calling you?
9     A.    All kinds of people.  There were
10 radio stations, and a lady was doing a podcast.
11 Someone else was doing this over here.  I felt
12 like I was being, like, pulled, and I wasn't sure
13 what to do.  Another part of me said, well, then
14 I'll just use this CBN to tell -- warn people
15 about Jesus Christ of Nazareth, but then, like I
16 said, it just -- it was happening so fast.
17    Q.    And were you able to use CBN to
18 kind of spread your message about Jesus Christ?
19    A.    Yes, sir.
20    Q.    Do you know how many page views
21 the CBN YouTube posting of your interview
22 received?
23    A.    No, sir.  I know it was a few.
24 Matt's was a few, too.  Then there was all these
25 reaction videos that came after it.  They seemed

Page 109

1 like they had a lot of views, too.
2     Q.    And just for the clarity of the
3 record, when you say a few, you mean more than
4 three.  It was a lot?
5     A.    It was a lot.  Thousands and
6 thousands.  One of them was 500,000.  I saw one
7 that's 700,000.
8     Q.    Okay.  Did you go back and look
9 at how many page views were getting accumulated
10 for either Matt Wear's video or video from CBN
11 News?
12    A.    Well, I watched one reaction
13 video, and the comment, like, brought me to
14 tears, so then I said I'm not -- I can't look at
15 this anymore.  And since then I don't -- last
16 night I looked at the video again, but I have
17 restricted it on my YouTube, so it doesn't let me
18 see any comments because it just didn't -- it
19 didn't feel right when I read it.
20    Q.    What kind of comments -- what
21 comment did you read that brought you to tears?
22    A.    I don't really remember, but it
23 wasn't a good comment.  It felt like they were
24 punching me in the stomach.
25    Q.    Okay.

28 (Pages 106 - 109)

Page 110

1    A.    Like, that's not why I was out
2  there, to get views or money.  I just wanted to
3  tell people about Jesus Christ.
4    Q.    Okay.  I know that you got a
5  bunch of calls.  Are you aware that the City of
6  Reading, the police department and Officer
7  McClure were receiving a bunch of calls as well?
8    A.    I heard that.  Yeah.
9    Q.    Where did you hear that?
10    A.    I thought I saw it on -- someone
11 told me, and I saw it on the news that they were
12 getting, like, all kinds of rude calls which I
13 wouldn't want them to get.  I didn't tell anyone
14 to call them or want anyone to say anything, but
15 I just remember hearing that they couldn't even
16 operate they were getting so many phone calls.
17    Q.    Do you want a break?
18    A.    No.  I'm all right.
19    Q.    So you don't agree with that?
20    A.    Absolutely not.  No.
21    Q.    You don't agree with these people
22 that were calling the police department and
23 Officer McClure?
24    A.    No.
25    Q.    Do you know that some of them

Page 111

1  included direct threats against Officer McClure,
2  Sergeant McClure?
3    A.    No.  I just remember hearing that
4  they weren't nice, and I wouldn't want anyone to
5  threaten him.
6    Q.    Do you have any personal animus
7  towards Sergeant McClure?
8    A.    No, sir.
9    Q.    Do you have any personal animus
10 towards the City of Reading, Mayor Moran, Chief
11 Tornielli?
12    A.    No, sir.
13    Q.    And lastly, Courtney Dupree, no
14 personal animus?
15    A.    No, sir.
16    Q.    I'm going to ramp it back down a
17 little bit.
18        When you do your street
19 preaching, you intend to have an audience,
20 correct?
21    A.    No, sir.
22    Q.    No?
23    A.    Uh-uh.
24    Q.    You don't intend for people to
25 hear your voice?

Page 112

1    A.    Well, the Bible says that God's
2  word won't return void, so if someone hears it,
3  then I will.  That's not my intention.  My
4  intention is to go do what he wants me to do.
5    Q.    Do you object if somebody hears
6  your voice when you do your street preaching?
7    A.    No, sir.
8    Q.    Again, if you can wait.
9    A.    I'm sorry.
10    Q.    You're doing fine.  I know it's
11 hard.  I'm going to read from your complaint
12 which we have previously marked as Atkins-1.  I'm
13 going to paragraph 41, and it says, quote:  Eddie
14 Moran, mayor of the City of Reading, who was
15 present during the visit and after having further
16 opportunity to investigate the same, made a
17 public statement:  Quote, with regard to the
18 incident, the city respects the First Amendment
19 rights of all individuals.  However, freedom of
20 speech does not include the right to disrupt an
21 organized event and interfere with the rights of
22 others, end quote.
23        I'm sorry.  You weren't reading
24 along.  I didn't ask you to.  Do you have any
25 objection as to whether I read that accurately?

Page 113

1        MR. READY:  We'll stipulate that
2    you read it accurately.
3    Q.    Thank you.  I apologize.
4    A.    That's okay.
5    Q.    And then in paragraph 42, if you
6  want to follow along, it says:  Richard
7  Tornielli, chief of police for the Reading Police
8  Department, after having opportunity to
9  investigate the incident, made a public
10 statement:  Our officers gave him warnings to
11 cease that behavior as it was disrupting the
12 event that was taking place, end quote.
13        The next paragraph says:  The
14 foregoing statements by Eddie Moran and Richard
15 Tornielli are false and were willfully and
16 wantonly made by them to harm Atkins' reputation.
17        Specifically with regard to
18 paragraph 41, what exactly in the statement that
19 is quoted in paragraph 41 is false?
20        MR. READY:  Object to form, but
21    you can answer.
22    A.    What about 41 is false?
23    Q.    What about the quotation that
24 begins with, quote, with regard to and ends with
25 others, end quote, is false that's within

29 (Pages 110 - 113)

Plaintiff's App. 030

Page 114

1 paragraph 41 there?
2     A.    What do I think is false in here?
3     Q.    I'm asking you what's false?  If
4 there's nothing that's false, you can tell me
5 there's nothing that's false.
6     A.    Well, freedom of speech does not
7 include the right to disrupt an organized event
8 or interfere with the rights of others, I don't
9 feel like I was interfering with the rights of
10 others.  And organized event doesn't take away my
11 right to be able to stand on there and street
12 preach.
13     Q.    So the quotation there says --
14 doesn't mention you at all, does it?
15     A.    But no.  Am I saying why I think
16 this is false?
17     Q.    I'm asking why you think it was
18 false?
19     A.    Because I wasn't disrupting the
20 rights of others, and an organized event doesn't
21 take away my right to stand there and street
22 preach.
23     Q.    Okay.  I understand what you're
24 saying.  My question is:  There's nothing in that
25 statement that I quoted to you in paragraph 41

Page 115

1 that refers to you, is there?  It doesn't say
2 that you, Damon Atkins, were disrupting an event?
3     A.    Oh, no.  No, sir.
4     Q.    Okay.  So it's not false in that
5 regard?
6     A.    No, sir.
7     Q.    Okay.  And it doesn't say that
8 you, Damon Atkins, were interfering with the
9 rights of others?
10     A.    I'm sorry.  No, sir.
11     Q.    Okay.  So it's not false in that
12 regard either?
13     A.    No, sir.
14     Q.    With regard to the statement in
15 paragraph 43 that that statement was made to harm
16 you and harm your reputation, what facts do you
17 have to support that allegation that the
18 statement was made to harm you or to harm your
19 reputation?
20         MR. READY:  Object to form.  You
21     can answer.
22     A.    They didn't warn me.
23     Q.    Okay.  So you're saying you
24 weren't warned.  I'm asking you a different
25 question.  What facts do you have to support the

Page 116

1 claim that those statements were made with the
2 purpose of harming your reputation?
3         MR. READY:  Same objection.  You
4     can answer.
5     A.    The body cam footage showing
6 they're not warning me.
7     Q.    Again, the question is not -- how
8 does the body camera footage inform you about
9 whether those statements were made to harm your
10 reputation?
11     A.    Because they're not true.
12     Q.    Which statement is not true?
13     A.    That our officers gave him
14 warnings to cease that behavior as it was
15 disrupting the event that was taking place.
16 That's not true.
17     Q.    So you're referring to 42?
18     A.    Yes, sir.
19     Q.    You're saying that that's not
20 true?
21     A.    I didn't receive warning, sir.
22     Q.    Now, my question is going to be a
23 little bit different.  What evidence that you had
24 or what evidence do you have that that statement
25 was made -- and assuming it was false, that that

Page 117

1 statement was made for the purpose of harming
2 you?
3         MR. READY:  Object to form again,
4     but you can answer if you're able.
5     Q.    My question, just for clarity, is
6 not whether it was false.  My question is:  What
7 evidence you have about the intent behind the
8 statement?
9     A.    Well, I feel if you say something
10 that's not true, your intent is to harm you.
11     Q.    Okay.  So you assume intent from
12 a falsehood?
13     A.    If it's not the truth, why would
14 you say it?
15     Q.    Well, don't people make mistakes?
16     A.    I just feel like that statement
17 is untrue.
18     Q.    Okay.  Aside from it being
19 untrue, do you have any other evidence or
20 information as to whether it was made or why it
21 was made as you claim here that it was made to
22 harm your reputation?
23         MR. READY:  Same objection.  You
24     can answer.
25     A.    I have the video.

30 (Pages 114 - 117)

1    Q.    Other than the video?
2    A.    No, sir.
3    Q.    Okay.  Did those statements that
4 you read in paragraphs 41 and 42 lower your
5 reputation in the community or have any effect on
6 your reputation in the community?
7    A.    Yes, sir.
8    Q.    How so?
9    A.    It makes me like I'm not telling
10 the truth.
11    Q.    Has anybody told you -- has
12 anybody come to you and said, hey, Damon Atkins,
13 you're a liar based upon these statements?
14    A.    No, sir.
15    Q.    Nobody has said that?
16    A.    No, sir.
17    Q.    Okay.  You feel that way?
18    A.    Yes, sir.
19    Q.    Has anybody -- have you lost an
20 employment opportunity because of these
21 statements?
22    A.    I applied to a job, and one of
23 the people recognized me, and they didn't call me
24 back, but I can't really put that to that, but I
25 just felt like she looked at me weird after she

1 said that I was on the YouTube video, but...
2    Q.    She said that she recognized you
3 from the YouTube video?
4    A.    Yes, sir.
5    Q.    And then you didn't receive that
6 job?
7    A.    No.
8    Q.    What job was that?
9    A.    And they said I had it until she
10 said that they saw me on the YouTube.
11    Q.    And is she referring to the Matt
12 Wear YouTube video?
13    A.    Yes, sir.
14    Q.    What job was that?
15    A.    It was a dishwashing job at a
16 restaurant.  I'm not sure the name.  I'm sorry.
17    Q.    That's okay.
18    A.    It was a while ago.
19    Q.    And just to clarify, she didn't
20 say, hey, I saw you on the YouTube video.
21 Therefore, I'm not going to hire you?
22    A.    No.
23    Q.    But it's your feeling that you
24 weren't hired because --
25    A.    At first she said I'm a good fit

1 for the company.  Then someone came up and said
2 that they recognized me from the YouTube video,
3 and she said she was going to -- when she said I
4 was a good fit for the company, she said she'll
5 call me in a day or so, and she never called, and
6 they wouldn't return my call, so I kind of just
7 thought that was strange.
8    Q.    Okay.  Was it a different person
9 that told you about the video?
10    A.    I spoke to a lady that said I was
11 a good fit for the company.  Then someone came
12 up, and I heard them say that I was on the
13 YouTube video and then she said she was going to
14 give me a call before they started talking and
15 then she never called me.  And I called them, and
16 she didn't return my call.
17    Q.    Okay.  I think I understand.  So
18 in the course of your interview, a third party
19 came in?
20    A.    Yeah.  Came in.  Sorry to
21 interrupt.
22    Q.    That's okay.  With regard to the
23 statement in paragraph 42, is it your allegation
24 that that statement harmed your reputation?
25    A.    Yes, sir.

1    Q.    How so?  How did it harm your
2 reputation?
3    A.    Because it's not the truth.
4    Q.    Did anybody tell you, hey, I saw
5 this statement in paragraph 42 and I now think
6 that you don't tell the truth?
7    A.    No, sir.
8    Q.    Okay.  Did you lose any
9 employment opportunities because of that?
10    A.    No, sir.
11    Q.    Okay.  So other than your own
12 feelings, do you have any evidence that other
13 people hold you in lower regard because of the
14 statements contained within the complaint?
15    A.    No, sir.
16    Q.    Okay.  I'm going to ask you to
17 read paragraph 44 and just read it to yourself.
18 It's a longer one, so I'm not going to have you
19 read it out loud.
20    A.    (Witness complies with request.)
21    Q.    Are you done?
22    A.    Yes, sir.
23    Q.    Is there anything within
24 paragraph 44 that you claim is untrue?
25    A.    No, sir.

31 (Pages 118 - 121)

Plaintiff's App. 032

Page 122

1    Q.    Do you see paragraph 45 where it
2 says Tornielli made the foregoing statements,
3 those in paragraph 44, were made to, quote,
4 further chill the speech of Americans, end quote.
5 Do you see that?
6    A.    Yes, sir.
7    Q.    What evidence do you have that
8 those statements were made to chill the speech of
9 Americans?
10        MR. READY:  Object to form.  You
11    can answer.
12    A.    I'm not sure I understand the
13 question.
14    Q.    Do you understand what it means
15 to chill the speech of Americans?
16    A.    No, sir.
17    Q.    Respectfully, it's your
18 complaint.
19        MR. READY:  Objection.
20    Q.    What do you mean by that?
21        MR. READY:  Object to form.  You
22    can answer if you can.
23    A.    To try to stop the calls from
24 coming in.  I didn't want any of this to happen.
25    Q.    You didn't want the calls to come

Page 123

1 in.  Is that what you're talking about in 45
2 here, paragraph 45?
3    A.    Yes.  I didn't tell anyone to
4 call them.
5    Q.    Do you think that there were any
6 Americans -- any other American citizens or
7 people inhabiting America, maybe they're not
8 citizens, that were prevented or decided not to
9 express their opinions because of the statements
10 made by Chief Tornielli that are reflected in
11 paragraph 44?
12    A.    What do you mean?  Because of the
13 statement, they didn't call in?
14    Q.    No.  I don't know.  You tell me.
15    A.    I don't understand what you're
16 asking me.
17    Q.    Is there anything that Americans
18 didn't say, anything at all, based upon the
19 statements attributed to Chief Tornielli in
20 paragraph 44?
21        MR. READY:  Object to the form.
22    A.    I don't understand what you're
23 asking me.
24    Q.    I'm asking you.  I'm trying to
25 understand what you mean by your complaint, and

Page 124

1 respectfully it is your complaint.
2        MR. READY:  I'm going to object
3    to the form.  It's a complaint filed on
4    his behalf.  That doesn't mean he's going
5    to understand the legal language in it.
6    You're allowed to ask him about it, but
7    just object to the form as if it's his
8    statement.
9        MR. CONLEY:  I mean -- okay.
10 BY MR. CONLEY:
11    Q.    I'm trying to understand what you
12 mean by saying in this complaint that, yes, it is
13 filed on your behalf.  You agree with that,
14 right?
15    A.    Yes.
16    Q.    And you reviewed the complaint?
17    A.    Yes, sir.
18    Q.    Okay.  And everything in the
19 complaint met with your approval?
20        MR. READY:  Object to the form.
21    Q.    If there's something that didn't
22 meet your approval, you can tell me about it.  If
23 you disagree with paragraph 45 and you want to
24 say, hey, Mr. Conley, it shouldn't be in here,
25 feel free.

Page 125

1        MR. READY:  I'm going to object
2    to the form.  You can try and answer if
3    you'd like.
4    A.    I'm not trying to be, like, rude.
5 I don't understand what you're asking me.
6    Q.    I'm trying to ask you what speech
7 of Americans were chilled?  And when I say
8 chilled, I mean they read something, they heard a
9 comment, and they decided that I'm not -- me, the
10 American, I'm not going to make a statement now
11 because I've heard what Chief Tornielli said.
12        MR. READY:  Object to the form.
13    Calls for speculation, but you can
14    answer.
15    A.    I feel that this was said to try
16 to stop people from aggressively calling.
17    Q.    The police department?
18    A.    Yes.
19    Q.    With threats?
20    A.    Yes.  Like, almost, like, you
21 don't have to call on my behalf because there's
22 more to the story is how I feel when I see that.
23    Q.    Okay.  Do you have any evidence
24 that any Americans didn't make calls to the
25 police department because of the statements in

32 (Pages 122 - 125)

Plaintiff's App. 033

Page 126

1 paragraph 44?
2         MR. READY: Object to the form.
3     You can answer.
4     A.    I didn't want anyone to call.
5     Q.    I understand you didn't want them
6 to. My question is a little bit different. I'm
7 asking if you know of any people who intended to
8 call that didn't because of the statements in
9 paragraph 44?
10    A.    No, sir.
11    Q.    Okay. In paragraph 49 of the
12 complaint, the allegation is as follows, quote:
13 Based on the foregoing, it is the policy of the
14 City of Reading to accord a privileged status to
15 the LGBTQ pride movement, which privileged status
16 equates any dissenting viewpoint from LGBTQ
17 identity politics or from the public promotion of
18 LGBTQ practice as "derogatory comments,"
19 "insults" and "hate speech," which must be
20 chilled and suppressed, including by force of the
21 Reading police department.
22        Aside from some of the quotation
23 marks, did I read that accurately?
24    A.    Yes, sir.
25    Q.    What information do you have, if

Page 127

1 any, to support the allegation that the City of
2 Reading holds that policy?
3     A.    Because the officer stated I was
4 yelling derogatory comments.
5     Q.    Aside from the officer stating
6 that, do you have any other information that it
7 was the policy of the City of Reading?
8         MR. READY: Object to form.
9     You're asking him personally, correct?
10        MR. CONLEY: Yeah. What he
11    knows. It's his complaint. I want to
12    know what evidence he has.
13        THE WITNESS: Well, I was
14    arrested, so it feels like they got to
15    have their day, but I didn't get the
16    same. And then it was said that I yelled
17    derogatory statements, and I didn't.
18 BY MR. CONLEY:
19    Q.    Are you aware of any written
20 policy, like a document that says that this is
21 the policy of the City of Reading?
22    A.    No, sir.
23    Q.    Okay. Are you aware of any
24 emails, correspondence, memos that indicate that
25 the allegation in paragraph 49 is the policy of

Page 128

1 the City of Reading?
2     A.    No. Just how I was treated.
3     Q.    Okay. Is it fair to say that
4 your interpretation of how you were treated is
5 the basis for the statements you made that the
6 city has that policy?
7     A.    Yes, sir.
8     Q.    Regarding those allegations, the
9 statements attributed to Chief Tornielli in
10 paragraph 44, would you agree with me that the
11 purpose of those statements was to address the
12 amount of calls coming into the city and the
13 police department about the incident?
14    A.    I think that the reason that was
15 said was because of the amount of calls that were
16 coming in, yes. Yes, sir.
17    Q.    Is there anything in the
18 statements attributed to Chief Tornielli in
19 paragraph 44 that is derogatory or harms your
20 reputation?
21        MR. READY: Object to form. You
22    can answer.
23    A.    They're not talking about me in
24 this paragraph.
25    Q.    Okay.

Page 129

1     A.    They're just talking about the
2 phone calls, which I didn't want anyone to call.
3     Q.    Did you have the intent to make a
4 phone call to the city to complain?
5     A.    I didn't call them at all. No.
6     Q.    My question was just slightly
7 different. Did you have the intent to call them?
8     A.    I never wanted to call them. No.
9 No, sir.
10    Q.    After the -- I'm going to talk
11 about both of them together. After the YouTube
12 video posted by Matt Wear and the YouTube video
13 of the CBN News interview, after they were posted
14 to the internet, did you do anything to promote
15 those videos?
16    A.    No, sir.
17    Q.    You didn't tell anybody to watch
18 them?
19    A.    I sent the video of Matt Wear to
20 my family.
21    Q.    How did you send it? Via text or
22 email?
23    A.    Text. A group text.
24    Q.    Was it all your brothers and
25 sisters or just your sisters?

33 (Pages 126 - 129)

1    A.    It was friends and family.
2    Q.    Do you know how many people you
3 sent it to?
4    A.    I would say about maybe eight, I
5 think.
6    Q.    You probably don't remember
7 exactly who you sent it to, but can you give me
8 any names of the people that were included in
9 that group text?
10    A.    Brian, Toni, Nikki. I don't
11 remember the rest. I'm sorry.
12    Q.    That's okay. Brian, what's his
13 last name?
14    A.    Brian Page.
15    Q.    Is he a friend?
16    A.    Yes.
17    Q.    Toni, what's his last name?
18    A.    Toni is my sister.
19    Q.    So is it spelled T-O-N-I?
20    A.    T-O-N-I, yeah. Fritz. It's her
21 husband's name.
22    Q.    Okay. And who's Nikki?
23    A.    Nikki is my sister, and her last
24 name is the same, Atkins.
25    Q.    Okay. After the incident and

1 after you were released, did you require any
2 medical attention from a doctor?
3    A.    No, sir.
4    Q.    Did you go to any doctor to get
5 checked out to see if you were okay?
6    A.    No, sir.
7    Q.    Did you go to any psychologist or
8 mental health counselor for counseling or mental
9 health services after your arrest?
10    A.    No. I felt like I went to the
11 Bible.
12    Q.    Okay. So you weren't treated by
13 any medical professional?
14    A.    No, sir.
15    Q.    Okay. Do you have any evidence
16 that the purpose of your arrest was to retaliate
17 against you for speech that you were making?
18        MR. READY: Object to form. You
19 can answer.
20    A.    I have a video.
21    Q.    Which video?
22    A.    The YouTube video.
23    Q.    The Matt Wear video?
24    A.    Yes, sir.
25    Q.    Aside from that, do you have any

1 evidence that the purpose -- my question is about
2 the purpose of the arrest was to retaliate
3 against you for your speech?
4    A.    Yes, sir.
5    Q.    What evidence is that?
6    A.    This.
7    Q.    The affidavit of probable cause?
8    A.    Yes, sir.
9    Q.    Okay. And what exactly in the
10 affidavit of probable cause leads you to believe
11 that the purpose of the arrest was to retaliate
12 against you for the content of your speech?
13    A.    The sworn sincerity, the truth of
14 this that's not.
15    Q.    So you're saying that's untrue?
16    A.    Yes, sir.
17    Q.    My question is about the purpose.
18 What evidence do you have that the purpose of
19 that affidavit, assuming for the purposes of the
20 deposition here that it was untrue, that the
21 purpose was retaliatory?
22    A.    Because it's not true.
23    Q.    Okay. Other than that, do you
24 have any other evidence?
25    A.    No, sir.

1    Q.    Okay. Same thing with the video.
2 What evidence do you have in relation to the
3 video to suggest that the purpose of the arrest
4 was retaliatory?
5    A.    Because they didn't like what I
6 was saying.
7    Q.    How do you know that they didn't
8 like what you were saying?
9    A.    Because I didn't even get to
10 finish what I was saying.
11    Q.    How do you know that you didn't
12 get to finish because they didn't like what you
13 were saying?
14    A.    Because I was placed in
15 handcuffs.
16    Q.    How do you know that you were
17 placed in handcuffs because they didn't like what
18 you were saying?
19    A.    Because when I started to say it,
20 I was placed in handcuffs.
21    Q.    Is it the timing of the placement
22 of handcuffs and what you were saying that leads
23 you to believe that? I'm not trying to be
24 difficult.
25    A.    I'm not trying to be difficult

34 (Pages 130 - 133)

Plaintiff's App. 035

1 with you. I feel like they didn't want me to say
2 what I wanted to say.
3      Q.   Okay.
4      A.   So they retaliated by arresting
5 me.
6      Q.   Okay. And you're basing that on
7 the totality of the circumstances?
8      A.   I'm basing it on the events that
9 took place there.
10     Q.   Okay. And your interpretation as
11 to why?
12     A.   Well, I wouldn't say it's
13 interpreting. It's what happened.
14     Q.   Fair enough. Okay. My question
15 is more related to interpretation of their
16 intent, the officer's intent?
17     A.   Their intent was to silence me.
18     Q.   Did you ask any of the officers
19 if your intent was to silence -- if their intent
20 was to silence?
21     A.   No, sir.
22     Q.   And, again, I'm not trying to be
23 difficult, but you're interpreting their actions
24 as intent to silence you. Is that fair?
25     A.   Well, their actions silenced me,

1 so I'm not interpreting it.
2      Q.   I'm talking about the intent.
3      A.   Their intent was to silence me.
4      Q.   Based upon their actions?
5      A.   Their actions, yes, sir.
6      Q.   Okay. Okay. Do you believe that
7 the officers disagreed with your viewpoint that
8 you were trying to express?
9      A.   Yes, sir.
10     Q.   What leads you to believe that
11 they disagreed with your viewpoint?
12     A.   Because they put me in handcuffs.
13     Q.   So for the same reasons that we
14 just discussed about intent about retaliatory?
15     A.   Yes, sir.
16     Q.   Okay. One of the allegations in
17 your complaint is that you were -- there's a
18 malicious prosecution claim that you were
19 prosecuted maliciously. Do you have any evidence
20 or what evidence do you have that Sergeant
21 McClure acted maliciously or for a purpose other
22 than bringing you to justice in arresting you?
23     A.   The video.
24     Q.   Okay. And is it the same as what
25 you were talking about with the intent to be

1 retaliatory and the disagreement with viewpoint?
2      A.   Yes, sir.
3      Q.   Okay. So your interpretation or
4 your view of the interactions leads you to
5 believe that?
6      A.   It's not my interpretation. It's
7 what happened. Their actions made me feel that
8 way.
9      Q.   Okay. You don't have any -- you
10 didn't ask Sergeant McClure if he arrested you
11 out of malice?
12     A.   No, sir.
13     Q.   And he didn't tell you that he
14 arrested you out of malice?
15     A.   He said things that made me feel
16 that way.
17     Q.   What things?
18     A.   He said I'm embarrassing myself
19 and that he didn't care about why I was there,
20 and he didn't care about the Bible.
21     Q.   Did he specifically say I don't
22 care about why you're here?
23     A.   I believe so. Yes.
24     Q.   Did he specifically say I don't
25 care about the Bible?

1      A.   I brought up a scripture to him,
2 and he said I don't care about that.
3      Q.   And so you believe that he was
4 saying he doesn't care about the Bible based upon
5 that statement?
6      A.   He didn't care about the
7 scripture I should have said. I'm sorry.
8      Q.   He didn't care about the
9 scripture?
10     A.   That I was saying, yeah.
11     Q.   Might it be that he didn't care
12 about not what the scripture said but what you
13 were saying?
14     A.   He said he didn't care about the
15 scripture.
16     Q.   He said specifically I don't care
17 about the scripture?
18     A.   I said, what about First
19 Corinthians, and he said, I don't care about
20 that, so, you know.
21     Q.   That's your understanding?
22     A.   Yes, sir.
23     Q.   Okay. You raise an allegation
24 against the city that it failed to train its
25 police officers. Are you aware of that?

35 (Pages 134 - 137)

Plaintiff's App. 036

Page 138

1     A.    Yes, sir.
2     Q.    Okay.  How did they fail to train
3 their police officers?
4          MR. READY:  Object to form, but
5     you can answer.
6     A.    Because I thought he was there to
7 protect my rights as well.
8     Q.    And you're saying that he didn't
9 protect your rights?
10    A.    He placed me in handcuffs.
11    Q.    I'm asking if he didn't --
12    A.    I don't feel like he did.  No.
13    Q.    Okay.
14    A.    He might not have agreed with
15 what I was saying, but I have a right to stand
16 there and say it.
17    Q.    And you believe that that
18 happened because he wasn't properly trained?
19    A.    I believe he wasn't trained on my
20 rights.  Yes, sir.
21    Q.    Okay.
22    A.    Because he didn't stick up for
23 them.
24    Q.    Other than the fact that from
25 what you're telling me that he didn't stick up

Page 139

1 for your rights, do you have any other evidence
2 that he wasn't properly trained?
3     A.    The other two officers weren't
4 properly trained either because they didn't even
5 say anything.  They just watched him violate my
6 rights.
7     Q.    Okay.  Do you think that they
8 should have said something?
9     A.    If you were trained on rights,
10 wouldn't you think that you would stick up for
11 them?
12    Q.    Okay.  So what I'm trying to
13 understand, based upon their actions, you assume
14 they weren't trained?
15    A.    Based upon their actions, they
16 weren't trained.  I felt they weren't.  I didn't
17 assume.  They showed me by their actions that
18 they didn't care about my First Amendment right.
19    Q.    Do you have any specific
20 knowledge about the training that the City of
21 Reading provided to its police officers?
22    A.    Their actions.
23    Q.    Other than actions of the
24 officers, do you have any specific knowledge --
25    A.    No, sir.  No.

Page 140

1     Q.    Let me just get the question out
2 because I need the record to be clear.
3          Other than their actions, do you
4 have any specific knowledge that the city failed
5 to train its police officers?
6     A.    No, sir.
7     Q.    Okay.  Have you been ostracized
8 by any community because of your involvement in
9 the events on June 3rd, 2023?
10    A.    Well, I feel like the community
11 is my community, and I just hope they didn't get
12 the wrong impression on why I was there.  Like, I
13 don't even like saying the LGBTQ community
14 because I feel like they're my brothers and
15 sisters, so I don't -- I didn't specifically hear
16 from anyone, but I just hope it didn't make it
17 look like I was there to disrespect the police,
18 Reading or the event that was going on.  And
19 before I stopped reading the comments, I can tell
20 they didn't understand why I was there.
21    Q.    Who's "they"?  The people that
22 were commenting on the YouTube channel.
23    A.    Yeah.  Yeah.  Like, they thought
24 I was there to get views or to be aggressive
25 towards people, and I wasn't.  I didn't say

Page 141

1 anything to anyone across the street.  I started
2 quoting the Bible verse.
3     Q.    Did you see any comments on
4 either of the YouTube channels or any of the
5 digital articles that were supportive of you?
6     A.    I saw both until I saw, like I
7 said, the one comment.  It felt like they punched
8 me in the stomach, and that's when I decided I
9 can't look at these comments anymore, and now I
10 can't see comments on my YouTube channel.
11    Q.    Did you have to hire a criminal
12 defense attorney after the arrest?
13    A.    One said they would represent me
14 free of charge.
15    Q.    You didn't pay anybody for
16 helping --
17    A.    No, because the charges got
18 dropped.
19    Q.    How quickly were the charges
20 dropped?
21    A.    It seemed pretty quick.  I don't
22 remember, like, exactly time, but it was way
23 before my court date.  Do you want to take a
24 break and get some water or something?
25          MR. CONLEY:  Let's go off the

36 (Pages 138 - 141)

Plaintiff's App. 037

1    record.
2        (A short break was taken.)
3 BY MR. CONLEY:
4    Q.    Some more general questions.
5 Aside from your lawyer, have you talked to
6 anybody about this incident?
7    A.    Yes.
8    Q.    Who have you talked to?
9    A.    Well, I talked to the guy from
10 Lancaster Patriot.  I talked to Brother Jose.  I
11 talked to WFMZ 69.  I've talked to my friends and
12 family about it.
13    Q.    Have you talked --
14    A.    I'm not trying to not mention
15 anyone if I make a mistake, but like I said,
16 there was -- so many people were texting and
17 calling me, and anyone that wanted to talk about
18 it, I at first wanted to talk about it.
19    Q.    I'm not going to hold you to it
20 that the names you gave me were an exhaustive
21 list.  You spoke to a lot of people --
22    A.    Yes, sir.
23    Q.    -- about the incident?
24    A.    Yes, sir.
25    Q.    Have you spoken to anyone about

1 the lawsuit?  Do you understand the difference
2 that I'm asking?
3    A.    Yes.
4    Q.    Who have you spoken to, other
5 than your counsel, about the lawsuit?
6    A.    Well, Brother Jose asked me about
7 it.  My sisters asked me about it.  My friend
8 Brian asked me about it.  I think Lancaster
9 Patriot asked me as well.  They asked me if I had
10 counsel, if I needed help, if I needed anything
11 to let them know.
12    Q.    Did they all ask similar
13 questions?
14    A.    Pretty much.  Yeah.
15    Q.    Okay.  Did anybody ask you why
16 you filed the lawsuit?
17    A.    One time I was street preaching,
18 and a stranger passed me by and said he
19 recognized me, and he asked me if I was going to,
20 and I said, yeah.  He said, why?
21    Q.    If you were going to file a
22 lawsuit?
23    A.    Yes, sir.
24    Q.    That was just a random person?
25    A.    Yeah.  I didn't know who he was.

1 He said he was going to pray for me.
2    Q.    I'm going to show you a document
3 that I'm going to have marked as Atkins-4.
4        (A document was marked for
5        identification as Atkins Exhibit No. 4.)
6 BY MR. CONLEY:
7    Q.    I've shown you a document which
8 we've marked as Atkins-4, and it's titled
9 plaintiff's responses to defendants' first set of
10 interrogatories.  Do you see that title?
11    A.    Yes, sir.
12    Q.    Have you ever seen this document
13 before?
14    A.    I remember the questions.  I
15 haven't seen this document, though.  No, sir.
16    Q.    So you remember being asked
17 questions in written form that you had to respond
18 to with the help of your counsel?
19    A.    Yes, sir.
20    Q.    Okay.  I don't want to know
21 anything about what you discussed with your
22 counsel when asking questions about these.  Is
23 that fair?
24    A.    Yes, sir.
25    Q.    So on page 3, do you see

1 interrogatory number 4?  It's the one that starts
2 with four and then asks you to please identify
3 with specificity.  Do you see that?
4    A.    Yes, sir.
5    Q.    Can you read that whole paragraph
6 to yourself?
7    A.    Okay.
8    Q.    Did you read both the request and
9 the answer or just the request?
10    A.    I read the answer.
11    Q.    Okay.  I'm going to direct you to
12 the request where it starts with four where it
13 says:  Please identify with specificity -- I'll
14 just read it.
15        Please identify with specificity
16 any and all damages which you contend were
17 suffered as a result of this incident, including,
18 but not limited to, damage or injury to person(s)
19 or reputation.  Describe in detail how these
20 damages were calculated and attach to the
21 accompanying defendants' request for production
22 of documents any and all documents which support
23 these allegations?
24        In your answer to that, the
25 answer reads:  To the best of plaintiff's

37 (Pages 142 - 145)

1 knowledge and information at this time, which is
2 subject to investigation, plaintiff has not
3 determined that he suffered any pecuniary loss as
4 a result of this incident.
5          Do you see that?
6     A.    Yes, sir.
7     Q.    Since the time that these answers
8 were provided, and I'll represent to you that
9 they were sent to me on January 15, 2024, have
10 you determined that you've suffered any pecuniary
11 loss?
12    A.    This answer I feel like is since
13 then -- I still feel the same way is the answer.
14    Q.    You don't feel that you've had
15 any monetary damages?
16    A.    No, sir.
17    Q.    You haven't lost any money out of
18 your pocket?
19    A.    No, sir.
20    Q.    You haven't had to pay any bills
21 or anything like that that you otherwise wouldn't
22 have to pay?
23    A.    No, sir.
24    Q.    Have you earned any money because
25 of this incident?

1     A.    No, sir.
2     Q.    Did any of the news interviews
3 pay you?
4     A.    No, sir.  Nor would I want to be
5 paid.
6     Q.    Did they offer to pay you?
7     A.    No, sir.
8     Q.    Did anybody offer to hire you as
9 a consultant or anything like that after the
10 incident?
11    A.    No.  I received calls and letters
12 from lawyers saying they would represent me for
13 free, but no, sir.
14    Q.    Okay.  Other than from a lawyer,
15 you didn't receive any offers?
16    A.    No, sir.
17    Q.    The next line of the answer to
18 interrogatory number four reads:  Rather,
19 plaintiff has suffered nonpecuniary loss as a
20 result of the incident in an amount to be
21 determined at trial, which is in the nature of
22 emotional distress, anguish, humiliation, loss of
23 liberty, violation of constitutional rights and
24 reputational harm.
25          I think I've gone through

1 reputational harm.  I want to ask you about
2 emotional distress.  What type of emotional
3 distress have you suffered?
4     A.    Well, just the whole situation,
5 and now I'm weary when I'm street preaching if
6 I'm going to have another encounter with the
7 police.  My name is now attached to companies
8 selling T-shirts saying they're the official
9 shirt of Damon Atkins, and that does not feel
10 good.
11    Q.    Have you contacted any of those
12 companies --
13    A.    There's so many of them.  No.
14    Q.    Okay.  Again, just wait for my
15 question.
16    A.    I'm sorry.
17    Q.    Have you contacted any of those
18 companies to have them stop selling or promoting
19 those T-shirts?
20    A.    No, sir.
21    Q.    You say there's more than one?
22    A.    Yeah.  I wanted to, but then when
23 I clicked on the site, I saw things that were not
24 okay.  So I just exited off, and I kind of feel
25 at this point it is what it is.

1     Q.    What do you mean by you saw
2 things that weren't okay?
3     A.    They're selling things that are
4 inappropriate to me, so I just got off the
5 website.  Instead of trying to scroll down and
6 find where you can send them an email, I just saw
7 inappropriate things, and I just got off the
8 website.
9     Q.    I don't want to make you
10 uncomfortable, but I'm trying to understand what
11 you mean by inappropriate things?
12    A.    Just in my -- just things that I
13 didn't want to see my name attached to.
14    Q.    Like what?
15    A.    Like, T-shirts and ungodly
16 things.
17    Q.    What was an ungodly thing that
18 your name was attached to?
19    A.    My name is attached to the
20 company, and the company is selling those things.
21    Q.    And you're saying it's ungodly
22 that they're using your name without your
23 permission?
24    A.    No.  That's not ungodly.  What's
25 ungodly is my name being attached to that

Page 150

1 company. It makes me feel like if someone were
2 to see that, it looks like I'm a representative
3 of that company, and that's not true. And I
4 never wanted it to be that way.
5       Q.    Do you disagree with the beliefs
6 or mission of that company?
7       A.    Some of them, yes, sir.
8       Q.    Can you explain to me what those
9 beliefs are that you disagree with? I'm just
10 trying to understand this.
11      A.    Yeah. I just felt uncomfortable
12 when I went to their website.
13      Q.    Were they, like, websites that
14 were promoting some, like, lewd or lascivious
15 behavior?
16      A.    Well, both, yeah, and selling
17 T-shirts at the same time.
18      Q.    Was it, like, pornography?
19      A.    It was -- it just made me
20 uncomfortable.
21      Q.    Okay. Yes or no, was it
22 pornography?
23      A.    I didn't see that, but what I saw
24 was uncomfortable to me.
25      Q.    Okay. Was it --

Page 151

1           MR. CONLEY: Can we go off the
2       record here?
3           (A discussion was held off the
4       record.)
5           MR. READY: Can you just explain,
6       what were those other products that the
7       companies were selling that were ungodly?
8           THE WITNESS: Like, T-shirts with
9       slogans on them that I didn't -- I didn't
10      want to be a part of, and I feel that I'm
11      a part of that now, and it doesn't feel
12      good.
13 BY MR. CONLEY:
14      Q.    Okay. Did any of the defendants
15 named in this lawsuit have anything to do with
16 those companies putting your name on T-shirts?
17      A.    Yes. The officer.
18      Q.    He had something to do with
19 companies putting your name on T-shirts?
20      A.    I feel, yes.
21      Q.    How so?
22      A.    By arresting me.
23      Q.    Okay. By the simple fact of
24 arresting you, he had some sort of involvement
25 with these companies?

Page 152

1       A.    Because that's what created this
2 video.
3       Q.    The police officer didn't create
4 the video. Somebody else did.
5       A.    But him taking away my rights
6 created the video.
7       Q.    Okay. I'm trying to understand.
8 Did he have any intent for your name to get on
9 T-shirts by arresting you?
10      A.    I feel like he didn't not have
11 the intent.
12      Q.    What does that mean, he didn't
13 not have the intent?
14      A.    Because he just disregarded my
15 rights. It's like he didn't even think about
16 what was going to happen when he did that.
17      Q.    Other than the fact of the
18 arrest, is there anything else that would connect
19 the officer to the T-shirts?
20      A.    No, sir.
21      Q.    So we talked about you being
22 weary of police officers and these T-shirts. Has
23 your feeling of weariness of police officers at
24 other street preaching incidents or events caused
25 you not to street preach?

Page 153

1       A.    It's definitely caused me to
2 hesitate. I haven't done it as much as I
3 normally would, and I don't feel the same way I
4 did before this incident happened.
5       Q.    What does that mean you don't
6 feel the same way?
7       A.    I felt -- I felt like I was -- I
8 had a right to do it, and now I don't -- I feel
9 like that right can be taken away.
10      Q.    But you have street preached
11 after this incident?
12      A.    Yes, sir.
13      Q.    Anguish comes after emotional
14 distress in your answer to interrogatory number
15 four. What kind of anguish have you suffered?
16      A.    Anguish meaning, like, anxiety?
17      Q.    I don't know. This is your
18 response.
19      A.    Just, like, the whole thing. I
20 don't -- I didn't want this to happen. I didn't
21 want to take off work today and tell my boss that
22 I needed off. I didn't want to answer those
23 questions. I just -- the whole thing. This
24 isn't something I wanted to do.
25      Q.    What did you tell your boss when

Plaintiff's App. 040

Page 154

1 you took off today?
2      A.    That I needed off.  I had a
3 deposition.  I had an appointment I said to her,
4 but she looked at me like, already?  You already
5 need off?  But what was I going to do?
6      Q.    Did you tell her specifically it
7 was for a deposition?
8      A.    No, sir.
9      Q.    Okay.
10      A.    Because I didn't -- I don't know.
11 Something -- I just told her I had an
12 appointment.  I was scheduled and then she
13 crossed it off, and it just -- I didn't feel
14 right about it.  And then all last night and
15 yesterday, my hands are sweaty.  I'm anxious.  I
16 don't -- I don't know if this has happened to
17 someone else.  I don't know.  It's anxiety, I
18 feel like.
19      Q.    So you felt this last night?
20      A.    The day before, yeah.  I felt it
21 since this happened, but last night was tough.
22      Q.    Was it related to the fact that
23 you were going to have to --
24      A.    Yeah.
25      Q.    -- provide answers in a

Page 155

1 deposition today?
2      A.    Well, I've never done this
3 before, so I don't know what -- but I'll answer
4 anything to the best of my ability.  It's not the
5 questions that make me anxious.  It's this whole
6 process.
7      Q.    To be fair, if you didn't file a
8 lawsuit, you wouldn't have to give a deposition?
9      A.    Well, to be fair, if my rights
10 weren't violated, I wouldn't have had to file a
11 lawsuit.
12      Q.    Other than the anxiety -- with
13 regard to the anxiety, what, if any, treatment
14 have you received relating to anxiety?
15      A.    The Bible.
16      Q.    Any medical treatment or
17 psychological treatment?
18      A.    No, sir.
19      Q.    Humiliation is the next one.  I'm
20 trying to go through these a little faster.  How
21 did you feel humiliated?
22      A.    Well, because of the reaction.
23 There's reaction videos of me, and people are
24 laughing at me saying good that I got arrested.
25 I'm humiliated by the companies that take my name

Page 156

1 and said I'm the official spokesperson of them.
2 I'm humiliated by the affidavit which isn't true.
3 I'm humiliated by the statement that's on Fox
4 News that says I was there for an hour before
5 yelling back and forth across the street
6 antagonizing them and there's more to the story.
7 It just makes me feel humiliated because it's not
8 true.
9      Q.    Has anybody specifically
10 addressed you -- other than looking at those
11 comments, have they addressed you in person in a
12 manner that made you feel humiliated?
13      A.    No, sir.
14      Q.    Almost done.  I'm just going to
15 go back briefly.  I believe I forgot to ask this
16 question.  In your complaint you allege that any
17 sexual conduct outside of marriage between one
18 man and one woman is sin?
19      A.    Yes, sir.
20      Q.    And we spoke about that, right?
21 Do you know anybody that's engaged in sexual
22 conduct outside of marriage?
23      A.    No, sir.
24      Q.    You don't know anybody that's
25 done that?

Page 157

1      A.    Well, I try not to -- if they
2 don't want to talk to me about it, I don't -- you
3 know, I don't think my sisters are.  We haven't
4 talked about it.  They could be.  I think my
5 friend Sara might be, but I don't really -- I
6 just ask her if she's read the Bible.
7      Q.    In paragraph 22 of the complaint,
8 you made a statement that sinners are not
9 forgiven from sin unless they're born again.
10 What's the -- I want to understand how that
11 affects you if other people are not forgiven for
12 their sins?
13      A.    Because I'm worried and I care
14 about them and they're my family, and everyone
15 across the street on my side and their side I
16 look at as my family, and I just want to help
17 people, and that's what I was there to try to do
18 that day, to talk to someone.
19           The Bible says when Jesus
20 returns, there's going to be weeping and gnashing
21 of teeth, and that worries me, and I'm living
22 proof that what I did not only works, it changed
23 my life, and I stumbled upon it.  It's like
24 finding a place that's pouring out gold.  You
25 want to go tell everyone you can because you

40 (Pages 154 - 157)

Page 158

1  found this place that pours out gold.  I did not
2  expect this to happen when I started reading the
3  Bible.  It did.
4      Q.    Okay.  Thank you for that.  So I
5  guess from that, would you want all sinners to be
6  forgiven?
7      A.    Everyone.
8      Q.    Everyone?
9      A.    Everyone can be.
10      Q.    Okay.
11      A.    That's the main reason why I want
12  to tell people.  Sometimes I feel like it's like
13  walking past someone's house that's on fire, and
14  they're upstairs asleep.  I have -- I kind of
15  feel like I should knock on the door and tell
16  them.
17      Q.    Returning to Exhibit-4, the
18  interrogatories, if you could turn to page 6 and
19  look at number 11.  Do you see that?
20      A.    Yes.
21      Q.    So what people do you intend to
22  call as witnesses if this matter goes to trial?
23          MR. READY:  I'm just going to
24      object to the form.  That's really a
25      question for counsel, but you can answer

Page 159

1      subject to that, if you can.
2      A.    I just would like to call the
3  witness of the video.
4      Q.    Matt Wear.  Is that who you're
5  talking about?
6      A.    No.  Just the video itself.
7      Q.    I'm talking about individuals,
8  people?
9      A.    No.  I don't have anyone.
10      Q.    Okay.  Do you recall saying to
11  Sergeant McClure, quote:  You know who is
12  cheering for this?  The people that are in hell?
13      A.    Yes, sir.
14      Q.    What did you mean by that?
15      A.    I was referring to the story in
16  the Bible of the rich man and Lazarus.  The rich
17  man is in hell, and he had everything on this
18  Earth, and he did whatever he wanted, and all he
19  wanted was a drop of water, and he said, please
20  send someone to warn them so that they don't come
21  to this place of torment.
22      Q.    Are you saying that the people
23  that were cheering are those that are cheering to
24  have somebody sent to relieve them of their
25  torment?

Page 160

1      A.    Well, the reason I said it was
2  because I feel like the rich man wants someone to
3  go out and warn them.  So not necessarily, like,
4  they're cheering for me, but they want someone to
5  be warned.
6      Q.    Who wanted somebody to be warned?
7      A.    The people who are in hell.
8      Q.    And who are those people?
9      A.    Whoever didn't know Jesus Christ
10  of Nazareth.
11      Q.    Are you saying that there were
12  people in hell that agreed with the pride rally
13  that were saying that?
14      A.    No.  I meant whoever is down
15  there.  When you go to hell, it's not going to
16  matter what you represent.
17      Q.    And so those people that are
18  cheering, they're not cheering for the pride
19  rally.  They're cheering for what you were
20  saying?
21      A.    I feel like I was nervous when I
22  was talking to him.  I wouldn't probably say that
23  now again because that's another thing, that
24  because it was recorded, it doesn't -- it doesn't
25  make me feel good.  I was mixed up.

Page 161

1          What I was trying to say was, do
2  you know who wants us to be here?  The people who
3  are in hell, but it came out as, do you know who
4  is cheering for us?  So it almost looks like I'm
5  saying the people that are in hell are cheering
6  for us, which doesn't really make any sense, but
7  I was so anxious when I first saw him, I kind of
8  wish I would have calmed down myself and been
9  more talkative, but I just -- I went up, and I
10  didn't -- I've never experienced a police
11  interaction like that before, so I didn't have
12  practice in dealing with it.
13      Q.    Okay.  So it might be taken out
14  of context, what's in the video.  You weren't
15  necessarily meaning that anybody that was in the
16  vicinity was in hell?
17      A.    No.
18      Q.    You were trying to relate it to a
19  Bible passage?
20      A.    Yeah.  That's where it came from.
21  What I was thinking of when I thought of that was
22  the rich man and Lazarus, and Lazarus is asking
23  if someone can be sent to warn them not to come
24  to this place, and that's pretty much what I feel
25  like I was doing.

41 (Pages 158 - 161)

Plaintiff's App. 042

Page 162

1     And keep in mind, I'll put anyone
2  across that street in my house.  It doesn't
3  matter what you're doing or what you've done.  If
4  you're hungry, I'll get you something to eat, and
5  I want to help you read the Bible.  It doesn't
6  matter to me who you are or where you're from.
7  The ultimate goal is I want to sit with you and
8  read the Bible.  That's why I was there.
9     Q.    I'm going to try to show you a
10  video.  Hopefully it works.  Can you see this?
11     A.    Yes, sir.
12     Q.    I'm going to represent to you
13  that this is a video on YouTube that is a CBN
14  News posting title Man Arrested at Pride Event --
15  at a PA Pride Event.  And I'll try to find the
16  date.  It was posted on June 6, 2023.  I'm going
17  to play a little bit and then I'll ask you some
18  questions.
19         (Video being played.)
20     Q.    I'm going to pause it right
21  there.  We're paused at 20 seconds into the
22  video.  Do you recognize this video?
23     A.    Yes, sir.
24     Q.    Have you seen it in its entirety
25  before?

Page 163

1     A.    Yes, sir.
2     Q.    Who's the man that is
3  interviewing you?
4     A.    I'm not sure.
5     Q.    You don't know his name?
6     A.    He told me his name, but I forget
7  it.
8     Q.    Was his name Chris?
9     A.    I'm not sure.
10     Q.    Okay.
11         MR. READY:  May have been Dan
12     Andros.
13         THE WITNESS:  That's his name.
14     Chris was from the Lancaster Patriot, I
15     think.  See, that's what I'm saying,
16     stuff just gets, like, mixed up in my
17     head.
18  BY MR. CONLEY:
19     Q.    I'm going to ask you some
20  specific questions about this.  I'm not going to
21  make you watch the entire thing.  I'm going to
22  jump around a bit.  If you feel like you want to
23  watch the entire thing --
24     A.    I've seen it.  I don't need to.
25     Q.    -- for context.  So I'm going to

Page 164

1  jump -- I'm going to start here at 2:34.
2         (Video being played.)
3     Q.    I stopped it at three minutes
4  into the video.  Did you hear the portion of your
5  statements on the interview where you said that
6  you are aggressive towards sin?
7     A.    Yes.
8     Q.    What do you mean by that?
9     A.    Once again, at that time, it's
10  three days later, and sometimes what I want to
11  say, that's the tricky thing about videos because
12  once you -- it's there.  You can't go back and
13  fix it.  I don't know why.
14         I said that because I felt that
15  he was taking it as that I was being aggressive
16  towards them, so then what followed after I said
17  I wasn't there to be aggressive towards them, I'm
18  aggressive towards sin, but I'm not really
19  aggressive towards it.  Like, I don't want to
20  push people away or make you feel 'cause you're a
21  sinner.  I'm not better than you.  I just want to
22  help people, but I feel like at that time I
23  misspoke again.
24         And this is another reason why I
25  didn't want to do these after they were done

Page 165

1  because after I watched this I didn't feel good
2  about it, so I shouldn't have done this.  If they
3  called me, I thought I was helping, and it seemed
4  like I just made it worse.  So that's why after I
5  talked to him, I haven't done anything.  I don't
6  want to talk about it to anyone.
7         I don't want to do an interview
8  because it kind of -- it, like, manipulates it, I
9  feel like.  So I was saying that I felt like they
10  thought I was there to be aggressive towards
11  them, and I'm not aggressive towards them.
12         I should -- I don't even like
13  that word, I'm aggressive towards sin, but I'm
14  not -- I'm not okay, honestly, if you're living
15  in sin because I'm worried for you because what
16  if I never see you again and I had a chance to
17  warn you about it, but I didn't take that
18  opportunity.
19     Q.    Are you all right?
20     A.    Yeah.  Thank you.  How can I
21  spend an eternity in peace knowing that you're in
22  trouble, and that's how I feel about every single
23  one of them.
24     Q.    I'm sorry.  When you're pointing,
25  are you pointing to the people that are in the

42 (Pages 162 - 165)

1 pride celebration?
2      A.     Across the street and the guys
3 next to me if they came to me and talked to me.
4 You guys I'm worried about.  Him, I'm worried
5 about.  Everyone.  Anyone I look at I hope
6 they're okay because I have a feeling on that day
7 it's going to be a problem, and I don't want
8 anyone to go through that.
9           So I'm not quite sure why I said
10 that.  I just wanted him to know I wasn't
11 aggressive towards the other people, and maybe
12 looking back I feel like I wanted to say I'm
13 aggressive towards people reading the Bible.
14 Like, I'm aggressively trying to help them is
15 more like how I felt, but that's why I'm glad I
16 reached out to him because once you put a video
17 out, what's it?  1.7 million.  That's a lot of
18 people that might misunderstood what I said.
19 It's not a good feeling.
20           I didn't want none of this to
21 happen.  I didn't.  That's why I didn't have a
22 camera guy with me.  I didn't have a GoPro that
23 was filming.  When I stepped on that street I had
24 no video recording because I don't want to be in
25 this kind of spot.

1      Q.     Do you want to take a little
2 break?
3      A.     No.  I'm okay.
4           MR. READY:  We'll take a break.
5 Say, a two-minute break and come back.
6 How's that?
7           (A short break was taken.)
8 BY MR. CONLEY:
9      Q.     One other topic.  I'm going to
10 start it up here at 6:53, so I've jumped ahead.
11           (Video being played.)
12      Q.     A couple things.  Brother Matthew
13 is Matthew Wear?
14      A.     Yes, sir.
15      Q.     And Brother Chris is the guy we
16 don't know his last name from the Lancaster
17 Patriot?
18      A.     Yes, sir.
19      Q.     And you indicated there that
20 you've got brothers in Christ that are helping
21 you.  Are you talking about offers of legal help
22 or are you talking about other type of help?
23      A.     Yeah.  Basically, I was talking
24 about Matt and Chris that wanted to make sure
25 that I had legal for the criminal part of it.

1 They just said if you need anything, you know,
2 let us know.  And then I had lawyers sending me
3 letters saying that I'll represent you for free,
4 and here's my contact information.
5      Q.     All right.  We've already talked
6 about that, so I don't want to beat a dead horse.
7 You also said that you've received nothing but an
8 outpouring of love and support in the portion of
9 that video.  Did you see hear that?
10      A.     Yes, sir.
11      Q.     I know that you've said that
12 you've also read some negative comments about
13 you?
14      A.     Yes, sir.
15      Q.     At that time had you read any of
16 those negative comments?
17      A.     No.
18      Q.     And can you describe to me the
19 outpouring of love and support that you were
20 talking about at the time of this interview?
21      A.     It was from the people that were,
22 like, around me.  Brother Jose.  Chris I thought
23 was really nice that he offered to help me out.
24 My sisters.  It sounds like I'm saying more, but
25 it was just a few people.

1           But it just felt like a lot
2 because there was so much going on.  People were
3 texting and calling, and people wanted to sit and
4 talk with me.  It just -- it felt like the people
5 that were surrounding me were trying to help me.
6      Q.     Had you ever done a news
7 interview before?
8      A.     No, sir.
9      Q.     That was your first time?
10      A.     Yes, sir.
11      Q.     Did you do any prep with the
12 interviewer, Dan Andros, before the interview?
13      A.     No, sir.
14      Q.     Did he tell you what he might ask
15 you about?
16      A.     No, sir.
17      Q.     Okay.  That's all I have on the
18 video.  Thank you.
19           I wanted to ask you about your
20 cell phone.  I know we brought that up earlier.
21 Is it on and working?  Would you mind grabbing
22 it?  So I guess a couple of things.  Do you have
23 any contact information for Dan Andros and/or
24 Matt Wear?
25      A.     No.  Can I show you my contacts?

Plaintiff's App. 044

1    Q.    Sure.  Is that the complete list?
2    A.    Yes.  Remember how I said I kind
3 of -- once in a while I wipe it out.
4    Q.    So you do have Brother Jose on
5 there?
6    A.    Yes.
7    Q.    Got you.  Thank you.
8    A.    Yep.
9    Q.    Have you changed that contact
10 list or deleted anything from that contact list
11 in the last -- from the filing of your lawsuit?
12    A.    Yes.
13    Q.    You have?
14    A.    Yes.
15    Q.    When did you delete information
16 from the contact list?
17    A.    Two days ago I deleted all my
18 sisters and then they reached out to me, and I
19 put them back in there.
20    Q.    Why did you delete your sisters
21 two days ago?
22    A.    Why?
23    Q.    Yeah.
24    A.    Because I felt like I was trying
25 to help them, but there's, like, resistance

1 there.  I get, like, frustrated and so that's why
2 I do that because I feel like if you're in my
3 life, then you're going to come back to my
4 contacts anyway.
5    Q.    So you felt frustrated that they
6 weren't -- that they were resisting your
7 evangelizing?
8    A.    Not so much that.  Even my help,
9 like, outside of the Bible.  They have children
10 that are -- there's stuff going on in their life,
11 and I feel like when they tell me that, that
12 stuff stays with me, and they might not realize
13 that.  So sometimes I feel like it's better that
14 I don't talk to them because they're not aware of
15 what's happening when they're not talking to me.
16         And then if I try to help them
17 and they don't want to do something about it,
18 then I'm stuck feeling sad and upset, and I feel
19 like they just want someone to talk to, but now
20 they're back in there, and we're doing good.
21 It's a family, you know, so...
22    Q.    I don't want to delve into
23 your -- have your family relationships been
24 negatively affected by this lawsuit?
25    A.    No, sir.

1    Q.    I'm going to ask you to look at
2 your text messages.  Do you have any text
3 messages from Matt Wear?
4    A.    No.  Can I show you?
5    Q.    Yes.  Those are the only text
6 messages you have?
7    A.    Yes, sir.
8    Q.    You got one from Erica and one
9 from Sara?
10    A.    Yes, sir.
11    Q.    Okay.  It looks like those were
12 sent today.  Is that correct?
13    A.    Yeah.  I shut my phone off when I
14 came in here till you asked me to turn it on.
15    Q.    Got you.  Have you deleted text
16 messages since the filing of this lawsuit?
17    A.    Yes, sir.
18    Q.    When did you do that?
19    A.    Every day.
20    Q.    You delete text messages every
21 day?
22    A.    I try to, yeah.
23    Q.    So suffice it to say, you would
24 not have any text messages from Matthew Wear
25 either before or after the lawsuit?

1    A.    No, sir.
2    Q.    You didn't save them or download
3 them on your computer?
4    A.    I didn't think to.  No, sir.
5    Q.    Have you ever updated that phone
6 onto your computer?
7    A.    No, sir.
8    Q.    And it's an Android phone, right?
9    A.    I believe so.  Yeah.  Yes, sir.
10    Q.    It's not an Apple.  Okay.  What
11 service provider is your cell phone?
12    A.    Comcast.
13    Q.    Same question.  You don't have
14 any text messages from Dan Andros?
15    A.    No, sir.  He text me, but I
16 deleted them.
17    Q.    When did he last text you?
18    A.    Around the interview.  After I
19 did the interview I just deleted all his texts.
20 His number, obviously, was attached to it.
21    Q.    What was the content of those
22 text messages?
23    A.    Just am I available.  Do I want
24 to do the interview and what time.
25    Q.    Okay.  Did he text -- so it was,

Page 174

1 like, setup?
2    A.   Yeah.
3    Q.   Did he text you after the
4 interview?
5    A.   No, sir.
6    Q.   With regard to Matt Wear, from
7 your recollection, other than him sending you the
8 video, which I believe you said was via text
9 message?
10    A.   I believe so.  I think that's
11 what it was.  Yeah.
12    Q.   Other than --
13    A.   He doesn't have my email, so I'm
14 sure it's text.
15    Q.   Did you respond in any way to
16 that text message that you can remember?
17    A.   Yes, sir.
18    Q.   What did you say?
19    A.   I don't remember.  I think I said
20 thank you, and call me if you need anything, like
21 stuff like that.
22    Q.   Did he call you afterwards?
23    A.   No, sir.
24    Q.   Other than that exchange of text
25 messages, did you have any other text message

Page 175

1 exchanges with Matt Wear?
2    A.   I think I text him and asked if
3 he needs help with counsel, and he never replied.
4    Q.   Did he tell you that he needed
5 help with an attorney?
6    A.   No.  I was just, like, checking
7 in with him.
8    Q.   Is there a reason that you
9 thought he might need an attorney's help?
10    A.   I feel like my attorney asked
11 me --
12    Q.   I don't want to hear what your
13 attorney said.
14    A.   I wanted to see if he needed
15 help.
16    Q.   Okay.  But you don't have any
17 specific reason that you know of that he might
18 have needed help?  Were you aware that he had
19 been sued or anything like that?
20    A.   No.  I feel like his rights were
21 violated as well.
22    Q.   I'll leave it at that.  Let me
23 just go through my notes.
24       MR. CONLEY:  Can we go off the
25    record?

Page 176

1       (A discussion was held off the
2    record.)
3 BY MR. CONLEY:
4    Q.   Just a couple more questions.
5    A.   You can ask me whatever you want.
6 I'm not in a rush.  You're not bothering me.
7    Q.   You also filed a lawsuit against
8 Officer Courtney Dupree.  Is that correct?
9    A.   Yes, sir.
10    Q.   Okay.  What are your allegations
11 against her?
12    A.   That she violated my rights.
13    Q.   How so?  What did she do to
14 violate your rights?
15    A.   By not saying something to him.
16    Q.   So do you believe that she should
17 have intervened and stopped him from doing
18 something?
19    A.   Yes, sir.
20    Q.   What should she have done to
21 intervene and stop him from doing something?  And
22 by him, I'm referring to Sergeant McClure.
23    A.   She should have stuck up for my
24 rights because she was trained and took an oath
25 to do that.

Page 177

1    Q.   Do you know the oath that she
2 took?
3    A.   No, sir.
4    Q.   Other than that, that she should
5 have stepped in, what are your claims against
6 her?
7    A.   That's it.
8    Q.   You don't allege that she made
9 any statements that harmed you?
10    A.   No, sir.
11    Q.   You don't allege that she
12 physically harmed you in any way?
13    A.   No, sir.
14    Q.   You don't allege that she
15 assaulted you or battered you?
16    A.   No, sir.
17    Q.   You don't alleged that she
18 defamed you?
19    A.   No, sir.
20    Q.   You don't allege that she
21 published things about you that placed you in a
22 false light in the community?
23    A.   No, sir.
24       MR. CONLEY:  Okay.  That's it.
25    That's all I have.  Thank you.  Your

45 (Pages 174 - 177)

Plaintiff's App. 046

Page 178

1    counsel might have some questions.
2          * * *
3             EXAMINATION
4  BY MR. READY:
5     Q.    Just a few questions, and some of
6  these are going to seem a little random.  I just
7  want to clear up a few things on the record.  For
8  the record, what is your race?
9     A.    Caucasian.
10    Q.    You've been asked about an
11 amplifier system, a public address-type system
12 that you sometimes wear.  Did you have that with
13 you on June 3rd, 2023?
14    A.    Yes, sir.
15    Q.    Were you using it?
16    A.    No, sir.
17    Q.    Did you have it on?
18    A.    No, sir.
19    Q.    Were you wearing it?
20    A.    No, sir.  It was in my bag.
21    Q.    You told a story earlier about --
22 I think you said it was on 5th and Penn, if I
23 remember correctly, but I'm not sure, about an
24 officer telling you to turn that same address
25 system off?

Page 179

1     A.    Yes, sir.
2     Q.    That was another date completely,
3  correct?
4     A.    Yes, sir.
5     Q.    And was that after this incident?
6     A.    It was before.
7     Q.    In interacting with Officer
8  McClure, did he tell you that there was a certain
9  volume that you had to maintain?
10    A.    No, sir.
11    Q.    Did he tell you how loud you
12 could be?
13    A.    No, sir.
14    Q.    Did he tell you how far back you
15 had to stand?
16    A.    No, sir.
17    Q.    You talked a little bit about
18 having tunnel vision when you walked up.  Did you
19 see the rally?
20    A.    Yes, sir.
21    Q.    Did you have time to -- did you
22 hear how -- did you hear people talking at the
23 rally?
24    A.    No, sir.
25    Q.    What was going on at that time

Page 180

1  over at the pride rally across the street?
2     A.    Me and the officer's
3  conversation.  That's when, as I walked up, I saw
4  a gathering, but I didn't really hear and then as
5  soon as I approached the men that were standing
6  there, I don't even remember what the sign said
7  he was holding.  I just focused in on him.  I
8  felt like he came directly up to me.
9     Q.    Who is "he"?
10    A.    The officer.
11    Q.    Okay.  You talked about somebody
12 with a sign they were holding.  Do you remember
13 what that sign said?
14    A.    No, sir.
15    Q.    What did you say to the
16 protesters across the street or the pride rally
17 attendants?
18    A.    Well, I remember after I spoke
19 with the officer, someone was pointing at me and
20 to the sign, and that's when I said, yo.  Like, I
21 was yo'ing to that person and then I was going to
22 start by saying God is not the author of
23 confusion.
24    Q.    How far into that did you get?
25    A.    God is not.

Page 181

1     Q.    And after the officer began his
2  arrest, you attempted to say something else.
3  What was that?
4     A.    After they were laughing at me,
5  it kind of felt like I was being punched in the
6  stomach, so I at least wanted to finish what I
7  started saying, and I was going to try to finish
8  saying, God is not the author of confusion.
9     Q.    And what happened when you tried
10 to say that again?
11    A.    I was swung around and pushed up
12 against the wall.
13    Q.    Who swung you around?
14    A.    The officer.
15    Q.    You pointed across the table.
16 Which officer?
17    A.    Officer McClure.  Is that how you
18 say your name?  I'm sorry.
19    Q.    Did you observe the officers
20 wearing pride wristbands?
21    A.    No, sir.
22    Q.    You talked about people laughing.
23 Who was laughing?
24    A.    There was laughing and clapping
25 across the street.

46 (Pages 178 - 181)

Plaintiff's App. 047

Page 182

1    Q.    You said there was laughing --
2 sorry.  You said there was laughing and clapping
3 across the street?
4    A.    Yes, sir.
5    Q.    You mean at the pride rally?
6    A.    At the rally.  Yes, sir.
7    Q.    Could you tell what, if anything,
8 they were laughing or clapping about?
9        MR. CONLEY:  Objection to form.
10    Calls for speculation.  Go ahead.
11    A.    Well, I felt like it started
12 after he put me in handcuffs, so I just felt like
13 it was laughing at me.
14    Q.    The shirt that you were wearing,
15 what did it say?
16    A.    It said:  You must be born again.
17 And on the back it says:  Except a man be born
18 again, he will not see the kingdom of heaven.
19    Q.    What is that quote from?
20    A.    It's from the Bible.
21    Q.    And who said that?
22    A.    Lord Jesus.
23    Q.    You were holding a sign that was
24 double-sided, correct?
25    A.    Yes, sir.

Page 183

1    Q.    And what did the sign say?
2    A.    The sign said:  Jesus said go and
3 sin no more.  The other side said:  Jesus said I
4 am the way, the truth and the life.
5    Q.    And what are those quotes from?
6    A.    What chapter in the Bible?
7    Q.    Sure.
8    A.    Well, Jesus said them.  Like I
9 said, when I street preach, I kind of just, like,
10 go off the cuff.  I have flashcards with verses
11 that I try to remember, but sometimes it's hard
12 for me to remember the exact part of the Bible.
13    Q.    That's okay.  My question may
14 have even been more general than that.  You're
15 saying both of those quotes are from the Bible.
16 Is that correct?
17    A.    Yes, sir.  Yeah.
18    Q.    Did your sign have any other
19 words on it?
20    A.    No, sir.
21    Q.    Okay.  Did your shirt have any
22 other quotes than the ones you told us about?
23    A.    No, sir.
24    Q.    Did you say to any of the
25 protesters across the street anything other than

Page 184

1 yo God is not?
2    A.    No, sir.
3    Q.    There was some questions about
4 demons earlier.  Did you call someone while
5 present at the rally a demon?
6    A.    No, sir.
7    Q.    Okay.  Your message, is it -- do
8 people sometimes find it offensive when you're
9 street preaching?
10    A.    Yes, sir.
11    Q.    So why do you persist?  Why do
12 you keep sharing your message even if people are
13 offended by it?
14    A.    Well, because the Bible says go
15 into all the world and preach the gospel.  And
16 like I said earlier, I'm living proof that this
17 book changed my life.  So sometimes I have
18 trouble even sleeping at night knowing that I
19 feel like I should just street preach for the
20 rest of my life.
21        In fact, I'm kind of tempted to
22 do that, to go to Miami with nothing but the
23 clothes on my back and spend the rest of my life
24 telling people about Jesus Christ.  That's how
25 serious I am because I don't want to be somewhere

Page 185

1 knowing I could have told someone, and I didn't
2 help them.  I would want someone to do it for me.
3 I wish someone would have sat me down and read
4 the Bible with me when I was younger.  Maybe it
5 would have stopped me from doing some of the
6 things I've done.
7    Q.    You've been asked a lot about
8 Matthew Wear?
9    A.    Yeah.
10    Q.    And I guess he sent you a
11 message.  Have you had any other communication
12 other than texts you told counsel about with
13 Matthew Wear since this event?
14    A.    No, sir.
15    Q.    Have you had any -- did you have
16 any communication with him -- other than the one
17 day you both basically preached in the same spot,
18 did you have any communication with him before
19 this event?
20    A.    Just that one day.  He came out
21 of nowhere.  I didn't even know who he was, and
22 he street preached with me for a couple minutes,
23 and I gave him my number.  Then I saw him a year
24 later at that event.
25        Then a few weeks later he came up

47 (Pages 182 - 185)

Plaintiff's App. 048

Page 186

1 to me and Brother Jose when we were at Queen City
2 Diner.  He did a few minutes and then he left.  I
3 reached out to him here and there, and I
4 don't -- it's not someone I talk to regularly,
5 which is why I don't have his number in my phone.
6     Q.    During the conversation with
7 Sergeant McClure, he told you to respect them.
8 First of all, who did you think he was referring
9 to, the them?
10    A.    The people across the street.
11    Q.    And what did you think he meant
12 by respect them?
13    A.    Well, I'm not sure.  Like, it
14 never dawned on me that I wasn't able to talk, so
15 the respect, assuming I wasn't going to, like,
16 throw anything, act a certain way.  I wasn't
17 going to cross the street.  I wasn't going to
18 name call or point anyone down.  Respect, I took
19 it as that as I thought.  It never crossed my
20 mind that I wasn't allowed to talk.  That thought
21 never crossed my mind.
22    Q.    Did any other officer speak to
23 you before you were arrested other than Sergeant
24 McClure?
25    A.    No, sir.

Page 187

1     Q.    Was your voice louder than the
2 just general speaking and discussion of the crowd
3 across the street?
4     A.    No, sir.
5           MR. CONLEY:  Objection to form.
6     Q.    The phrase "God is not the author
7 of confusion," where does that come from?
8     A.    It comes from the Bible.
9     Q.    One moment.  What effect do you
10 hope that your preaching has on people who are
11 listening?
12    A.     Just like the young man that I
13 saw the change in his face, the Bible says God's
14 word does not return void.  So no matter who you
15 talk to, it will impact them in a different way.
16 I just want everyone to be okay.  No matter who
17 you are or where you're from, I just want you to
18 be okay.  And if you feel that you were born a
19 certain way, I want you to know you can be born
20 again.
21    Q.    Did Officer Dupree assist
22 Sergeant McClure in arresting you?
23    A.    I'm not sure who that was.  The
24 one with the short hair?  The long hair?
25    Q.    Sure.  No.  The officer with the

Page 188

1 long hair.
2     A.    Yes, sir.
3     Q.    And how did she assist?
4     A.    She helped go through my bag.
5     Q.    Were you carrying any weapons
6 with you that day?
7     A.    No, sir.
8     Q.    Did you engage in fighting with
9 anyone?
10    A.    No, sir.
11    Q.    Did you engage in threats with
12 anyone?
13          MR. CONLEY:  Objection to form.
14    A.    No, sir.
15    Q.    Did you threaten people from the
16 pride rally, the officers, anyone?
17    A.    No, sir.
18    Q.    Did you engage in any violent
19 behavior?
20    A.    No, sir.
21          MR. CONLEY:  Object to the form.
22    Q.    Did your speech cause any
23 disruption of the pride march and rally?
24          MR. CONLEY:  Objection to form.
25    You can answer.

Page 189

1     A.    No, sir.
2     Q.    Did anything else you did disrupt
3 the pride march and rally?
4     A.    No, sir.
5     Q.    When you were being taken away by
6 the officers, did you hear someone come on the PA
7 system at the pride rally and begin speaking?
8     A.    No, sir.
9     Q.    Okay.  Do you recall someone
10 speaking at the pride rally?
11    A.    Yes, sir.
12    Q.    And do you recall what they were
13 saying?
14    A.    At the time it was, like, you
15 know, tunnel vision, but after I looked back, you
16 know, I can hear, and I remember it getting
17 started as I was walking away.
18    Q.    Do you remember what was said?
19    A.    No, sir.
20    Q.    Was the event in progress when
21 you arrived?
22    A.    No, sir.
23    Q.    Did the handcuffing cause you any
24 physical pain?
25    A.    At the time, just they were too

48 (Pages 186 - 189)

Plaintiff's App. 049

Page 190

1 tight.
2      Q.    How long were you handcuffed?
3      A.    I would say an hour maybe until I
4 got to the police station and they let me out.
5      Q.    Were they too tight throughout
6 that time?
7      A.    I'm not sure.  I just remember at
8 first they were.
9      Q.    You were arraigned by a judge
10 that day?
11     A.    Yes, sir.
12     Q.    Did anyone give you a Miranda
13 warning at any time, telling you that what you
14 said could be used against you, that you had a
15 right to counsel?  Did you hear that from an
16 officer at any point?
17          MR. CONLEY:  Objection to form.
18 You can answer.
19     A.    Yes, sir.
20     Q.    Do you remember who told you
21 that?
22     A.    No, sir.
23     Q.    Okay.  Was it the judge when you
24 were arraigned?
25     A.    I'm not sure.

Page 191

1      Q.    Okay.  Did you have bail set by
2 the judge during that arraignment?
3      A.    I don't remember.  I thought they
4 said I wasn't going to get bail because of the
5 charge.
6      Q.    Did they maybe tell you you were
7 released on your recognizance?
8      A.    I think that's what she said.
9 Yes, sir.
10     Q.    Do you remember what judge you
11 saw?
12     A.    It was a female.
13     Q.    Was it on video?
14     A.    Yes, sir.
15     Q.    How long were you in a holding
16 cell at central booking?
17     A.    A couple hours.
18     Q.    Who was -- were there people in
19 there with you?  Were you alone?
20     A.    Yes, sir.  There were people in
21 there.
22     Q.    How many people were in with you?
23     A.    Three or four.
24     Q.    Did they tell you what they were
25 there for?

Page 192

1      A.    Yes, sir.
2      Q.    What were they there for?
3      A.    Different charges.
4      Q.    Do you remember any of them?
5      A.    Abuse, missing a court date,
6 something with his baby's mom, the other guy.
7      Q.    Did you tell them what you were
8 there for?
9      A.    They kind of knew.
10     Q.    Okay.  How did they know?
11     A.    They said my shirt, and I didn't
12 look like I belonged in there.
13     Q.    Did anyone interview you from the
14 police department?
15     A.    No.
16     Q.    So, in other words, just to make
17 sure that question is clear.  After Sergeant
18 McClure got you in a -- they call it the wagon to
19 take you over to central booking, a police
20 officer or detective didn't come and have a
21 discussion with you about what had happened, did
22 they?
23          MR. CONLEY:  Objection to form.
24     A.    I don't really remember.  I don't
25 think they asked me questions and all.  They just

Page 193

1 kind of processed me.  I talked to the intake
2 officer about Jesus, and that was about it.
3      Q.    So you've been asked some
4 questions about this, but since June 3rd, 2023,
5 how has this arrest affected your life?
6      A.    Well, like I said earlier, just
7 anxiety, and I feel like I don't want anyone to
8 think that I didn't tell the truth of what
9 happened that day.  I don't like how they said
10 there's more to the story and I was there for an
11 hour.  I don't like being attached to these
12 companies.
13     Q.    Has this affected your ability to
14 sleep at all?
15     A.    A few nights, but not really.
16 No.  No, sir.
17     Q.    Have you been affected with
18 tiredness or fatigue as a result of this
19 incident?
20     A.    No, sir.
21     Q.    Damon, we've talked about sin a
22 lot today, which is fairly unusual for
23 depositions, but what are the consequences of sin
24 that you are concerned about?
25     A.    Well, the separation of God, and

49 (Pages 190 - 193)

Plaintiff's App. 050

Page 194
1 what really concerns me is that there's an
2 alternative, and a lot of people, especially our
3 younger generation, aren't aware of it because
4 people attack the Bible. They say it's manmade,
5 and it's not true, but I'm living proof that it
6 is because it changed my life.
7     Q.    What does someone have to do to
8 be born again?
9         MR. CONLEY:  Objection to form.
10     You can answer.
11     A.    They have to have a relationship
12 with Jesus Christ of Nazareth, and he'll tell you
13 exactly what to do.
14     Q.    This message that you're sharing,
15 you've talked about it being called evangelism.
16 Is it also known as the gospel?
17     A.    Yes, sir.
18         MR. READY:  I have nothing
19     further.
20             * * *
21         RE-EXAMINATION
22 BY MR. CONLEY:
23     Q.    I've got a couple. I'm going to
24 start right there at the end because it's fresh.
25 Counsel just asked you some questions about sin

Page 195
1 and the consequences thereof. I want to ask you
2 something a little bit differently. Do you
3 believe that it is okay for people not to agree
4 with you about your views upon the consequences
5 of sin?
6     A.    Yes, sir.
7     Q.    Are people necessarily
8 wrong in their views?
9     A.    I'm worried. I can't say whether
10 they're right or wrong.
11     Q.    Okay. You mentioned that you had
12 a couple of nights where you struggled to sleep?
13     A.    Yes, sir.
14     Q.    I think you said a few nights. I
15 don't want to put words in your mouth. Do you
16 have any specific recollection of when those
17 nights were?
18     A.    No. The last one was last night.
19 I just feel uneasy.
20     Q.    And that was because this is the
21 first deposition you've ever given before, right?
22     A.    Yeah. And I just -- I don't want
23 to misrepresent Jesus or God. That worries me
24 more than anything.
25     Q.    And that's because you're

Page 196
1 testifying today?
2     A.    Yes, sir.
3     Q.    The people in jail, you were
4 asked some questions about they knew what you
5 were there for based upon what was on your shirt?
6     A.    Yes, sir.
7     Q.    Did you talk to them about it?
8     A.    No. They just said you don't
9 look like you belong here.
10     Q.    They didn't say we know why
11 you're here?
12     A.    No. And then they asked me, and
13 I started talking to them.
14     Q.    Okay. So after they asked you,
15 you explained why you were arrested?
16     A.    Yes.
17     Q.    Have you maintained contact with
18 any of those individuals?
19     A.    No, sir.
20     Q.    You mentioned that the handcuffs
21 were too tight. Have you been handcuffed at any
22 other point in your life?
23     A.    Yes, sir.
24     Q.    When was that? Was that with the
25 two arrests?

Page 197
1     A.    When I was younger, yes, sir.
2     Q.    Were these handcuffs tighter than
3 those events?
4     A.    Well, that was a long time ago,
5 but I don't remember feeling that pain before
6 when I was at the house party and when I was in
7 that car with my friends, so I can't -- I just
8 don't remember. I don't remember feeling that
9 pain before.
10     Q.    Okay.
11     A.    I didn't say these are too tight
12 to the officer that was arresting me. I remember
13 that.
14     Q.    But you didn't seek any medical
15 treatment --
16     A.    No, sir.
17     Q.    -- to your wrists or anything
18 like that?
19     A.    No, sir.
20     Q.    You mentioned in response to your
21 counsel's questioning that you were trying to
22 quote the Bible regarding the passage saying yo
23 God -- not yo. Yo is probably not in the Bible.
24 God is not the author of confusion?
25     A.    Yes, sir.

50 (Pages 194 - 197)

Plaintiff's App. 051

1    Q.    When you're saying that to the
2  people across the street, would it be reasonable
3  for somebody to assume that you're telling them
4  that they're confused?
5    A.    No, sir.
6    Q.    You don't think it's reasonable
7  for somebody to interpret that statement as a
8  suggestion that they are confused?
9    A.    No, sir.
10   Q.    Okay.  But you did tell your
11 counsel that some people feel uncomfortable by
12 your message?
13   A.    Yes, sir.
14   Q.    If somebody were to imply that
15 you were confused, would that make you feel any
16 particular way?
17   A.    No, sir.
18   Q.    If somebody were to imply that
19 you were a sinner, would that make you feel any
20 particular way?
21   A.    Well, I know I am, so no, sir.
22   Q.    No.  Okay.  Do you think some
23 people might be upset by an implication that
24 they're sinners?
25   A.    No, sir.

1    Q.    When you say go and sin no more
2  as was on your sign, would it be reasonable for
3  somebody to interpret that as suggesting that
4  they are a sinner?
5    A.    No, sir.
6    Q.    Why are you saying -- or why are
7  you carrying a sign that says go and sin no more
8  to a pride event rally?
9    A.    Because I feel like we're all
10 sinners, and that is meant to provoke
11 conversation because I'm the same as you.  I'm no
12 different.
13   Q.    Would you carry that sign to a
14 evangelical event?
15   A.    I carry it with me all over.
16 Yes, sir.
17   Q.    Have you ever carried it to an
18 evangelical event?
19   A.    What?  Like, church?
20   Q.    Any sort of --
21   A.    I've brought it into churches
22 before.  Yes, sir.
23   Q.    Okay.  And you mentioned that
24 your shirt said you must be born again?
25   A.    Yes, sir.

1    Q.    The word "must" was in there?
2    A.    Yes, sir.
3    Q.    Okay.  Would it be reasonable for
4  somebody to interpret the word "must" as a
5  directive?  As an order?
6    A.    Yes, sir.
7    Q.    Do you particularly like it when
8  people give you orders?
9    A.    Well, it depends on the order and
10 if they're trying to help me or not.  I've been
11 given orders to do things that hurt my life.
12 I've been given orders to do things that help it.
13 There's a difference.
14   Q.    And whether something hurts your
15 life or helps your life is kind of subjective to
16 the person, right?
17   A.    Yes, sir.
18        MR. CONLEY:  That's all I have.
19 I appreciate it.  Thank you for answering
20 my questions today.  Your counsel may
21 have follow-up questions.
22        MR. READY:  No.  I have nothing.
23 Thank you.
24        (Deposition was concluded at 4:39
25 p.m.)

1        CERTIFICATE
2
   COMMONWEALTH OF PENNSYLVANIA )
3                            )SS:
   COUNTY OF MONTGOMERY         )
4
5        I, Lauren Buchak, Notary Public,
6  Registered Merit Reporter and Certified Realtime
   Reporter, do hereby certify that prior to the
7  commencement of the examination, DAMON ATKINS was
   duly sworn or affirmed by me to testify to the
8  truth, the whole truth and nothing but the truth.
9        I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
10 testimony as taken stenographically by me at the
   time, place and on the date hereinbefore set
11 forth, to the best of my ability.
12       I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney nor
13 counsel of any of the parties to this action, and
   that I am neither a relative nor employee of such
14 attorney or counsel, and that I am not
   financially interested in the action.
15
16
17
18
   LAUREN A. BUCHAK, RMR, CRR
19
   Notary ID Number:  1115041
20
   Notary Expiration:  February 20, 2028
21
   Dated:  April 8, 2024
22
23
24
25

51 (Pages 198 - 201)

Plaintiff's App. 052

```
                                           Page 1

 1            IN THE UNITED STATES DISTRICT COURT

            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 2

 3      DAMON ATKINS,              : Civil No.

        Plaintiff                  : 5:23-cv-02732-JMG

 4                                 :

 5            vs.                  :

 6                                 :

 7      CITY OF READING, EDDIE     :

 8      MORAN, RICHARD TORNIELLI,  :

 9      BRADLEY T. MCCLURE, and    :

10      COURTNEY DUPREE,           :

11      Defendants                 :

12

13                          - - -

14

15                  Friday, March 22, 2024

16

17                          - - -

18

19

20            Deposition of SERGEANT BRADLEY T. McCLURE

21      taken in the Law Offices of Cornerstone Law Firm,

22      LLC, 8500 Allentown Pike, Suite 3, Blandon,

23      Pennsylvania, on the above date, commencing at

24      8:58 a.m. before Lauren A. Buchak, Registered

25      Merit Reporter and Certified Realtime Reporter.
```

Plaintiff's App. 053

Page 2

1   APPEARANCES:
2
3        CORNERSTONE LAW FIRM, LLC
4        By: JOEL A. READY, ESQUIRE
5        8500 Allentown Pike, Suite 3
6        Blandon, PA  19510
7        610-926-7875
8        joel@cornerstonelaw.us
9        -- For the Plaintiff
10
11       MacMAIN LEINHAUSER, P.C.
12       By: BRIAN C. CONLEY, ESQUIRE
13       433 West Market Street, Suite 200
14       West Chester, PA  19382
15       484-318-7106
16       bconley@macmainlaw.com
17       -- For the Defendants
18
19
20
21
22
23
24
25

Page 4

1        DEPOSITION SUPPORT INDEX
2   Directions to Witness Not to Answer
3   PAGE        LINE
4
5
    Request for Production of Documents
6
    PAGE        LINE
7
8
9   Stipulations
10  PAGE        LINE
11
12
    Questions Marked
13
    PAGE        LINE
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        INDEX TO WITNESSES
2
    WITNESS              PAGE
3
    SERGEANT BRADLEY T. McCLURE
4
    By Mr. Ready          5, 147
5
    By Mr. Conley         132
6
7
8
9        INDEX TO EXHIBITS
10                     PAGE
    EXHIBIT    DESCRIPTION       MARKED
11
12
13      (No exhibits were marked.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        SERGEANT BRADLEY T. McCLURE,
2   after having been duly sworn, was
3   examined and testified as follows:
4              * * *
5        MR. CONLEY:  Usual stipulations?
6        MR. READY:  Yes.  Usual
7   stipulations except he may read and sign.
8        MR. CONLEY:  We'll let you know
9   afterwards.
10             * * *
11       EXAMINATION
12  BY MR. READY:
13       Q.    Good morning, Sergeant McClure.
14       A.    Good morning, sir.
15       Q.    It's good to meet you again.  I
16  know we met yesterday.  My name is Joel Ready.
17  I'm representing Damon Atkins in this case.  I
18  know you sat through everything yesterday, so
19  you've heard these instructions, but I'm just
20  going to run through them again real quick.  I'll
21  ask you to let me finish all of the question
22  before you try to answer, and I will do my best
23  to let you finish your answer before I jump in.
24  Okay?
25       A.    Yes.

2 (Pages 2 - 5)

Page 6

1    Q.    Second, you're doing a great job
2 so far.  Try to verbalize your responses rather
3 than nodding or saying uh-huh or uh-uh.  That's
4 for our court reporter's benefit.
5    A.    Yes.
6    Q.    And then third and finally, feel
7 free to take a break at any time.  I would just
8 ask that you finish whatever question you're on,
9 but if you need a break, just let me know, and
10 we'll stop.  Okay?
11    A.    Yes, sir.
12    Q.    All right.  Would you state your
13 full name for our record?
14    A.    Bradley T. McClure.
15    Q.    Throughout today I'll be
16 referring to the city, and you'll understand, I
17 think, that that's the City of Reading, correct?
18    A.    Yes.
19    Q.    Where are you employed?
20    A.    City of Reading Police
21 Department.
22    Q.    How long have you been employed
23 there?
24    A.    I was hired July 2nd of 2007.
25    Q.    You currently hold the rank of

Page 7

1 sergeant.  Is that correct?
2    A.    Yes, sir.
3    Q.    How long have you been a
4 sergeant?
5    A.    I was promoted January -- it was
6 either 1st or 2nd of 2017.  I don't know what
7 date that was effective.
8    Q.    How old are you today?
9    A.    I'm sorry?
10    Q.    How old are you today?
11    A.    Fifty-two.
12    Q.    What did you do before you worked
13 with the Reading Police Department?
14    A.    I was a corrections officer at
15 Berks County Prison.
16    Q.    How long were you there?
17    A.    I was there from October 13, '99
18 until June 30th of 2007.
19    Q.    So you were here yesterday when
20 we showed some footage.  You've seen the body cam
21 footage in this case, correct?
22    A.    Yes, sir.
23    Q.    And that body cam was a Reading
24 Police Department-issued body camera, correct?
25    A.    Yes, it was.

Page 8

1    Q.    And you were wearing that
2 pursuant to the City's rules at that time?
3    A.    Yes, sir.
4    Q.    Okay.  So I want to take you back
5 to June 3rd of 2023.  How long had you been on
6 duty that day when this confrontation with Mr.
7 Atkins began?
8         MR. CONLEY:  Objection to the
9    form, but you can answer.
10    Q.    Let's see if I can clean that
11 question up.  I can probably ask it better.  When
12 did you start your shift that day?
13    A.    The best that I can recall,
14 because this was an overtime shift, so it
15 wouldn't have been my normal starting time.  I
16 believe it was 8:30 in the morning.
17    Q.    Was this a Saturday?
18    A.    Yes, sir.
19    Q.    Okay.  When you say overtime
20 shifts, what does that mean?
21    A.    In my current job as a traffic
22 sergeant, so by contract my hours are Monday to
23 Friday, 7:00 to 3:00.  So anything outside of
24 Monday to Friday, 7:00 to 3:00 would be overtime.
25    Q.    What does it mean that you're a

Page 9

1 traffic sergeant?
2    A.    Well, I'm the supervisor for the
3 traffic unit.  Now, the traffic unit in Reading,
4 the patrolmen handle the traffic issues,
5 obviously.  They handle, like, school bus
6 violations, like when people drive around the
7 stop sign, abandoned cars, if we have complaints
8 about, like, speeding on certain roads, and we
9 are also in charge of all special events in
10 Reading.
11    Q.    And that would include a
12 permitted event like the one at issue here?
13    A.    Yes, sir.  Yeah.
14    Q.    Why is your department in charge
15 of permitted events?
16    A.    I don't know the answer to that.
17    Q.    Okay.  Fair enough.  Is that
18 related to the fact that traffic has to be shut
19 down or is that just how kind of the lot falls on
20 who's responsible?
21    A.    You probably hit it right there.
22 I don't know, but the fact that obviously most of
23 these events affect traffic is probably how it
24 turned out that way.  It was certainly this way
25 when I started.  I'm not a hundred percent sure

Plaintiff's App. 055

Page 10

1 why we have it.
2    Q.   Okay.  So I want to just start on
3 the -- there was some discussion yesterday with
4 Chief Tornielli about the distortion of body
5 camera footage?
6    A.   Yes.
7    Q.   You've seen the body camera
8 footage in this case, correct?
9    A.   Yes.
10   Q.   Do you think it reflects what you
11 saw that day?
12   A.   Well, what I saw -- again, in
13 line with what he said, of course it's not
14 exactly what I saw because the -- I wear my body
15 camera here, which is -- I wish it could be
16 higher, but just the way our shirts are, this is
17 as high as it can go.
18        And, obviously, it only captures
19 what was happening at that moment.  Like, it
20 doesn't see anything out of the peripheral
21 vision.  It doesn't see anything, you know,
22 behind me.  So like Chief Tornielli said, and
23 we're taught this even when we started wearing
24 the body cameras, they're a tool, and they're a
25 great tool to have, and I'm glad that we have

Page 11

1 them, but they do have their limitations.
2    Q.   You mentioned the height of the
3 camera and the peripheral that doesn't capture.
4 Is there anything else that you think the body
5 cameras don't accurately capture when they're on?
6    A.   Well, just, I believe distances
7 and sizes of things are distorted just based on
8 their filming angle and where they're filming
9 from.  They're intentionally cut off.  They
10 intentionally do not cut -- do not include an
11 officer's field of vision and also sounds.  Like,
12 we may hear something, but maybe a car driving by
13 distorts or hides the sound.  Again, they're
14 great, but they have their limitations.
15   Q.   Okay.  I want to take you back to
16 your beginning with the Reading Police
17 Department.  Did you go through the Reading
18 Academy?
19   A.   Yes, sir.  Yes.  I was hired by
20 Reading and then they put me through the academy.
21   Q.   Do you remember when you went
22 through?
23   A.   July 2nd was my first day.
24   Q.   How long does the academy last?
25   A.   Our graduation date was November

Page 12

1 16.  I think it was Friday, November 16th of '07.
2    Q.   And what training -- sorry.  What
3 education did you have before the academy?
4    A.   I had gone to Reading Community
5 College.  I was an accounting major.  I did not
6 finish.  I was in my second year, and I didn't
7 finish.  I'm not proud to say.
8    Q.   And you were in the Marines after
9 high school.  Is that correct?
10   A.   Yes, sir.
11   Q.   How long did you serve?
12   A.   From '89 to '93.
13   Q.   Did you review any documents in
14 preparation for your deposition here today?
15   A.   I looked at some of the news
16 articles, body camera -- do you mean body camera
17 footage, also?
18   Q.   Sure.
19   A.   Yes.  Yeah.
20   Q.   So you reviewed the news
21 articles.  Which articles did you review, if you
22 recall?
23   A.   Well, I don't recall.  I did not
24 read them word for word.  Obviously, they were
25 not very favorable towards me, so...

Page 13

1    Q.   And you watched the body camera
2 footage, you said?
3    A.   Yes, sir.
4    Q.   Anything else you reviewed in
5 preparation for today?
6    A.   No.
7    Q.   Did you have any discussions with
8 anyone other than your counsel in preparation for
9 this deposition?
10   A.   In preparation for the
11 deposition, no.
12   Q.   Related to this case at any point
13 in time, have you reviewed any statements or
14 written reports by Mayor Eddie Moran?
15   A.   No.  No.
16   Q.   How about statements, written or
17 otherwise, by Courtney Dupree?
18   A.   No.
19   Q.   Did you talk with Ms. Dupree
20 about this incident after it happened?
21   A.   Briefly we did.  Yes.
22   Q.   When was that?
23   A.   Well, we would have discussed it
24 that day, maybe once in the few weeks afterwards.
25 Nothing official.  Like, we didn't set up a

4 (Pages 10 - 13)

Page 14

1 meeting or anything. As I recall, I was still
2 working one night. She was the 7:00 p.m. to 7:00
3 a.m. shift, and we had, like, just a brief
4 discussion about it.
5     Q.    Was Ms. Dupree on the traffic
6 division with you?
7     A.    No. She wasn't.
8     Q.    Did you two regularly work
9 together?
10     A.    No.
11     Q.    What did you discuss that day
12 after the incident?
13     A.    Do you mean the day of the
14 incident?
15     Q.    Yes.
16     A.    Okay. I think that -- I see what
17 you said. Okay. Sorry.
18     Q.    Let me clarify.
19     A.    I just misunderstood you. I'm
20 sorry.
21     Q.    That's okay. Let me clarify and
22 make sure I understood. I think you said you
23 discussed it that day with her after the arrest
24 was made?
25     A.    Right. Yes, sir.

Page 15

1     Q.    What was that discussion like?
2     A.    Just very briefly. Like,
3 normally in an arrest situation at our department
4 the patrolmen handle all the charges. So a
5 street sergeant -- which I'm a traffic sergeant.
6 You're still a street sergeant -- doesn't do
7 criminal complaints. You would have one of the
8 patrolmen do it.
9         And I could have done that. I
10 could have said, you know, Courtney, you're going
11 to handle these charges. You were there. Do the
12 charges. I didn't feel right about that. I was
13 the one who made the decision to make the arrest.
14 She was also -- it was her day off, too. She was
15 there on overtime. I knew none of us wanted to
16 stay late, so I said, you know what? It was my
17 decision. I'll do it. I'll take care of the
18 charges for you.
19         And that was really the extent of
20 our conversation about the incident itself. The
21 rest -- and this would have happened right after
22 as they're probably forming for their march up to
23 City Park, and so the rest of our conversation
24 was what you're going to do during this and what
25 I'm going to do during this, and once they get to

Page 16

1 City Park, you're good. You can leave. You're
2 done. I'll take care of everything else.
3     Q.    So your conversation about Mr.
4 Atkins after the arrest with Courtney Dupree was
5 about who was going to file the charges?
6     A.    That's all I can remember talking
7 about. It was brief. It wasn't, like, in-depth
8 about what did you see, what did I see, because
9 we were both there.
10     Q.    Okay. You said you also spoke
11 once a few weeks after with Courtney Dupree.
12 What did you discuss at the time?
13     A.    That would have been very
14 informally, and that would have -- that revolved
15 more around the backlash that I was getting, not
16 only the calls to the police department, but some
17 people had, you know, taken the time to find my
18 personal phone number and make some calls to me
19 that were not very complimentary, so that's --
20 that conversation would have centered around
21 that.
22     Q.    Did you discuss anything else
23 about Mr. Atkins with Courtney Dupree?
24     A.    Not that I recall. In fact, she
25 and I rarely saw each other, and the next time

Page 17

1 that we even had a conversation about this would
2 have been, I think it was in November when
3 somebody from the lawyer's office came to City
4 Hall to see us and met with us. I'm sorry. I
5 don't remember his name.
6         MR. CONLEY: If it was a
7     conversation with a lawyer, don't discuss
8     the conversation.
9         THE WITNESS: I'm sorry.
10         MR. CONLEY: That's okay.
11 BY MR. READY:
12     Q.    That's fine. Other than the
13 conversations you described so far, were there
14 any other times that you and Courtney Dupree
15 talked without a lawyer present?
16     A.    Not that I recall.
17     Q.    Okay. Did you review any
18 statements in preparation for today or previously
19 by Richard Tornielli?
20     A.    The only -- the statement that he
21 released to the media which was -- yesterday was
22 the first time I had seen it. I really steered
23 away from news coverage. I'm not really active
24 in news coverage anyway. I'm probably a little
25 less informed, but regarding to this event, I

Page 18

1 didn't actively look at any.
2      Now, he had emailed the entire
3 police department when the district attorney
4 decided to squash the charges, and he sent a long
5 email to the department.  That was the only thing
6 that I read from him about this.
7    Q.   That was from John Adams?
8    A.   The email was from Chief
9 Tornielli.  It was his response to the district
10 attorney's decision not to pursue the charges.
11    Q.   And Mr. Tornielli sent a long
12 response after that to the department?
13    A.   Yes.
14    Q.   Okay.
15    A.   Well, like, a paragraph.  It was
16 several sentences.
17    Q.   Okay.  Did you and Chief
18 Tornielli speak about this incident?
19    A.   Briefly, yes.
20    Q.   When was that?
21    A.   The first time that we
22 communicated -- this incident happened on a
23 Saturday morning.  The first time I heard from
24 him was Tuesday.  It was late Tuesday night which
25 would have been, I don't know, the 6th of June,

Page 19

1 and Tuesday was the day that the phone calls
2 started coming to my phone.  And late that night
3 he had sent me a text message about -- because he
4 was informed because -- I'm sorry.
5      When I first started getting
6 phone calls, I told my immediate supervisor which
7 is Captain Rogers.  Captain Rogers was the
8 command duty officer that day, so he called the
9 chief because this was after hours and then the
10 chief sent me a text message that night about it.
11      And there was, like, a
12 two-text-message response between me and him or
13 he and I and then we spoke briefly about it.  I'm
14 thinking it was sometime in July or maybe early
15 August to the best of my recollection.  Yeah.
16    Q.   What did you discuss in that
17 conversation?
18      MR. CONLEY:  I'm sorry.  The text
19      conversation or the July conversation
20      just for clarity?
21    Q.   Sure.  Let's start with the text
22 conversation.  What did you discuss there?
23    A.   The text message came from him,
24 and it was kind of a long message, and I remember
25 it started out, I'm sorry that you have to deal

Page 20

1 with this, you know, these people contacting you,
2 and he asked if I wanted to take the rest of the
3 week off, Wednesday, Thursday, Friday on
4 administrative leave so I didn't have to deal
5 with it.
6      I believe the feeling at that
7 point was these phone calls are going to die down
8 quickly.  So I said -- I thanked him, and I said
9 yes.  Yeah.  I'll take the admin leave for three
10 days, and he said -- he responded okay.  That's
11 what I would have chosen, too, and that was the
12 end of it.
13    Q.   What does administrative leave
14 mean?
15    A.   Administrative leave can be done
16 for different things.  In this case, they're
17 giving you paid days off.  He felt I needed paid
18 days off just so I wouldn't have to be at City
19 Hall when this happened.
20      Now, administrative leave can be
21 used if an officer is involved in a shooting.
22 They'll give him paid days off until everything
23 is cleared.  Now, it can be used punitively, too.
24 It can be used pending suspension.  Obviously,
25 that was not the case in my case.

Page 21

1    Q.   No one communicated to you that
2 this was a punitive measure, correct?
3    A.   No.
4    Q.   And this is -- practically
5 speaking, this is basically PTO, paid time off,
6 that's in addition to your normal paid time off?
7    A.   Yes.
8    Q.   Okay.  Did you have other
9 responsibilities during that time of
10 administrative leave?
11    A.   No.
12      MR. CONLEY:  Objection to form.
13      You can answer.
14    A.   I'm sorry.
15      MR. CONLEY:  Just for clarity,
16      what kind of responsibility?
17    Q.   Sure.  Let me rephrase.  Did you
18 have other job responsibilities you were supposed
19 to be doing from home during that administrative
20 leave?
21    A.   No, sir.
22    Q.   Did you review any
23 statements -- I'm sorry.  I'm getting ahead of
24 myself.
25      You also told us you had another

6 (Pages 18 - 21)

1  conversation with Mr. Tornielli, Chief Tornielli
2  in July.  What was the substance of that
3  conversation?
4       A.    Well, again, I'm not sure if it
5  was sometime in July or early August.  It was
6  very brief, and we basically talked -- and,
7  again, this was not a formal meeting.  This was a
8  chance encounter in the chief's -- not his
9  office, but the administrative area.
10            And I just said, hey, this
11 is -- this is why I chose to do this, and, you
12 know, this was happening.  He's like, you know, I
13 understand.  And then we talked really more about
14 the phone calls that were coming in to the police
15 department itself was the majority of the -- it
16 was a short conversation.
17      Q.    Did you talk to him about the
18 arrest and why you had done the arrest?
19      A.    Yes.  I did bring that up.  Yes.
20      Q.    What did you tell him?
21      A.    Well, I said, you know, what
22 happened, that these protesters had showed up
23 before the event started, and -- I mean, do you
24 want me to go into the whole thing now?
25      Q.    Tell me what you told the chief.

1       A.    Okay.  And the first, you know,
2  two guys showed up, and they were on the
3  sidewalk, the same side of the sidewalk as the
4  event organizers.  I was going over just to talk
5  to the event organizers to say, hey, we're here.
6  We're going to be here.  This is what we're doing
7  with traffic.
8             I was not expecting protesters at
9  all.  And I told them, I said, hey, you can't be
10 here.  You know, they have a permit for this
11 event.  They said it's a free country.  I said, I
12 get it.  It is a free country.  And either one of
13 them or me, I don't remember who had the idea,
14 can we go across the street?  I think it was one
15 of them.  Can we stand across the street?
16            And I said, yeah.  Absolutely.
17 That's a great idea.  Let's go across the street.
18 And I told them, these are the parameters.  You
19 can stay here.  You can hold your sign.  You can
20 do this.  Okay?  But if you do these other
21 things, if you're disrupting this event, you're
22 going to get arrested.
23            Another guy showed up.  I told
24 him the same thing because he came right into the
25 street right in the midst of them, and I told him

1  the same thing, so he went back on the sidewalk.
2             And a third guy showed up -- or,
3  I'm sorry, fourth and fifth guy showed up.
4  They're a different group.  I told them the same
5  thing.  As soon as I got done telling them, I
6  turned to walk away -- or I just turned.  I don't
7  even think I took a step, and he continued right
8  up again, and my choice at that point was do
9  I -- I've already set the standard.  I've already
10 laid the parameters down.  This is what we can
11 do.  This is what we can't do.  These other
12 people have heard the same thing.  They complied.
13 This person didn't comply.
14            So if I don't take action now,
15 does that embolden these people to keep their --
16 just resume their yelling?  Does this group yell
17 back?  Does this whole thing turn into a circus
18 is the term I was using, and that's why I decided
19 to make the arrest then and there.
20      Q.    What was the chief's response to
21 that explanation?
22      A.    I don't recall his exact words
23 other than he thought it was justified.
24      Q.    He told you he thought that your
25 actions were justified?

1       A.    I don't know if he used those
2  exact words, but that was certainly his meaning.
3       Q.    Did you have any other
4  conversations with Chief Tornielli after that
5  conversation in July?
6       A.    Any other conversations about
7  this incident itself?
8       Q.    Yes.
9       A.    Not that I can recall.  And,
10 again, I don't remember if that conversation was
11 July or August.  I'm not really -- because, like
12 I said, it wasn't a formal meeting.  It was more
13 of a chance encounter, so I don't remember.
14      Q.    So you mentioned the text
15 messages, and they were sort of about
16 administrative leave?
17      A.    Yes.
18      Q.    And you had this conversation in
19 July or August.  Is it fair to say that for 30
20 days after this incident, you didn't have any
21 conversations with Chief Tornielli about what
22 happened on June 3rd?
23      A.    I don't know.  The only reason I
24 would say it's not fair to say because I
25 don't -- I'm not a hundred percent sure the dates

Plaintiff's App. 059

Page 26

1 that I talked to him.
2     Q.    But you are confident that that
3 chance conversation and the text messages are the
4 only conversations that you had with Chief
5 Tornielli about this incident?
6         MR. CONLEY:  Objection to form.
7     I just want to clarify.  You mean, like,
8     in-person conversations as opposed to a
9     text message conversation.  Is that what
10     you're saying?
11     Q.    I'm saying the text messages you
12 testified to and the chance encounter
13 conversation you had with him are the only
14 communication you had with Chief Tornielli about
15 this incident.  Is that correct?
16     A.    Near as I can recall.  Like,
17 there was no, like, formal, the chief, hey, I
18 need you to see me now.  We're going to talk
19 about this.  It was nothing like that.  No.
20     Q.    How about anyone working on
21 behalf of the chief or the police department or
22 the city?  Did you have further conversations
23 with anyone about the arrest of Damon Atkins or
24 the incident on June 3rd?
25     A.    Well, yes.  Again, these are not,

Page 27

1 like, formal conversations.  These are people
2 saying, you know, what happened.  One of the
3 members of the command staff called me on
4 Wednesday morning, Wednesday, which I guess is
5 June -- I'm sorry if I'm getting the dates wrong.
6 Is it June 7th?  And we had a command staff
7 meeting which was -- which are Thursday mornings.
8         Now, the Thursday after this
9 event I was on admin leave for the command staff
10 meeting, so I had to go to the -- the traffic
11 sergeant at that time was required to go to
12 command staff meetings, so it was the following
13 Thursday.  It was briefly talked about at command
14 staff.
15     Q.    What was discussed?
16     A.    Well, basically, I'll say nothing
17 official.  They were -- it was about the phone
18 calls coming into the city.
19     Q.    And did anybody ask you for a
20 statement during that meeting about what had
21 happened?
22     A.    No.
23     Q.    How about after that or any other
24 time?  Did anybody on behalf of the city or the
25 police department or on behalf of the chief ask

Page 28

1 you for a statement or a version of events about
2 what happened?
3     A.    No, sir.
4     Q.    And, to your knowledge, you've
5 never been investigated by Reading or the police
6 department about what happened on June 3rd, 2023?
7     A.    No, I was not.
8     Q.    Did you review any statements by
9 Paige Stuart at any time?
10     A.    No.
11     Q.    Did you and Officer Stuart speak
12 about this incident after it happened?
13     A.    I'm sure we did.  I don't recall
14 the tone of the conversation.  We would have had
15 to have spoken because like I talked to Courtney,
16 you know, they're going to do their march, and I
17 would have told Paige, hey -- I think Paige was
18 at the front of it.  Regardless, you're going to
19 do this, and when they're done, when they're at
20 City Park, we're done.  Probably nothing more
21 in-depth than that.
22     Q.    Did you ask her what she had saw
23 or observed or anything in preparing your
24 criminal complaint?
25     A.    No.

Page 29

1     Q.    So I'm going to ask you a
2 question I asked everybody yesterday.  We've
3 received performance evaluation reports for the
4 years 2008, '09, '10, '11, '12, '13, '14, '15,
5 '17 and '18.
6         Did you receive performance
7 evaluations in the years that were not provided?
8     A.    Yes.  And I can make a very good
9 guess as to why the other ones were not there.
10         MR. CONLEY:  I don't want you to
11     guess.
12         THE WITNESS:  A very educated
13     guess.  I can give a very --
14         MR. CONLEY:  You can provide an
15     explanation.
16         THE WITNESS:  I would have bet
17     all the money in my wallet.
18         MR. CONLEY:  Again, I don't want
19     you to guess.  Testify to what you know
20     about, and I apologize, Counsel.  I
21     understand this is your deposition, but I
22     don't want you to guess.
23         MR. READY:  That's okay.
24 BY MR. READY:
25     Q.    You can give me your theory if

8 (Pages 26 - 29)

1 it's an educated theory, and that's fine.  And I
2 understand you're not sure.
3      A.    Yes.  2016 I know for a fact I
4 did not get any evaluations because the sergeant
5 who was my sergeant was -- didn't do evaluations,
6 and his lieutenant or shift lieutenant at the
7 time didn't make him do evaluations.
8           Around 2019 we changed and
9 implemented a new program at the Reading Police
10 Department called Benchmark, which I'm not going
11 to do it, but I could talk hours about the cause
12 of Benchmark, but Benchmark is used for tracking,
13 use of force incidents and citizen complaints
14 against police officers.  For that it's great.
15          For some reason we use it for
16 evaluations.  For that it's un-great, which is
17 not a word.  So it would seem that whoever was
18 asked to provide my performance evaluations
19 simply got the written evaluations when we used
20 to write them out and print them and did not get
21 the evaluations off Benchmark.  Whether they
22 thought that the Benchmark ones were included, I
23 don't know, but they're there.  I did get them,
24 and they're on the Benchmark program.
25      Q.    So from 2019 to the present, your

1 evaluations have all been done on this Benchmark
2 program?
3      A.    Yes, with the exception of '23.
4 I did not get one in '23.
5      Q.    You have not yet -- you have not
6 yet been evaluated for 2023.  Is that correct?
7      A.    I was not given an evaluation.
8 No.  Yes.  That's correct.
9      Q.    When are evaluations normally
10 done?
11      A.    They are -- they're supposed to
12 be done in December.  Sometimes the deadline will
13 get extended to the middle of January, and
14 usually by the end of January.
15      Q.    And you were not evaluated for
16 this past year?
17      A.    No.  I was not given an
18 evaluation for '23.
19      Q.    Do you know why?
20      A.    I can't guess.
21      Q.    Okay.  No one told you that you
22 were not being evaluated or that there was a
23 reason for no evaluation this year?
24      A.    That's correct.  No one told me
25 that.

1      Q.    Okay.  I'm going to -- one
2 moment.
3           (A short break was taken.)
4 BY MR. READY:
5      Q.    I'm going to represent to you the
6 binder in front of you is a binder discovery that
7 your attorney provided to us in this matter.  I'm
8 going to ask you to flip to Reading 202.  It's
9 toward the back of the binder.  And for the
10 record, when I refer to Reading 202, those are
11 the Bates stamps provided to us in discovery.
12          Do you recognize this document?
13      A.    Yes.
14      Q.    And what is this document?
15      A.    This was my transfer to the
16 traffic unit.  It's Chief Tornielli's memo to
17 command staff and other members of the police
18 administration, not officers, that I was
19 transferred to the traffic unit.
20      Q.    And was this the first time that
21 you had been assigned to traffic unit?
22      A.    Yes, sir.
23      Q.    And is this the document that as
24 far as you understand officially made your
25 transfer complete?

1      A.    Yes.
2      Q.    Okay.  As part of the transfer to
3 the traffic unit, what policies and procedures
4 did you have to familiarize yourself with?
5      A.    Well, there was -- no policies
6 and procedures that -- it was on-the-job
7 training.  March 27th which was a Monday was my
8 first day in traffic, and I was replacing
9 Sergeant Dougherty who had announced his
10 retirement, and March 27th started his final
11 week, so I worked with him for Monday through
12 Friday that week.
13      Q.    I'm going to turn your attention
14 to Bates 63 back toward the front.  Do you
15 recognize this document?
16      A.    Well, it's a general order for
17 special events.
18      Q.    Have you reviewed this document
19 before?
20      A.    I don't recall if I looked at
21 this.  No.
22      Q.    Okay.  Did you receive any
23 training from the Reading Police Department on
24 special events?
25      A.    Not officially.  It was just, you

Plaintiff's App. 061

Page 34

1  know, from being with Sergeant Dougherty for that
2  week.
3       Q.    Who is your immediate supervising
4  officer as the traffic -- in the traffic
5  division?
6       A.    My immediate supervisor is the
7  patrol captain which has been Captain Rogers
8  since my transfer to traffic to the present day.
9       Q.    Do you know why you were assigned
10  to the traffic division?
11      A.    I applied for it.
12      Q.    Why did you apply for it?
13      A.    Well, I spent my entire career in
14  patrol, and I love patrol work.  However, in
15  2022, January of '22, we switched from eight-hour
16  shifts to 12-hour shifts, and it wasn't working
17  out for me.  Traffic was a Monday through Friday
18  job, eight-hour shifts, and I thought the
19  schedule would work better for me.
20      Q.    Do you have any disciplinary
21  history with the Reading Police Department?
22            MR. CONLEY:  Objection to form.
23      You can answer.
24      A.    I was -- yes.  Yes.
25      Q.    When did you receive discipline

Page 35

1  by the Reading Police Department?
2       A.    Well, one would have been
3  sometime maybe -- well, it was an incident that
4  occurred on January, I believe, 8th of 2012, so
5  the discipline would have come maybe around March
6  of 2012.
7       Q.    And what was that for?
8       A.    Well, that was -- my police car
9  got stolen.
10      Q.    Why were you disciplined for the
11  car getting stolen?
12      A.    Well, because I left the car
13  running and the door was unlocked, and I didn't
14  keep eyes on the car.
15      Q.    After that time did you have
16  other discipline from the Reading Police
17  Department?
18      A.    I know I did.  I have at least
19  one written reprimand from 2017 and I think one
20  from 2021.
21      Q.    And what was the one from 2017
22  for?
23      A.    2017 was I walked into the midst
24  of an argument between two patrolmen which I
25  didn't recognize that they were arguing at first.

Page 36

1  I thought they were just talking.  When I
2  realized it was an argument and it was pretty
3  serious, I told them, you know, that's enough.
4  You guys got to stop.  And the one said -- I
5  said, you guys got to stop before this gets
6  worse, and the one said, well, it's about to get
7  a lot worse.
8            Long story short, they wouldn't
9  stop arguing until another patrolman came over
10  and separated.  It was nothing physical.  They
11  were just arguing, and another supervisor heard
12  it but didn't respond to it.  Somehow I got
13  written up for it because they wouldn't listen to
14  me when I told them to stop arguing, and I got a
15  written reprimand.
16      Q.    And what was the reprimand in
17  2021?
18      A.    '21, an officer had arrested
19  somebody for a PFA violation, protection from
20  abuse violation, and he had -- I was not on scene
21  for this.  I was merely the shift commander that
22  day, but he had put the person's wallet and phone
23  on top of his police car, like, after he had
24  searched him incident to arrest, and he was
25  waiting for a transport wagon.

Page 37

1            And the wait time was kind of
2  long because the wagon driver was busy, and the
3  wagon got there.  They put the prisoner in the
4  wagon, and the officer forgot to give the phone
5  and the wallet back and drove off without it.
6            When he realized his mistake, he
7  found the wallet but couldn't find the phone, and
8  when he told me, I said, make sure you document
9  that in your report.  What I should have said was
10  document that on, you know, a police memo which
11  we call E8.  So I was given a written reprimand
12  for that for telling him to document it in the
13  wrong place.
14      Q.    Did you receive any other
15  discipline from the Reading Police Department?
16      A.    Not that I can recall.
17      Q.    What was the reason for your
18  discharge from the United States Marine Corps?
19      A.    I was -- I tested positive on a
20  drug test in 1992.
21      Q.    What did you test positive for?
22      A.    It was cocaine.
23      Q.    Have you used cocaine in the last
24  four years?
25      A.    No.

10 (Pages 34 - 37)

Page 38

1    Q.    Have you used any other illegal
2  drug in the last four years?
3    A.    No, sir.
4    Q.    You heard some of the questions
5  yesterday. I'm going to run through a few of
6  them. What training did you receive from the
7  police academy about the First Amendment?
8    A.    Well, we did have training on the
9  amendments in the academy. I don't recall
10  specifically the First Amendment. The one I
11  remember the most being emphasized in the academy
12  was the Fourth Amendment.
13    Q.    Do you remember your training on
14  the First Amendment from the academy?
15    A.    No. Not specifically.
16    Q.    Do you remember any training at
17  the academy on differentiating between protected
18  versus unprotected speech?
19    A.    No, sir. I don't.
20    Q.    Since being in the academy have
21  you received any training from the Reading Police
22  Department on the First Amendment?
23    A.    Not that I can recall.
24    Q.    What training have you received
25  on the offense of disorderly conduct?

Page 39

1    A.    Just what -- you know, during the
2  crimes code in the academy and also from being in
3  the field training program with -- you know, with
4  the training officer.
5    Q.    What did you learn from the
6  police academy about the offense of disorderly
7  conduct?
8    A.    Well, in the academy when we do
9  crimes code, it's strictly reading from crimes
10  code and just taking it from the crimes code. It
11  was certainly not -- not that I can recall an
12  in-depth block of instruction on that specific
13  charge.
14    Q.    Do you agree with Chief
15  Tornielli's statement yesterday that disorderly
16  conduct is usually a summary offense?
17    A.    Normally it's a summary. Yes.
18    Q.    Why is it charged as a
19  misdemeanor in some circumstances?
20    A.    Well, it can be charged by a
21  misdemeanor. One of the things would be repeated
22  or police warnings that the person didn't comply
23  with. Without looking at the crimes code, I
24  wouldn't know it exactly. Thank you.
25    Q.    I'm going to put in front of you

Page 40

1  a copy of the disorderly conduct statute. I've
2  highlighted part of it, but if you want to review
3  it.
4    A.    Right. So under the grading
5  section, persists in the conduct after reasonable
6  warning or request to desist. On the other
7  section of -- you know, of the intent is to cause
8  substantial harm or serious inconvenience.
9    Q.    So the reason that you would
10  charge it as a misdemeanor rather than a summary
11  is because of repeated conduct, you said, and any
12  other reason?
13        MR. CONLEY: Objection to form.
14    I don't believe that was his testimony,
15    but you can answer.
16    Q.    Well, let me ask you then again.
17  Maybe I misunderstood.
18        What would be the reasons then
19  based on the statute and your experience that you
20  would charge disorderly conduct as a misdemeanor
21  rather than as a summary offense?
22    A.    Well, I would go by -- and I have
23  charged as a misdemeanor before, and I would go
24  by the crimes code. If it's -- you know, if the
25  intent is to cause harm or inconvenience or if

Page 41

1  the person persists after reasonable warning or
2  request to desist.
3    Q.    And how do you differentiate
4  between someone who has a right to persist in the
5  conduct and someone who doesn't in making that
6  determination for charging purposes?
7        MR. CONLEY: Object to form. You
8    can answer.
9    A.    I'm sorry. Are you saying how do
10  I differentiate the conduct where somebody who
11  has a right to?
12    Q.    You said that if there's a
13  reasonable request to stop, but of course people
14  ask people to stop doing things all the time that
15  they have a right to do. So how do you as an
16  officer make the determination about what's
17  protected conduct or speech in making a
18  determination to charge?
19        MR. CONLEY: Same objection. You
20    can answer.
21    A.    That's just something you're
22  going to have to decide as the circumstances are
23  given. Like, every situation is different.
24    Q.    Are there any guidelines that you
25  had been taught to use in making that

11 (Pages 38 - 41)

Page 42

1 determination?
2     A.    Unless it was something I learned
3 from a training officer, I don't remember
4 anything official. The officers in our
5 department are given a great amount of -- or are
6 encouraged to use their discretion. So when
7 we're deciding to -- and I'm not just saying it
8 because I was a sergeant when this happened, I'm
9 talking about the patrolmen as well at their
10 level.
11          There's really -- nobody is
12 looking over their shoulder. You're expected to
13 make and evaluate each incident as it's
14 happening, make your decision based on that
15 incident. It's hard to put, like, everything in
16 a box and say when this happens, you do this or
17 when this happens, you do this. You're just
18 going to have to deal with them as they come up.
19     Q.    I'm going to draw your attention
20 to what is Bates number Reading 78. I'll take
21 this back. And do you recognize this document?
22     A.    Well, I recognize it as a general
23 order on constitutional requirements from reading
24 it. Yes.
25     Q.    Do you recall when you first

Page 43

1 reviewed this general order?
2     A.    Well, I was given general orders
3 when I was in the orientation which is two weeks
4 from graduation to the academy to the day that
5 you start with your training officer.
6     Q.    That was in 2007, correct?
7     A.    Yes, sir.
8     Q.    Have you received updated copies
9 of any of these general orders since 2007?
10     A.    If I -- yes. We receive general
11 order updates fairly regularly. Now, they're
12 given out at roll call by whoever the shift
13 commander is that day, and each officer is to
14 sign and date them. You're signing that you've
15 not only received a copy, but you're also signing
16 that you've read it, too.
17     Q.    These general orders, how often
18 would you say that you review them?
19     A.    Some of them I've never reviewed.
20 Some I review -- I'm trying to give you more
21 exact. I won't say regularly because -- some of
22 them I've reviewed a couple times a year just
23 depending on -- some of them are more -- are used
24 more often on a day-to-day basis.
25     Q.    Which ones do you review

Page 44

1 regularly?
2     A.    Well, the ones that I review the
3 most, first-line supervisor's responsibilities,
4 pursuit policy. Those are the ones that are
5 sticking in my head right now. Probably some of
6 the newer ones, the updated ones. I can't think
7 of any right now.
8     Q.    Did you review this one on
9 constitutional requirements since your time in
10 the academy?
11     A.    No. Not that I can recall.
12     Q.    I'm going to turn your attention
13 to number 97. Again, that's Reading 97. I'll
14 represent to you this is the general order on
15 arrest authority. So, first, do you recognize
16 this document?
17     A.    Yes.
18     Q.    And have you reviewed this since
19 your time in the academy?
20     A.    I don't recall that. Well, no.
21 I don't recall.
22     Q.    Sorry. You don't recall if
23 you've read it, or are you saying you don't think
24 you read it?
25     A.    Well, when I was -- at one point

Page 45

1 for about a year and a half, maybe two years I
2 was the director of the training program for the
3 new officers on the street, and we had a general
4 orders class, which I would take the new officers
5 over general orders. And certainly as I'm paging
6 through this, arrest without warrant is, yes,
7 something that we do discuss, so I have reviewed
8 it as part of that.
9     Q.    And we discussed this a little
10 bit yesterday when you were present. There's a
11 reference to 98. It says separately issued
12 guidelines under C(2). Are you aware of any
13 separately issued guidelines on the arrest
14 without a warrant authority for the Reading
15 Police Department?
16     A.    I am not.
17     Q.    Okay. So you would agree that
18 this Section C is the full policy of the Reading
19 Police Department as you understand it on arrest
20 without a warrant?
21          MR. CONLEY: Objection to form.
22     You can answer.
23     A.    Yes.
24     Q.    So I want to turn your attention
25 to Reading 143. Do you recognize this document?

12 (Pages 42 - 45)

Plaintiff's App. 064

Page 46

1    A.    Yes.  Yes.
2    Q.    And what is this?
3    A.    Well, that we had to take online
4 training, Calibre Press's, a company that
5 provides online training to police departments,
6 so this is the implicit bias one from 2020.
7    Q.    What did the implicit bias
8 training teach you?
9    A.    Well, the best I can recall,
10 basically to not have biases.  Like, everybody
11 comes into a situation with their own biases, and
12 you're not -- you're supposed to overlook them
13 and judge the people and the situations as they
14 are, not from preconceived notions that you may
15 have.
16    Q.    What sorts of groups were you
17 taught to look for implicit bias against?
18        MR. CONLEY:  Objection to form.
19        You can answer.
20    A.    Well, I don't recall exactly, but
21 it seems it would be due with race, religion,
22 gender, ethnicity and also handicap, mental
23 health as well.
24    Q.    What did they teach you in
25 regards to recognizing implicit bias with regards

Page 47

1 to religion?
2    A.    Well, I don't recall the
3 specifics of the class.  No.
4    Q.    Did they teach you about
5 recognizing implicit bias in regards to
6 individuals who identify as LGBTQ?
7    A.    Well, we had that training.  I
8 don't know if it was included in this or if it
9 was another training, an in-person training that
10 we had, but we had that at some point.
11    Q.    Okay.  And what was that training
12 about?  What did it teach you?
13    A.    Again, that's not this one.  You
14 want me to talk about the in-person one?
15    Q.    Sure.
16    A.    Well, that one had to do with you
17 can't treat people different because they
18 identify a certain way, and that was really the
19 whole thing.  It didn't seem to be wholly
20 relevant to policing itself.  It was more of a
21 class that could be given to any group of people.
22    Q.    What were the directives that the
23 officers received at that training on how to
24 overcome your own implicit bias?
25    A.    Well, there were no directives.

Page 48

1 This was, like, a seminar that was given by some
2 outside group.
3    Q.    Okay.  Rather than directives,
4 what recommendations did they make for overcoming
5 your implicit bias?
6        MR. CONLEY:  Objection to form.
7        You can answer.
8    A.    Well, the same ones that I
9 mentioned in this one.  Like, you have to drop
10 your biases.  You can't -- this person is a guy
11 who dresses like a girl.  Well, you've got to
12 treat them like a girl if he thinks he's a girl,
13 that sort of thing.  And, again, that's not
14 coming from the police department.  That's this
15 outside agency telling us this.
16    Q.    What did the agencies tell you
17 about or recommend to you about how to overcome
18 your implicit bias in regards to religion?
19        MR. CONLEY:  Objection to form.
20    A.    I don't recall that being a part
21 of it.
22    Q.    Have you received any training
23 from the police department or any of these
24 outside groups on hate speech?
25        MR. CONLEY:  Objection to form.

Page 49

1        You can answer.
2    A.    I don't recall.  It's certainly
3 possible, but I don't recall at this time.
4    Q.    Just to be clear, you're saying
5 it's possible you received that training, but you
6 don't recall it as you sit here today?
7    A.    Yes.  That's what I mean.
8    Q.    Okay.  I want to ask you about
9 the event that you recall, too.  What was your
10 involvement, if any, in approving the permit for
11 the Reading Pride Celebration?
12    A.    Well, I was present at the
13 meetings with my secretary Audra and the mayor's
14 assistant and also the head of the pride group.
15 My involvement at those meetings, I don't say
16 much.  They make their plans and say what they
17 want to do, and when they ask me what police are
18 needed for this, then I'll give my
19 recommendation.  It's my decision then to decide
20 how many officers are going to be working it and
21 also ultimately approving the event has to meet
22 certain standards for it to be approved.
23    Q.    Who is Enrique Castro, Jr.?
24    A.    I think Enrique is the -- he's
25 the head of the pride group or the representative

13 (Pages 46 - 49)

Plaintiff's App. 065

1 of the pride group.  He's the one that always
2 shows up at City Hall.
3      Q.    So he was involved in those
4 meetings for the celebration?
5      A.    I met with him one time.
6      Q.    What concerns were expressed to
7 you about the Reading Pride Celebration
8 internally at the Reading Police Department?
9           MR. CONLEY:  Objection to form.
10      A.    The first one was that he didn't
11 want to have it in Reading because the venue that
12 they had previously used at Center Park he said
13 was too small.  I had nothing to do with previous
14 ones, so I had no comment on that, and that he
15 wanted to take the whole thing to Muhlenberg
16 Township.
17           And the mayor -- the mayor's
18 assistant said the mayor said no.  Have it in
19 Reading.  We'll raise a flag for you at City
20 Hall.  You can march to City Park and have a
21 party or whatever there.  And his concern was he
22 was worried about getting -- like, people
23 harassing them was the only thing he said to me.
24      Q.    Mr. Castro was concerned about
25 that?

1      A.    Yes, sir.
2      Q.    Did he tell you what kind of
3 harassment he was worried about?
4      A.    No.
5      Q.    Do you know if that was based on
6 prior experiences or did he say why?
7      A.    No.
8      Q.    Okay.  And did he express any
9 other concerns about having the event in Reading?
10      A.    No.
11      Q.    What was the mayor's response to
12 the concerns about harassment?
13      A.    I don't know.
14      Q.    Were you present in the meeting
15 when anyone responded to the concerns about
16 potential harassment?
17      A.    No.
18      Q.    So if I understand you correctly,
19 Mr. Castro just kind of raised the concern that
20 there might be people who would harass them if
21 they did this celebration?
22      A.    Yes.
23      Q.    No one attempted to assuage that
24 concern?
25           MR. CONLEY:  Objection to form.

1      You can answer.
2      Q.    While you were present, no one
3 attempted to talk him out of that concern or say
4 we'll do this or that to respond?
5      A.    No, because it didn't -- it
6 seemed more like an off-the-cuff comment, like,
7 towards the end of the meeting.  It didn't -- it
8 wasn't like he forcefully brought this up.  It
9 was just -- it just seemed almost like a
10 throwaway comment.
11      Q.    What other meetings were you a
12 part of leading up to the event, if any, to
13 prepare for it?
14      A.    I met one other time with just
15 Delores who was the mayor's assistant and Audra
16 just to finalize what was supposed to go on, and
17 there was concerns about -- I raised concerns
18 about staffing with them.
19      Q.    What was your concern about
20 staffing?
21      A.    Well, Delores had told me that
22 the pride group had gotten a grant to pay for ten
23 police officers.  I said that that doesn't
24 matter.  Nobody is going to want to work this
25 event.  We're not going to get anybody to work

1 this.  That was my concern, that nobody would
2 work it.
3      Q.    Why were you concerned that no
4 one would work the event?
5      A.    Because, quite frankly, a pride
6 celebration is not anything that -- most police
7 officers wouldn't want to work.  They wouldn't
8 want to even be involved in it.  They wouldn't
9 want to be there.
10      Q.    Why?
11      A.    Well, I can't answer for
12 everybody else.  I only know that it just would
13 not be a popular event, and I knew that and --
14 which is exactly what happened.  I put it out for
15 overtime, and nobody took it.
16      Q.    Why did you suspect that?  Was
17 that because of a prior event you had been
18 involved in?  Is that just based on your
19 conversations with other officers?
20      A.    I had never been involved in a
21 prior pride event.  At this time I was fairly new
22 in traffic.  I worked some special events before.
23 Officers like to work certain types of events.
24 Others they don't like to work.  And a pride
25 celebration, I knew this isn't -- this is not

14 (Pages 50 - 53)

Plaintiff's App. 066

---

1 barricades, the location and specifically which
2 corner of the intersection.
3        Q.    I see your name down here at the
4 bottom, Sergeant Bradley McClure, number 668?
5        A.    Yes.
6        Q.    Does this mean that you authored
7 this memo?
8        A.    No.  I didn't author this memo.
9 Audra writes these.
10       Q.    Okay.  Up in the top it also says
11 from Sergeant Bradley McClure.
12       A.    So -- I'm sorry.
13       Q.    That's okay.  Does that mean it
14 comes from your office?
15       A.    Yes.  So I just want to clarify
16 there.  When the permit is ready and we're ready
17 to notify public -- when I say we, I mean Audra
18 and I.  She and I go over the barricade list and
19 make sure -- or she runs it by me and makes sure
20 that I have all the spots covered.  And once she
21 and I agree on it, then she sends this memo to
22 public works.
23       Q.    So you did personally direct the
24 number of barricades listed here, correct?
25       A.    I'm sorry?

1        Q.    Did you personally decide how
2 many barricades were going to be placed?
3        A.    Yes.
4        Q.    And this memo was drafted by your
5 assistant but on your behalf.  Is that correct?
6        A.    Yes, sir.
7        Q.    Okay.  You may not have seen it
8 before it went out, though.  Is that what you're
9 saying?
10             MR. CONLEY:  Objection to form.
11       You can answer.
12       A.    I probably don't see the final
13 version.  I don't think that's normal.
14       Q.    When we talk about barricades
15 here, would you describe what that is?  What's a
16 barricade?
17       A.    Yes.  These are -- we use two
18 types of barricades.  Either -- in this case,
19 these are wooden barricades which would be -- I
20 don't know -- the kind that has one long piece of
21 wood and then two legs that you have to assemble.
22 That's normally what we use for events unless
23 we're expecting, like, major problems.  Sometimes
24 we use public works trucks.  On this case we
25 weren't, so we just used the wooden barricades.

1        Q.    What's the purpose of the
2 barricades?
3        A.    In this situation on this sheet
4 was for traffic control.
5        Q.    All right.
6             MR. CONLEY:  Can we go off the
7       record for a second?
8             MR. READY:  Yeah.
9             (A discussion was held off the
10      record.)
11 BY MR. READY:
12       Q.    We're back on the record.  I'm
13 going to show you what has been marked as
14 Sergeant Bradley T. McClure video number one.
15 This is the first of two body cam segments that
16 were produced to us in discovery.  I'm going to
17 play it from the beginning.  So, first of all,
18 you've seen this footage before, correct?
19       A.    Yes, sir.
20       Q.    And this is a true and accurate
21 reflection of the body camera footage from your
22 unit that day?
23       A.    Yes, sir.
24       Q.    Do you know approximately what
25 time this footage began?

1        A.    Well, the time up there says
2 9:52.  I don't know -- I'm sure that's accurate.
3        Q.    As far as you know --
4        A.    Yes.
5        Q.    -- the time stamp was correct?
6        A.    Yes.  I've never heard anything
7 about our time stamps being off.
8        Q.    So we're at the 30-second mark,
9 and I'm going to continue playing.
10             (Video being played.)
11       Q.    I'm going to stop it at 1:24.  So
12 we talked about some of the distortions that body
13 camera footage can do?
14       A.    Right.
15       Q.    Are there any of those
16 distortions that you think affect a proper
17 understanding of that interaction?
18       A.    Well, just distances look to be
19 much farther than -- like, looking from here,
20 City Hall looks much farther away than it is, and
21 you can tell from that because the building looks
22 kind of bent.  And other than that, it can't see,
23 you know, their faces.  I'm getting a chest-level
24 view of them.
25       Q.    And what about the face -- that

1 was Matthew Wear who you were interacting with.
2 Is that correct?
3      A.   I never got his name.
4      Q.   Okay.  Do you know at this time
5 whether that was Matthew Wear as you sit here
6 today?
7      A.   Only that you've told me that.
8      Q.   Okay.  All right.  So outside of
9 this conversation, you're not aware of that --
10      A.   No.
11      Q.   -- individual's name?  Okay.
12           Have you ever interacted with
13 that individual before?
14      A.   No.  No.  That was my first.
15 See, the body cam should have went on earlier and
16 so it doesn't capture my first interactions, but
17 I believe that was my first with him.  It wasn't
18 my first interaction of the day.
19      Q.   So let me just clarify quickly.
20 You've never interacted with that individual on
21 this day or before this interaction?
22      A.   Right.  And what I want to
23 clarify a little bit is the way that -- my
24 interaction with him there is certainly not
25 typical.  Now, on these purposes it looks like,

1 hey, this is your first body cam footage.  This
2 is your first interaction.  This is the way you
3 come off to people.
4           If that's the case, I wouldn't
5 have lasted 16 years as a police officer.  I just
6 wouldn't have, and I never would have been
7 promoted.  This was my first interaction with
8 him, but not my first interaction with protesters
9 that day, and I think -- well, I know what we're
10 seeing here is a little frustration is starting
11 to arise in me.
12      Q.   You said the body cam should have
13 went on earlier.  Did you attempt to turn it on
14 earlier?
15      A.   No.  And I'll clarify that, too.
16 According to our policy, it didn't need to go on
17 earlier.  And hindsight, you know, so much easier, I
18 know, hindsight is, you know, so much easier, I
19 wish I would have turned it on -- like Chief
20 Tornielli said yesterday, after this event he put
21 out a directive that when we're dealing with
22 events like this, just run it the whole time.
23 And I wish I had run it the whole time, although
24 that was not policy at the time, and it certainly
25 would have given a more accurate depiction of the

1 whole day's events.
2      Q.   What did Chief Tornielli -- when
3 did Chief Tornielli put out that new policy?
4      A.   I don't remember exactly, but at
5 some point in the weeks thereafter.
6      Q.   So you mentioned there were prior
7 interactions.  Would you describe when those
8 interactions began in the morning?
9      A.   Sure.  And I mentioned a little
10 of them earlier, and it was about -- I'm going to
11 say 9:30 in the morning.  This event had
12 not started.  Can I point at the screen?
13      Q.   Sure.
14      A.   Do you mind?  So our City Hall
15 parking lot is back here, and --
16      Q.   I'm going to stop you for a
17 second.
18      A.   I get it.
19      Q.   It's okay.  You're fine.  Because
20 our court reporter is blind, so to speak, we're
21 going to ask you to describe it as if you're on
22 the phone, so go ahead.
23      A.   Okay.  So I'm looking at City
24 Hall.  City Hall is on my left.  There is a white
25 car and a black car parked on the left side of

1 the screen.  Immediately after that black car
2 there is a road.  That's Cedar Street, and that
3 leads to the back parking lot of City Hall.  So
4 by 9:30 that morning -- well, Stuart, Dupree and
5 I came in at 8:30, and the purpose for that was
6 to make sure we had no parking signs posted on
7 Washington Street and North 8th Street in front
8 of City Hall.  We have to make sure that there's
9 no cars that need towed.  There wasn't.
10           9:30 we were in the back parking
11 lot, and I said to them, I'm going to go talk to
12 the event organizers and make sure that they
13 know, you know, where we're going to be, what
14 we're going to do, and how this whole thing is
15 going to go.
16           So I walked up that road that I
17 just described, and I came out right where that
18 black car is, and I walked along the front of
19 City Hall to where -- the front steps here, not
20 quite to where that podium is, and there was two
21 men there holding signs, and they're the ones
22 that are seen in this video that we just saw in
23 the video.  We see three of them.
24           The two that I didn't talk to
25 were on the sidewalk right there, and that

Plaintiff's App. 069

Page 66

1  was -- and I was surprised. Like I said before,
2  I was not expecting this to be that type of
3  event. I thought that this is -- it was proposed
4  to me as a ten-minute flag raising. They're
5  going to raise this flag and then they're going
6  to walk 8th to Penn, Penn to City Park, and it's
7  done.
8              I was not expecting any trouble,
9  so -- I was not expecting any protest whatsoever.
10  So they were standing there. They're holding
11  signs. They weren't yelling or anything like
12  that. They were standing there holding their
13  signs. And, I said, well, like, we're not doing
14  this. Guys, this is not going to be one of those
15  type of events. This is -- they're going to do
16  this.
17              This is the conversation I talked
18  about earlier. Hey, it's a free country. I
19  said, true, but they have a permit to be in this
20  section. You don't. So, you know, you're going
21  to have to -- I don't remember my exact wording.
22  When I say you're going to have to leave, I
23  certainly don't mean you have to leave the area.
24  Leave the immediate sidewalk area there.
25              And that's where they said, we're

Page 67

1  going to go across the street. I said, that's
2  great, and I walked across the street with them.
3  And they tried to, you know, drag me into some
4  religious debate or, you know, do you agree with
5  what's going on here?
6              Now, my personal beliefs are not
7  relevant when I'm working. Like, I have a job to
8  do, and my job is to make sure that this event
9  goes off safely or without problems because I
10  know that when these events happen and there's no
11  problems, nobody cares, right? But when there's
12  a problem, they want somebody to blame. Who gets
13  the blame? Middle management. So it's always
14  going to come back to me whether I'm there or
15  not. It doesn't matter what the problem is.
16              So I want this to go off as
17  smoothly as possible. I get them across the
18  street, and this is where I laid the parameters
19  down. This is your spot. You can be here. You
20  can hold your sign. If you're walking out into
21  the street where they're going to be, if you're
22  disrupting this event in any way, then you're
23  going to get arrested. And they tried to
24  continue the conversation. I can't. Like, I
25  can't get involved in that type of conversation

Page 68

1  while I'm working. I wouldn't do it off duty
2  either.
3       Q.   Why do you feel you can't get
4  involved in that kind of conversation when you're
5  working?
6       A.   Well, when we're working these
7  events and our personal feelings on the group
8  that's holding the event, they're not relevant to
9  what we have to do. We have a job to do, so
10  regardless of what the group is, this thing has
11  been approved. This event is going to happen,
12  and we're there to make sure that it happens as
13  smoothly as possible, and that's it. It would be
14  inappropriate for us to even get into a debate
15  about anything.
16       Q.   So after you asked the two
17  gentlemen to cross the street and stand on the
18  sidewalk --
19       A.   Yes.
20       Q.   -- they asked you about that
21  location. You approved that spot for them. Is
22  that right?
23       A.   Oh, yes. Yeah.
24       Q.   And when you saw the third
25  protester who I'm identifying for you as Mr.

Page 69

1  Wear, the YouTuber.
2       A.   Yes.
3       Q.   That's okay. Why did you -- this
4  was your first interaction with him. It's on
5  body cam one?
6       A.   Yes.
7       Q.   Why did you feel the need to
8  discuss with him?
9       A.   Well, when he first came, he came
10  from -- this camera view right now at the screen
11  as we're looking at it now is facing east in the
12  800 block of Washington. I was walking west in
13  the 800 block of Washington, and he was
14  coming -- when I say towards me, I don't mean at
15  me, but towards the direction that I was coming
16  from, and he walked into the street right away,
17  and he was yelling something.
18              I'm like, okay. We can't have
19  this I was saying, thinking to myself. Like,
20  here's another one. Now somebody else is showing
21  up. So that was -- I immediately went to him.
22  So my thought process in this is, listen, if I
23  tell them right away this is the way it's going
24  to be, there's no ambiguity. This is what we're
25  doing. This is what they're doing, and this is

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Plaintiff's App. 070

Page 70

1  how it's going to be, that's it.  I'll have fewer
2  problems that way.
3          We only had three officers
4  working this detail.  It was Stuart, Dupree and
5  I, and I did not -- and at this point already,
6  now I'm worried -- I went from not expecting any
7  problems, now I'm worried about how many of these
8  other guys are going to show up?  Are the pride
9  people going to start arguing back?  What is --
10  is this going to turn into something that we are
11  not equipped to handle right now, so I'm going to
12  keep it under control right from the beginning.
13      Q.    At that point in time at 9:52 or
14  9:53 in the morning, had any of the pride people
15  argued back as you put it?
16      A.    I don't recall.
17      Q.    Let me put it a different way.
18  Not that you recall or not that you had observed
19  at that point?
20      A.    Not that I recall.  Well, I did
21  not observe any, like, arguments between the two
22  groups.
23      Q.    When you said that a third one
24  showed up, referring to the gentleman that you
25  confront here in body cam one?

Page 71

1      A.    Yes.
2      Q.    You said he was another one.  Did
3  you believe that these folks were together or
4  coming from the same group at this point?
5      A.    No.  And I can see how that's not
6  clear.  When I say another one, I mean another
7  protester, another person who has a problem with
8  this pride event.
9      Q.    You made two statements earlier.
10  You said this is not one of those events.  What
11  do you mean by that?
12      A.    Well, what I mean by that is
13  something that's going to turn into a circus, and
14  you'll hear me, and I'll use a couple phrases
15  like this is not a thing, which is something I
16  say on the street probably every day in different
17  situations.  I don't know.  It's a catch phrase I
18  use.  This is not a thing or this is happening.
19          I say those things.  Some of the
20  other things I say I don't often say.  However,
21  yes.  This is not going to turn into a circus.
22  This is not going to be chaos because I know if
23  this thing turns into a circus, and the last
24  thing I want to do -- the last thing I want is
25  anybody to be arrested because I know it's all

Page 72

1  going to reflect back on me regardless of the
2  circumstances.
3      Q.    You also said earlier can't have
4  this, referring to what you told the two, I
5  think, when they were over on the City Hall side?
6      A.    Yes, sir.
7      Q.    What did you mean by "can't have
8  this"?
9      A.    We can't have trouble.  We can't
10  have you standing right where they're setting up.
11  There's people already setting up equipment, and
12  you're standing right there.  Obviously, they're
13  going to get a reaction.
14          It was my interpretation that
15  their purpose was to get a reaction.  Why else
16  would you stand that closely holding signs
17  with -- clearly showing yourself to be
18  antagonistic towards this group that's here.  So
19  when I say you can't have -- we're not going to
20  have this.  We're not doing this.  We're not
21  having these problems here.  We got to keep this
22  under control.
23      Q.    Why did you push the protester in
24  body cam one?
25          MR. CONLEY:  Objection to form.

Page 73

1          You can answer.
2      Q.    Let me back up.  Do you agree
3  that you pushed the protester in body cam one?
4      A.    I agree that I put my hand on his
5  chest and walked him back.  It certainly was not
6  an aggressive, like, push, like using -- fully
7  extending both arms, but I did make contact with
8  him.  Why did I feel it was necessary?  Again,
9  just to create distance, to direct him where to
10  be.  That's a common thing.  I've done that many
11  times over the years in different situations.
12      Q.    He was standing on the sidewalk
13  when you made contact with him, correct?
14      A.    Yes.
15      Q.    You had approved that location
16  for counterprotestors to stand in?
17      A.    Yes.
18      Q.    Why did you think you needed to
19  direct him somewhere else?
20      A.    That may have -- that may be a
21  situation where I was still on the street and
22  he's a little elevated, and I want to get on the
23  sidewalk, too.  So rather stand so we're at an
24  even level so than rather stand, so give me a
25  little space while I step up here and talk to

19 (Pages 70 - 73)

Plaintiff's App. 071

Page 74

1 you.
2      Q.    At one point early in the
3 discussion you told him to shut up.  Why?
4      A.    Well, that's not normally
5 something I would say to somebody, and in this
6 situation I said it, obviously.  Probably because
7 I felt like he was trying to talk over me.
8 Again, it's not normally something I would say.
9      Q.    You told him that if he continued
10 he was going to end up being arrested?
11      A.    Yes.
12      Q.    What did you believe he was going
13 to be arrested for at that time?
14           MR. CONLEY:  Objection to form.
15      You can answer.
16      A.    Well, my thought at the time was
17 when I say if you continued because, like I said,
18 when he first showed up there, he walks -- he's
19 in the street, and he's yelling at these people.
20 So this is what I'm referring to, if he's
21 continuing to yell in speech that's, like I said,
22 clearly antagonistic towards people, designed to
23 get a reaction from them and being disruptive to
24 this event.
25      Q.    The event had not started yet at

Page 75

1 9:52.  Is that correct?
2      A.    That's correct.  The scheduled
3 start time was 10 o'clock.
4      Q.    Other than him initially showing
5 up, walking in the street, was he ever back in
6 the street that you observed?
7      A.    Do you mean after I talked to
8 him?
9      Q.    You mentioned that when you were
10 coming -- as you said, you were coming at each
11 other, maybe not directly?
12      A.    Right.
13      Q.    Opposite directions down the
14 street?
15      A.    Right.
16      Q.    I understood your testimony to be
17 that he was walking in the street on his way to
18 this location.  Is that correct, first of all?
19      A.    Yes.
20      Q.    Okay.  Did you ever observe him
21 in the street other than on that approach?
22      A.    No.  No.  No.
23      Q.    And the street was closed to
24 traffic at this point, correct?
25      A.    I'm looking -- I don't think it

Page 76

1 is closed to traffic at this point.  I'm looking
2 at the intersection a half block further than
3 where Cedar Street was.  We did not have
4 barricades -- I did not ask for barricades at
5 that location because I never intended to close
6 Washington Street beings that it's a state route,
7 and we need -- normally need PennDOT approval for
8 that.
9           However, I later made a decision
10 probably a couple minutes after this to have
11 Stuart and Dupree block Washington Street for
12 safety reasons.  It just seemed there was too
13 many people from the pride group in the street.
14 And I can't see the -- I see a police car right
15 on the right side of the screen, so that leads me
16 to believe that Washington Street is still open
17 at this point.
18           MR. CONLEY:  Just for the record
19      for clarity, you've made a couple
20      references to the screen.  I want to
21      point out that we're still -- we're
22      paused at 1:24 into the video.
23           MR. READY:  That is correct.
24 BY MR. READY:
25      Q.    And also for the record for those

Page 77

1 who don't know Reading, Washington Street is this
2 street that runs right in front of City Hall.  Is
3 that correct?
4      A.    Yes.
5      Q.    We're going to look at the Damon
6 Atkins video in just a moment.  Other than the
7 interactions with the two protesters over on the
8 City Hall side of the street --
9      A.    Yes.
10      Q.    -- and your interaction with
11 Mr. -- we continue to, I guess, assume without
12 maybe knowing, Mr. Wear in body cam one --
13      A.    Yes.
14      Q.    -- did you have any other
15 interactions with counterprotesters against the
16 pride celebration that day?
17      A.    At this point, no.  And I was
18 thankful for that, that they stayed in the spot
19 that was agreed upon, and at this point I'm
20 thinking, okay.  We're going to get through this.
21 No problems.
22      Q.    So I'm going to continue playing
23 at 1:24, and it sounds like you just answered the
24 phone?
25      A.    Yes.

20 (Pages 74 - 77)

Page 78

1    Q.    Do you know who was on that call?
2    A.    Yes.  I answered the phone,
3 hello, birthday girl.  That's actually Paige
4 Stuart.  This being her birthday, which when she
5 agreed to work the detail, I said, Paige, I'm
6 sorry.  I didn't know it was your birthday.  She
7 said, no.  No.  I'll come in and do it.
8         (Video being played.)
9    Q.    I'm going to stop at 1:50.  Two
10 questions.
11    A.    Okay.
12    Q.    First, I saw another officer
13 walking through the street.  Who was that?
14    A.    That is our -- and still is our
15 deputy chief, Javier Ruiz.
16    Q.    And do you know why he was
17 present?
18    A.    He was there because at the time
19 he was in charge of the Reading Police Youth
20 Academy which is, like, an organization for high
21 school kids, and they were marching in this, with
22 the procession or whatever, the pride group.
23    Q.    Is this youth academy a Reading
24 police auxiliary of sorts?
25    A.    I don't know exactly.

Page 79

1    Q.    Is it associated with the Reading
2 Police Department?
3    A.    Yes.  I don't know at what level
4 or what degree.  I've never had any contact with
5 him or any -- or anything to do with them.
6    Q.    So fair enough.  Officer Ruiz,
7 it's your understanding that that's part of his
8 job responsibilities.  That's not a volunteer
9 thing he does outside.  Is that correct?
10    A.    I believe he was told that he's
11 volunteering for this job responsibility, and
12 that sounds funny.  I don't intend to be funny.
13 I believe that at the mayor's direction, the
14 deputy chief at the time was in charge of the
15 youth academy.
16    Q.    Okay.  Understood.  You appear to
17 be in the street as well at this time.  Is that
18 right?
19    A.    Yes.
20    Q.    So is this before or after you've
21 closed Washington Street?  I think a minute ago
22 you thought it was before.  Is that still your
23 answer?
24    A.    Yes.  Right before you paused it,
25 when it was still showing west on Washington

Page 80

1 Street, we can see the right lane is -- has all
2 these pride people in it which I was not
3 expecting.  This was supposed to be a flag
4 raising on the sidewalk.  Why wouldn't you stay
5 on the sidewalk?  Why would you stand in the
6 street?  And they started coming out into the
7 street and -- okay.  Well, great.  So I guess we
8 got to do something about that before people
9 start getting run over.
10         The other fear I had, one of the
11 things I considered doing was just putting a car
12 in the right lane and allowing traffic in the
13 left lane, but then I was worried that somebody
14 is going to stray into the left lane.  Somebody
15 is going to get run over or some passing car is
16 going to -- I don't know, going to hit these
17 people or traffic is going to back up at the red
18 light, so I'm like, you know what?  It's going to
19 be ten minutes, so I was told, so we'll just shut
20 the road for ten minutes.
21    Q.    Did you have any conversation
22 with -- I'm sorry, was it Mr. Castro or any other
23 organizers of the pride event about how to get
24 people onto the sidewalk for the pride event?
25    A.    No.

Page 81

1    Q.    Did you have any conversation
2 with any of them about the counterprotestors or
3 the -- I won't say growing crowd, but the
4 increasing number of counterprotestors?
5    A.    No.
6    Q.    Did you do anything or any of the
7 officers under your direction do anything that
8 you know of to get the pride attendees over onto
9 the sidewalk?
10    A.    No.  I figured the easier thing
11 to do -- and, again, our whole goal when we do
12 these things is get them done as easy as
13 possible.  I figured it was just easier to close
14 the street.
15    Q.    And at no point did you or any of
16 the others officers under your command there
17 direct any of the pride protesters not to cross
18 the street to the counterprotest side.  Is that
19 correct?
20    A.    That's correct.  Yeah.
21    Q.    You didn't direct any of the
22 pride attendees to not speak to or harass or yell
23 at the counterprotestors, correct?
24    A.    I don't recall telling anybody
25 that.  No.

21 (Pages 78 - 81)

Page 82

1   Q.   Okay.  You had a brief call with
2  Officer Stuart --
3       A.   Yes.
4       Q.   -- the birthday girl, and what
5  was the substance of that conversation?
6       A.   I believe -- based on what I
7  said, I believe she was probably further east on
8  Washington Street and asking me if she should
9  block Washington Street at 9th.  There was also
10  another conversation, and I don't know if it's
11  caught on camera, where either her or Dupree
12  asked me about cars that were already parked in
13  the block.  Should we let them pass, and I said
14  yes.  Let's get them through.  We're not going to
15  hold people up who are -- we're not going to
16  block people in in this block.  We'll let them go
17  through.
18       Q.   I want to continue playing the
19  video.  We had paused it at 1:49.
20          (Video being played.)
21       Q.   You turned your body cam off at
22  that time, correct?
23       A.   Yes.  Yeah.
24       Q.   Why did you turn it off?
25       A.   Well, within policy I was done

Page 83

1  with my interaction.  So in accordance with
2  policy, I could turn it off at that point.  I'm
3  sure my mind frame was like, okay.  Good.  That's
4  over.  This is going to be over soon.
5       Q.   Okay.
6       A.   No more problems.
7       Q.   I'm going to take you now to what
8  has been labeled Sergeant Bradley T. McClure
9  video number two.  This is the second segment of
10  body cam footage that we received from your
11  attorney.  I'm going to start playing it here.
12          (Video being played.)
13       Q.   I'm going to pause it here at 15
14  seconds, and at this point -- and I just want to
15  confirm -- there have been no other interactions
16  with the protesters between the last video and
17  this one.  Is that correct?
18       A.   Do you mean the ones that we
19  already saw me talking to?
20       Q.   Yeah.  I guess since your last
21  conversation with the protester in body cam
22  one --
23       A.   Yes.
24       Q.   -- there were no other
25  pro -- there were no other interactions between

Page 84

1  you and counterprotestors between that and
2  arresting Mr. Atkins.  Is that correct?
3       A.   Other than just Mr. Atkins
4  himself which is not on body cam, and I see the
5  one that you say is Wear is standing there
6  filming.  I didn't even notice that at the time.
7       Q.   I'm just going to continue this
8  video for 15 seconds.
9          (Video being played.)
10       Q.   I'm going to stop at 1:09, and it
11  appears or it sounds like on the video that
12  that's the point at which the event is getting
13  started.  Is that your recollection?
14          MR. CONLEY:  Objection to form.
15  You can answer.
16       A.   I can hear somebody talking on --
17  it sounds like somebody is talking on a loud
18  speaker.  I don't know if it started on time or
19  not.
20       Q.   Okay.  Let me ask this:  Before
21  your interactions with Mr. Atkins, do you recall
22  if the event was in progress, that he was
23  speaking, that anything was going on?
24       A.   Yeah, because he showed up later
25  than the other fellows that we saw earlier, yes,

Page 85

1  so the event would have started.  I see here it's
2  10:09.  It was scheduled for 10 o'clock.
3       Q.   So this is our second look at the
4  body cam footage.  Is there anything in this
5  footage that you feel is distorted based on the
6  distortions you talked about earlier with body
7  cameras?
8          MR. CONLEY:  Objection to form.
9  You can answer.
10       A.   Other than just the angle, you
11  know, the point of view.
12       Q.   Do you feel that changes
13  significantly the perception of what happened
14  here based on the footage?
15          MR. CONLEY:  Objection to form.
16  Calls for an expert opinion.  You can
17  answer.
18       A.   Well, a body camera is going to
19  change the perception of any incident just based
20  on their limitations, and if we understand the
21  limitations, then they're much more effective.
22  It's easy to look at body cams and say, well,
23  this is what the police officer saw and heard
24  which may not always be the case -- which is
25  almost never the case.

Page 86

1    Q.    Okay.  Does this -- does this
2  body camera footage accurately reflect what you
3  saw and heard that day at least for the time that
4  it's on?
5    A.    For this incident that we're
6  playing right now?  I mean, for this camera, is
7  this number two?
8    Q.    This is body cam two.
9    A.    For the first one minute, nine
10  seconds, yes.
11    Q.    Okay.  I'm going to continue
12  playing.
13          (Video being played.)
14    Q.    So I'm going to stop it here at
15  1:53.  It sounds like you tell him shut up.
16  Don't tell me what to do.  Why did you say that?
17    A.    Well, 'cause sometimes when
18  people get arrested, they like to tell us what to
19  do or tell us we're doing something wrong with
20  the way that -- like, they don't have to sit
21  down.  We want people to sit down as we're
22  waiting transport.  It's just safer.  I don't
23  know what he said to make me say that in this
24  case, but that's not unusual.
25    Q.    Okay.  I'm going to continue

Page 87

1  playing at 1:53.
2          (Video being played.)
3    Q.    So at 2:45, a little bit before
4  2:45 a couple of statements get made.  You said
5  several times he ain't getting nothing out of
6  this bag?
7    A.    Yes.
8    Q.    Why did you say that?
9    A.    When we arrest somebody, it is
10  practice within our department that what you have
11  on you in your possession is going with you.
12  We're not getting into a situation where we're
13  allowing people to -- it's very common in
14  Reading, somebody gets arrested.  Somebody else
15  goes, hey, he has my phone or, hey, he has 20
16  bucks for me.  Can I get that?  Can I get that?
17  No.  Nobody gets anything.  What's on you when
18  you're arrested is what's on you, and it's going
19  with you.  We're not giving stuff away.
20    Q.    Why is that?
21    A.    Well, number one, we don't
22  know -- like, somebody could say, hey, he has my
23  keys or he has my phone.  We don't know whose
24  stuff it is, and we're not going to be in the
25  position where we're trying to divide out whose

Page 88

1  property is what.
2          We're making an arrest.  This is
3  in your pocket.  You're carrying this bag.  This
4  bag, it's yours.  It's going with you.  That's
5  it.  We're not standing here.  It just turns
6  into -- and I learned this actually in my prison
7  days, and it was reinforced when I got hired at
8  the police department.
9          It just turns things too chaotic.
10  It gives the impression that, like, we really
11  don't have control of the situation.  We don't
12  know what we're doing.  We're starting to hand
13  property out to people, and we don't even know
14  who it belongs to.  So the standard is, if it's
15  on you, if you have it in your possession, it's
16  yours.  It's going with you.
17    Q.    So who is the "he" that you're
18  referring to?  He ain't getting nothing out of
19  that bag?
20    A.    There was another person with
21  him, and that person had followed us around the
22  corner, so we're back on Cedar Street now.  So
23  we're kind of right behind City Hall, and he was
24  asking for -- he said something in that bag
25  belonged to him.

Page 89

1          And at this point -- and what's
2  apparent to me, certainly not to people who don't
3  know me, that the whole day's events, and it's
4  early, have me very -- I'm frustrated for several
5  reasons at this point, so I was not in the mood
6  at that point to talk about bag ownership.
7    Q.    Why were you frustrated?
8    A.    Well, some of it I touched on
9  earlier.  One of the reasons I took the traffic
10  job was so I didn't have to work weekends
11  anymore.  I did that for many -- going back to my
12  prison days, many years.
13          Now it's Saturday morning, and I
14  have to work because nobody wants to work this
15  event.  I don't want to work this event.  I am
16  standing.  There's one side, I have a group
17  that -- I don't want to be -- I don't get it.
18  Okay.  They're having their event.  I don't get
19  it.  Whatever.  They're going to raise their
20  flag.  They're going to walk to City Park.  Let's
21  just get this over with.
22          Another side I have a completely
23  antagonistic -- two groups are antagonistic
24  towards each other.  Neither group would ever
25  agree to see somebody else's point of view, and

Plaintiff's App. 075

Page 90

1 we're in the middle of it.
2          And all I want is just get this
3 day over with no problems.  Now there's a
4 problem.  Now I have to -- now I made the
5 decision to arrest this guy.  Now I know I've got
6 to do charges.  Now I know I've got to be here
7 later.
8          And it just reflects -- when the
9 events don't go smooth, when there is a problem,
10 and this is not normal for there to be a problem,
11 police are funny.  When we work special details,
12 if it's a crime-focused detail, if we're doing,
13 like, drug work or traffic enforcement or
14 something, the goal is you're going out there in
15 overtime.  You're going to make contacts.  You're
16 going to make arrests.
17          When we work special events,
18 parades, concerts, these flag raisings, it's the
19 exact opposite goal.  It's like, let's go there.
20 Let's do our thing and get out.  We're not
21 looking for any extra work, and now there's extra
22 work, and I know that it's fallen on me.  It's my
23 decision, and like I said before, I'm not going
24 to push it off onto them to do the charges.  I'll
25 take care of it myself, but now I know I'm going

Page 91

1 to be there for much longer.
2          And also, as I said before, even
3 though it's only ten after 10:00, I can see
4 already that what this event was proposed to me
5 is not what it is turning into.  It was not
6 proposed to be this big thing.
7          You can't really see it on here,
8 but there's a line of speakers.  Speakers, I mean
9 people who are going to speak.  Not amplifiers.
10 People are lined up.  This guy is going to talk
11 and then this guy is going to talk.  This was
12 supposed to be ten minutes, and now -- it ended
13 up being about 50 minutes.  So for a lot of
14 those -- for all those reasons, I was
15 becoming -- I had become very frustrated.
16     Q.    Do you feel this event could have
17 been planned better with the Reading Police
18 Department?
19     A.    Yes.  Had somebody told me
20 exactly what was going on rather than tell me one
21 thing and then, oh, now it's something else, yes.
22 I would have done this differently had I been
23 given an accurate plan of what was to be
24 occurring.
25     Q.    Who didn't give you accurate

Page 92

1 information or gave you inaccurate information, I
2 should say?
3     A.    I don't know if anybody
4 intentionally gave me inaccurate information.  I
5 believe that the information I was given was
6 accurate as far as the event organizers thought
7 it was going to be.  I believe that other people,
8 by that, I mean local dignitaries, heard about
9 this and decided I got to get in on that, and
10 they showed up, and I think the thing just
11 ballooned into something that it was not.
12          Washington Street should have
13 been closed, PennDOT approval.  Not by police
14 cars on the fly like we did.  That's one thing.
15 The protesters, like I said before, I never
16 expected -- had I expected them, I would have
17 planned -- I would have had a plan in place, and
18 it would have gone much smoother.
19     Q.    At 10:10 and 48 seconds or as
20 paused here, 2:45 in this video, all three of the
21 officers on scene except, I guess, Officer Ruiz
22 were participating in the arrest.  Is that
23 correct?
24     A.    Yes.
25     Q.    Did you have concerns about

Page 93

1 leaving the other protesters and
2 counterprotestors unattended at that time?
3     A.    I didn't, and the reason I didn't
4 was probably -- well, partly based on hope and
5 partly based on what had happened since my
6 interactions with them, and that is, they stayed
7 in their group.  Now, one of them did come off to
8 film us, but, again, he's still on the side.
9 He's not hurting anybody.  He's on the sidewalk.
10 He's not causing a problem.  So they stayed on
11 the sidewalk, and as long as -- and they weren't
12 yelling anything.  They weren't being disruptive.
13          And I was -- and I'm always
14 confident, and I've had this belief since a
15 couple years in when I started to get a little
16 experience, like, listen, when I show up,
17 everything is going to be all right.  There's not
18 going to be any problems.  I got it under
19 control.
20          This, it didn't work out that
21 way, which is another reason I was frustrated,
22 but at this point, I'm still confident those
23 other guys aren't going to be a problem because
24 they complied with what I said and -- I don't
25 know.  I was just confident that they weren't

Plaintiff's App. 076

Page 94

1 going to cause any more problems.
2     Q.    Did you think that the Atkins
3 arrest was going to have a positive effect on the
4 demeanor of the other counterprotestors?
5         MR. CONLEY: Objection to form.
6     You can answer.
7     A.    No. I don't think it would have
8 had a positive effect.
9     Q.    Did you think it was going to
10 have a negative effect?
11        MR. CONLEY: Same objection.
12     A.    I don't know if I thought that it
13 would have a negative effect. I thought
14 that -- the thought that was going through my
15 mind was I gave these people in three separate
16 groups the same warning. Atkins was the last one
17 to show up and when -- I gave them the previous
18 warnings, and they gave me no problems
19 afterwards.
20        And then Atkins shows up. I gave
21 him the warning and then when I turn away and
22 then he starts up again, I think that they saw,
23 hey, okay. This guy said this is going to happen
24 if we don't comply. Obviously he means business,
25 so that was my hope that they say, hey, okay.

Page 95

1 This guy is serious.
2         I would always get frustrated at
3 police officers who would say things and then
4 they would basically say things that they're not
5 prepared to back up. And that's something I was
6 taught when I was a new police officer going to
7 domestics, and you leave the domestic, and the
8 veteran officers would say, hey, if you go back
9 to this domestic, tell the people that if I have
10 to come back again, somebody is getting arrested.
11        And I said, well, why? How do
12 you know that? Like, you're going to tell
13 somebody that? Well, what if there's no reason
14 to arrest somebody? So if you're going to tell
15 somebody something, then be prepared to carry it
16 out.
17        So I was always prepared or I was
18 always conscious of it. Like, if I'm going to
19 tell somebody something, if this happens, I'm
20 going to do this, then I better be prepared to do
21 this. And if I'm not prepared, people see that,
22 and people -- they take advantage of that if they
23 see you're not prepared to carry out what you
24 did.
25     Q.    So safe to say you were prepared

Page 96

1 to do the things that you suggested you would do
2 that day?
3     A.    Yes. And at this point -- well,
4 even prior to this I'm hopeful that it doesn't
5 come to that. This is the last thing that I want
6 to do at any event, whether it's this, a parade,
7 a concert, whatever. This is the very last thing
8 I want to do is arrest somebody.
9         And now that I made the decision,
10 one, the thought has gone through my head, I
11 hope -- I hope nothing else happens, because if
12 this gets into a situation where now we're
13 arresting multiple people, this is not going to
14 look good.
15     Q.    Did you believe the other
16 counterprotestors would take your warnings more
17 seriously if they saw you follow through on this
18 threat?
19        MR. CONLEY: Objection to form.
20     A.    Yes.
21     Q.    Sorry. You said yes?
22     A.    Yes, but that's not -- that's not
23 to say or to insinuate that that is the reason I
24 made the arrest. I certainly believe the arrest
25 was justified, but, again, I have that discretion

Page 97

1 whether to arrest or not to arrest, and I believe
2 it was justified. Yes. I believe that they
3 would see that, okay. Well, this guy was
4 serious.
5     Q.    I'm going to keep playing from
6 2:45.
7         (Video being played.)
8     A.    I'm sorry. Can you just stop it
9 there for one second?
10     Q.    Sure.
11        MR. CONLEY: Hold on. You can
12     wait for a question. If there's
13     something you need to clarify, go ahead
14     and clarify it from past testimony. I'd
15     prefer if you just wait for a question.
16     A.    Okay.
17     Q.    I'll play a bit more and then
18 we'll talk about what we just saw.
19        (Video being played.)
20     Q.    I'm going to stop you at 3:03.
21 So there was some interaction between Officer
22 Dupree and Mr. Atkins, and what was that about?
23     A.    It seemed to be about the
24 contents of the bag.
25     Q.    And this was the bag that just

25 (Pages 94 - 97)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Plaintiff's App. 077

Page 98

1 seconds ago in real time you had said he ain't
2 getting nothing out of that bag?
3     A.   Yes.
4     Q.   This gentleman we see at 3:03
5 right in the middle of the screen holding the
6 sign, is that the "he" you were referring to?
7     A.   Yes.
8     Q.   You described him earlier. And
9 so the contents of the bag, what was the
10 discussion about?
11     A.   His contention was that the bag
12 or whatever was in the bag -- and I don't recall
13 what it was. I believe something medical. He
14 said that that is mine. That's mine. I want
15 that. That's mine.
16     Q.   And there was a reference by
17 Officer Dupree here to a passport. Do you recall
18 a discussion of a passport?
19     A.   I do. I don't recall the
20 specifics. She was going through the bag. I
21 don't recall the specifics.
22     Q.   Okay. I'm going to start at 3:03
23 again.
24         (Video being played.)
25     Q.   Let's stop it at 3:30. So you

Page 99

1 told him he was going across the street?
2     A.   Yes.
3     Q.   You also said if he didn't, that
4 he was going to join Mr. Atkins, presumably being
5 arrested. Is that correct?
6     A.   Yes.
7     Q.   Did you lay your hands on him at
8 that time?
9     A.   Yeah. You could see I -- like,
10 I'm guiding him, turning him around. Let's keep
11 going across the street. Yes.
12     Q.   What were you -- what did you
13 believe you were going to arrest him for?
14     A.   Well, I believe --
15         MR. CONLEY: Objection to form.
16 You can answer.
17     A.   My thought at that time was if he
18 continued with his behavior or if he wouldn't
19 leave our immediate area or if he's interfering
20 with us or interfering with the arrest or being
21 disorderly, those were my thoughts at the time.
22 Certainly what he did at the time did not rise to
23 the level of disorderly conduct, and he was not
24 arrested.
25     Q.   Okay. I'm going to keep playing

Page 100

1 here from 3:30.
2         (Video being played.)
3     Q.   When you say call your buddy, are
4 you referring to Mr. Atkins?
5     A.   I don't know who I was referring
6 to there. I definitely heard it. I don't know
7 who I'm referring to.
8         (Video being played.)
9     Q.   So I'm going to stop right here
10 at 3:59. It does look like there are quite a few
11 people out in the street. At this point you had
12 blocked off the street?
13     A.   Yes.
14         (Video being played.)
15     Q.   Okay. So I acknowledge we've
16 stopped it a couple of times, but is this footage
17 a fair and accurate reflection of what you
18 observed that day on the scene?
19         MR. CONLEY: Objection to form.
20 Go ahead.
21     A.   Yes.
22     Q.   I'm going to show you one more
23 video, and let me just ask you: Have you seen
24 the YouTube video that was posted by Barely
25 Preacher Man in this case?

Page 101

1     A.   I did not see the whole video.
2 No. I've seen parts of it.
3     Q.   Have you accessed it on YouTube
4 or when have you seen it?
5     A.   It was sent from my attorney.
6     Q.   Okay. All right. Very good. So
7 you've seen the link on YouTube?
8     A.   Yes.
9     Q.   You say you've not watched the
10 whole thing. Is that correct?
11     A.   That's correct.
12     Q.   Okay. I'm going to skip
13 forward --
14         MR. READY: Actually, can we go
15 off the record for a second?
16         (A discussion was held off the
17 record.)
18 BY MR. READY:
19     Q.   So I'm going to show you a
20 YouTube video that was posted by Barely Preacher
21 Man. It was titled Christian Arrested in
22 Reading, Pennsylvania at a Pride March. I'm not
23 going to read this whole YouTube URL into the
24 record.
25         MR. CONLEY: Is there a date that

26 (Pages 98 - 101)

Page 102

1    it was posted?  I don't know if there is.
2           MR. READY:  It was posted on June
3    3rd, 2023.
4    BY MR. READY:
5       Q.   So I'm going to show you this
6    video in its entirety and then we'll discuss.
7           (Video being played.)
8       Q.   I'm going to stop you here at
9    4:57.  Is this video an accurate reflection of
10   what you observed at the event on June 3rd?
11          MR. CONLEY:  Objection to form.
12      A.   Well, that's not from my vantage
13   point.  It's from the filmer's vantage point.
14   So, I mean, this is an accurate reflection from
15   his vantage point.  The only difference I'll make
16   is we can't hear my whole interaction with the
17   plaintiff.
18      Q.   Okay.  I'll put it a different
19   way.  As far as what you did experience in terms
20   of the event and your arrest, do you believe
21   having seen this that this accurately reflects at
22   least in part what happened with you and Mr.
23   Atkins?
24      A.   Yes.
25          MR. CONLEY:  Objection to form.

Page 103

1       Q.   So I want to ask you about -- I
2    want to go back here a little bit.  The initial
3    interaction you have with Mr. Atkins is recorded
4    here, and I'm going to go back to 1:46, and I'm
5    going to play again.
6           MR. CONLEY:  Objection to form.
7           Note my objection to the original
8           interaction.  I don't think there's been
9           any testimony as to whether that was an
10          original interaction.  You can certainly
11          ask your questions.
12   BY MR. READY:
13      Q.   Sergeant, I'm going to play for
14   you starting at 1:46, now 1:47 an interaction
15   with Mr. Atkins, and I'll ask you about it.
16      A.   Yes.
17          (Video being played.)
18      Q.   I'm going to stop at 2:12.  Is
19   this the first interaction you had with Damon
20   Atkins?
21      A.   Yes.
22      Q.   And I think you testified earlier
23   you never met Mr. Atkins before?
24      A.   No.  No.  I have not.
25      Q.   Okay.  So what occurred in that

Page 104

1    interaction?
2       A.   Well, this interaction, the event
3    is about to start, and I think or I believe that
4    anybody who's against this event has already
5    shown up, so let's get this going and get this
6    over with.  And then when he showed up, I went
7    over to him, and I gave him the same talk that I
8    gave to the other guys, so I had given this same
9    talk two times prior.
10          Now, he was more -- less -- I'm
11   sorry.  He was less conciliatory towards me than
12   the others were.  The others certainly didn't
13   agree with what I said, but they weren't as
14   forceful, and this was -- forceful with their
15   disagreement.  This was -- it's difficult to me.
16          Now, I am -- I said before I'm
17   frustrated at this point already with what's
18   going on on both sides of the street, and he
19   starts talking about the Bible, talking about his
20   beliefs.  I am a devout Catholic, and I have
21   been -- that was raised in that household from
22   the time that I was young to present day, till I
23   went to mass last Saturday at 5:00 p.m.
24          I was never taught in my life
25   ever at any level by a parent, father, sister,

Page 105

1    whatever to be hateful, that a part of
2    Christianity is being hateful and judgmental,
3    hateful of others, judgmental of others.  So when
4    I'm telling them, let them have their day, let's
5    just let this thing go and let the event proceed,
6    I'm having trouble understanding their point of
7    view.
8           This is not -- this doesn't
9    seem -- this is not the way that I was taught,
10   and I don't understand why they even showed up,
11   why they felt it necessary to show up and berate
12   people.  If you don't like it, just don't show
13   up.
14          So I had given him that speech.
15   I walked away, and I'm standing there thinking,
16   okay.  This is going to work out the way it
17   worked out with these other guys.  Everything is
18   going to be good.  And then he raised his voice a
19   little bit.  I don't recall what he said.
20   Clearly he's -- I know it's portrayed in a way
21   that he's this innocent guy standing on the
22   corner quoting Bible scripture.
23          Clearly he's being antagonistic
24   and trying to get a reaction from the crowd, and
25   that's something that I just could not allow, and

27 (Pages 102 - 105)

Page 106

1 that's why I made the decision to arrest him at
2 this point. And you notice I didn't walk up to
3 him and just arrest him. I walked up to him,
4 disengage, walk away. And then when he continued
5 with it, then I went -- and then I made the
6 decision.
7        Q.    What is it you said to
8 him -- what is it that he said before you
9 approached him for the first time that made you
10 approach him?
11       A.    I don't know exactly. It's
12 not -- it's not caught on here.
13       Q.    I'll back up to 1:12 and play
14 again.
15            (Video being played.)
16       Q.    I'll move forward to 1:32.
17            (Video being played.)
18       Q.    So at 1:48, I'm pausing. The
19 narrator, and I understand he's just talking, so
20 I'm not --
21       A.    Yes.
22       Q.    -- asking you to necessarily
23 agree or disagree. He says that Mr. Atkins just
24 walked up.
25       A.    Yes.

Page 107

1        Q.    Had you seen him before this
2 point?
3        A.    No.
4        Q.    Okay. And at this point you'll
5 agree at least in this video that Mr. Atkins
6 can't be seen saying anything to the crowd,
7 correct?
8            MR. CONLEY: Objection to form.
9 Calls for speculation. Calls for a
10 perspective that is not Officer McClure's
11 or Sergeant McClure's.
12       Q.    Okay. Sergeant, do you recall if
13 he said anything to the crowd before you
14 approached him?
15       A.    Well, I don't recall, but I
16 approached him for a reason. I didn't just pick
17 him out because he was standing there peacefully.
18       Q.    What was that reason that you
19 approached him?
20       A.    Well, the only reason -- since he
21 is on the sidewalk and not in the street, the
22 only reason I would have approached him is that
23 he was yelling stuff. Now, I want to point out
24 on this one, the body cam footage, which turned
25 out to be the guy that's filming this, that Wear

Page 108

1 I believe his name was, I approached him, hand on
2 the chest right away. Let's get back. Atkins
3 here is standing here, and I approach him in a
4 much more -- a different manner, and, in fact, I
5 don't even get that close to him.
6            And I believe that knowing my
7 thought process, and that was that, hey, this
8 speech has worked twice before. It's going to
9 work again. I'm just going to say the same thing
10 I said to these other guys, and this is all going
11 to work.
12       Q.    So you don't recall then whether
13 Mr. Atkins had said anything prior to your
14 engaging with him the first time?
15       A.    I don't specifically recall what
16 he said, but I had to have approached him for a
17 reason. I wouldn't have just approached him if
18 he was standing there quietly. I'm not looking
19 for that much extra work to do on this day.
20       Q.    Okay. I'm going to keep playing
21 from 1:50.
22            (Video being played.)
23       Q.    I'm going to stop at 2:04. You
24 can hear him saying this is public property.
25       A.    Yes.

Page 109

1        Q.    Do you recall what you two were
2 discussing at that point?
3        A.    I think the event itself, I
4 probably said something to the effect that you
5 can't disrupt this event. I don't want you
6 coming out into the street, probably something
7 like that, which would be in line with what I had
8 told the other people that were involved.
9        Q.    You said let them have their day.
10 What did you mean by that?
11       A.    Look, if they want to raise this
12 flag at City Hall, if that makes their day, let
13 them raise the flag. Let them take their walk
14 from 8th Street to Penn Street to City Park, and
15 let's just be done with it. Like, to me, my
16 point of view, this is only going to bother you
17 if you choose to show up and let it bother you,
18 so...
19       Q.    I'm going to keep playing from
20 2:04.
21            (Video being played.)
22       Q.    At one point you said to him
23 respect them. What did you mean by that?
24            MR. CONLEY: Objection to form.
25       You can answer.

28 (Pages 106 - 109)

Plaintiff's App. 080

Page 110

1      A.   Well, we have to respect others
2  whether we agree with them or not.  We have
3  to -- so this pride group, they're going to raise
4  this flag at City Hall.  They're going to dance
5  around in the street.  If that's what they want
6  to do that day and they have the city's
7  permission, just respect it.  You don't have to
8  stand here and yell insults at them.  What is the
9  point of that?  I don't know.  So I'm trying to
10  talk people down to see things from another point
11  of view.  Have respect for other people.  This is
12  what we're taught.
13      Q.   All right.  I'm going to play
14  from 2:10.
15          (Video being played.)
16      Q.   I'm going to stop at 2:18.  You
17  can hear Mr. Atkins say yo God is not.  And at
18  that point you proceeded to arrest him?
19      A.   Yes.
20      Q.   Why did you arrest him for saying
21  yo God is not?
22          MR. CONLEY:  Objection to form.
23      You can answer the question.
24      A.   Well, he wasn't arrested for
25  saying yo God is not.  That is simply not true.

Page 111

1  When we have our first interaction, I start to
2  turn away from him, and he says about, you know
3  who cares?  People who are burning, you know,
4  down there.  You do you.  I'll do me, he says.
5  Those things he's saying to me.  All right?
6  That's not a big deal.  Okay?  He's saying it to
7  me.  He's not causing a problem.
8          So I turned away, and I took no
9  action on that.  To me, this is just conversation
10  still between him and I.  When he says what he
11  said there, the yo God, you could clearly hear to
12  me his voice is raised.  Now he's not talking to
13  me anymore.  Now he's engaging the crowd.  You're
14  being loud enough to be heard by the crowd.  So
15  he's doing exactly what I told him.  Listen, you
16  can't do this.  You can't disrupt this event.
17  That's why I made the decision there.  Certainly
18  not because of what he said.
19      Q.   So why did you arrest Damon
20  Atkins?
21          MR. CONLEY:  I think he just
22      answered that question.  Do you want him
23      to answer it again?  I think that's the
24      exact same question.
25      Q.   I did not hear a reason.  So why

Page 112

1  did you --
2          MR. CONLEY:  He provided you a
3      reason.
4      Q.   Why did you arrest Damon Atkins?
5          MR. CONLEY:  Again, objection to
6      form.  Asked and answered.  He literally
7      just told you.  If you don't agree with
8      it, that's your problem.  He answered
9      your question.
10          MR. READY:  Are you instructing
11      him not to answer?
12          MR. CONLEY:  I am telling you I'm
13      objecting to the form, and it's asked and
14      answered.  I'll give you a little leeway.
15      I'll let him answer it again, but if
16      you're going to argue with him about
17      whether you think -- or whatever you
18      think about his answer, he did provide an
19      answer, so go ahead.  You can answer the
20      question.
21          THE WITNESS:  The reason I made
22      the decision is I had given -- provided a
23      space for the protesters and given them
24      all the same warning which was, number
25      one, if you come out in the street,

Page 113

1  you're going to get arrested, or if you
2  yell things to disrupt this event, you're
3  going to get arrested.  So two things
4  that would disrupt this event.
5          Now, Atkins did not come out in
6  the street.  When he's talking to me when
7  I walk away, he's saying things to me.
8  Again, I'm not concerned with that.
9  That's what we deal with.  People insult
10  us all the time.
11          But when he yells at the end, I
12  hear his voice is raised.  He's no
13  longer -- I'm fairly close to him.  He's
14  not shouting at me.  Now he's shouting at
15  the crowd.  It appears his intention is
16  to disrupt this event which I had already
17  told him we're not going to allow this to
18  happen.  That's why I made the arrest.
19  BY MR. READY:
20      Q.   How did Mr. Atkins disrupt the
21  event?
22          MR. CONLEY:  Objection to form.
23      You can answer.
24      A.   By yelling things which are
25  clearly meant to be antagonistic towards the

Page 114

1 crowd.
2    Q.    In any other way did he disrupt
3 the event?
4    A.    No.
5    Q.    Did anybody at the event tell you
6 that they had been disrupted by Mr. Atkins either
7 before or after his arrest?
8    A.    No.
9    Q.    Did anybody at the event ask you
10 to arrest Mr. Atkins?
11    A.    No.
12    Q.    Did anyone at the event commend
13 you or other officers for arresting Mr. Atkins?
14    A.    Yes.  Some people clapped when we
15 were walking him to the back of City Hall to
16 Cedar Street which I could have done without
17 that.
18    Q.    At one point Mr. Atkins
19 complained when you had him up against the wall
20 that the handcuffs were too tight?
21    A.    Yes.
22    Q.    Did you loosen the handcuffs for
23 him?
24    A.    I don't recall.  Handcuffs are
25 too tight is something you hear in 75 percent of

Page 115

1 the time they put handcuffs on somebody.
2    Q.    Did you hear the organizer of the
3 event speaking, saying about the
4 counterprotestors, when they get themselves in
5 trouble, the police are going to deal with it,
6 something along those lines?
7        MR. CONLEY:  Objection to form.
8        MR. READY:  What's the objection
9    to form?
10        MR. CONLEY:  You're
11    characterizing the audio.  That's my
12    objection.
13 BY MR. READY:
14    Q.    Do you recall the organizer of
15 the event -- on this video or not, do you recall
16 the organizer of the event saying when they get
17 themselves in trouble, referring to the
18 counterprotestors, the police are going to deal
19 with it or they're going to arrest them?
20        MR. CONLEY:  Objection to form.
21    You can answer.
22    A.    I did not hear him say that at
23 the time.  I heard it on this video.  I think --
24 it looks like I'm kind of around the corner
25 there, and the person filming it is still on

Page 116

1 Washington Street, and I'm a little around the
2 corner on Cedar.  I don't remember hearing that.
3    Q.    You would agree that the event
4 actually kicked off with the first speaker right
5 after you began arresting Mr. Atkins.  Does that
6 timeline sound correct?
7    A.    Yes.
8    Q.    You mentioned some of the
9 cheering, the clapping.  Did anybody else commend
10 you or thank you for intervening or arresting Mr.
11 Atkins?
12    A.    Not that day, no.
13    Q.    You talked about some of the
14 phone calls you received and other public
15 response regarding this arrest.  Have you
16 received positive response from individuals
17 regarding this incident?
18        MR. CONLEY:  Objection to form.
19    Go ahead.
20    A.    Just from family and co-workers.
21 That's it.
22    Q.    What have they told you?
23    A.    That they supported me.
24    Q.    What about other members of the
25 public or others you've interacted with?

Page 117

1    A.    No.  People often don't commend
2 the police for anything really.
3    Q.    I'm going to show you -- I'm
4 sorry.  Have you made any statements to the
5 press, a reporter, a blogger, a YouTuber or
6 anyone else about this incident?
7    A.    No, I haven't.
8    Q.    Who other than your attorney and
9 your spouse, if any, have you spoken with about
10 the events on June 3rd, 2023 that we haven't
11 already discussed?
12    A.    Well, family members, other
13 members of the police department.
14    Q.    What family other than your
15 spouse have you spoken with?
16    A.    My parents, my kids and my
17 brothers.
18    Q.    What have you told them about
19 this?
20    A.    Everything that I've said here
21 today, basically.  You know, what happened and
22 why I did this, and you may see things about
23 me -- like, I'm not on social media or anything,
24 so I don't know what's out there, but you may see
25 some things written about your old dad, I told

1 the kids, but I told them what happened.
2     Q.    You said you're not on social
3 media.  So just to confirm, you don't have a
4 Facebook, an Instagram, a TikTok, Snapchat,
5 anything like that?
6     A.    No, sir.
7     Q.    Okay.  I'm going to turn your
8 attention to what has been marked as Reading 1 at
9 the very beginning here.  Can you tell us what
10 this is?
11     A.    Well, this is a printout version
12 of our report system.  If you ask me questions
13 about it, it may take me a while to find it
14 because we don't normally ever see this portion
15 of it.  Our reports are never printed out.
16     Q.    You probably access it on a
17 computer screen or something like that?
18     A.    Yes.  And it just looks a little
19 different than this.
20     Q.    That's fine.  I appreciate that.
21 I'll go to page 3.  Did you type this narrative?
22     A.    Yes.
23     Q.    Okay.  I guess I shouldn't just
24 ask if you typed it.  Did you author it?  Was
25 this your writing?

1     A.    Yeah.  It has my name at the top.
2 That's mine.
3     Q.    Okay.  You reference here in the
4 second paragraph, second sentence: He, referring
5 to Mr. Atkins, was carrying a sign with antigay
6 slogan written on it.
7         What was the antigay slogan?
8     A.    I don't know.  I would have
9 written it specifically if I knew it.
10     Q.    Do you remember what was on his
11 signs or sign, I should say, singular?
12     A.    Only that I see it today.  It
13 appeared to have some kind of Bible -- I don't
14 know if it was a specific verse.
15     Q.    Okay.  Do you remember him saying
16 anything antigay while he was there?
17         MR. CONLEY: Objection to form.
18     You can answer.
19     A.    Like, specifically I don't
20 remember him saying, like, I hate you, you gay
21 people.  However, when, you know, you're
22 condemning people for their belief, I would
23 consider that to be antigay.
24     Q.    What did he say that made you
25 think he was condemning people for their belief?

1     A.    Just -- I don't remember
2 specifically what he was saying.  Just the stuff
3 that he was yelling, the stuff that we saw here,
4 like, you know, these people are burning down
5 below.  It was stuff like that.  They were there
6 for a reason, and their reason is to get a
7 reaction from...
8     Q.    It says in the next sentence: He
9 began to yell at the people at the event.  I
10 immediately approached him and told him that
11 while he was free to stand there on that side of
12 the street and hold a sign, he could not cross
13 the street nor yell comments intended to disrupt
14 the event.  Atkins said he understood.
15         Is that an accurate reflection of
16 what happened?
17         MR. CONLEY: Objection to form.
18     You can answer.
19     A.    Yes.  I wrote this right after it
20 happened.
21     Q.    Did Mr. Atkins say that he
22 understood?
23     A.    Initially he did, and I don't
24 know -- I think when I said something like --
25 like, towards the end of our conversation when I

1 went on about saying something about respecting
2 them or whatever, and that's when he said, you
3 know who respect -- you do you.  I'll do me or
4 something like that.  That would have came after
5 that.
6     Q.    It says he began to yell at the
7 people at the event --
8     A.    Yes.
9     Q.    -- followed by what we've
10 described as your first interaction with Mr.
11 Atkins.  Did he yell before you interacted with
12 him the first time?
13     A.    Yes.  I wouldn't have approached
14 him if he had been standing there quietly.
15 Again, I'm not looking for extra work to do, and
16 I'm not looking for conflict.  I would not have
17 approached him had he not.
18     Q.    The third paragraph says: Less
19 than a minute later he resumed yelling derogatory
20 comments to the people at the event.
21     A.    Yes.
22     Q.    What was the derogatory comment?
23     A.    Well, that was the -- whatever he
24 yelled, something about he yelled yo God or
25 something like that.  I don't remember what he

31 (Pages 118 - 121)

Plaintiff's App. 083

Page 122

1 said.
2      Q.    Why did you think the comment "yo
3 God is not" is derogatory?
4      A.    Well, I may have not heard him
5 correctly when he said it. It's easy to hear
6 now. There was no -- I had not turned my body
7 cam footage on yet, so there was no footage to
8 review. That may have just been the way that I
9 interpreted it.
10      Q.    What did you think he said at the
11 time?
12      A.    I don't even know. All I know
13 that he was yelling something I know -- he's
14 yelling something towards the people at the
15 event, and he's -- I know he's not yelling yay
16 for any kind of support.
17      Q.    If he had been yelling in
18 support, would you have arrested him?
19      A.    If he had been yelling in
20 support? Well, no. Then he's not disrupting the
21 event.
22      Q.    There was a time where he was
23 sitting on the sidewalk after you had put him in
24 cuffs?
25      A.    Yes.

Page 123

1      Q.    And you walked him over next to
2 the building, and you said something along the
3 lines of all you had to do was keep your mouth
4 shut. Do you recall saying that?
5      A.    Yes. I do.
6      Q.    And is it accurate that if he had
7 not spoken, you would not have arrested him?
8      A.    No. That's not accurate.
9            MR. CONLEY: Objection to form.
10      A.    He's free to speak. The specific
11 instructions were don't disrupt this event, and
12 to me, this is a simple thing. It's a simple
13 thing. Why do we have to take it to this level?
14 Why does it have to get pushed this far?
15      Q.    What do you mean pushed this far?
16      A.    Why does this have to be taken to
17 the level of an arrest? Why? Why couldn't you
18 just -- you stand there. You're holding a sign.
19 You're already -- people can see you're against
20 what's going on. Your opinion and your concern
21 is noted. I talked to him. Please stop. Don't
22 do this. Don't disrupt this event.
23            If he had just stood there, held
24 his sign. The other guys were standing there
25 holding their sign. They were talking amongst

Page 124

1 each other, but they chose not to take it any
2 further. Why push it to the point where this
3 happens? That's what I don't understand.
4      Q.    So if he had stood there and held
5 his sign and not spoken up, he would not have
6 been arrested. Is that correct?
7            MR. CONLEY: Objection to form.
8 You can answer.
9      A.    Partially. He could speak up.
10 Just don't speak up in language that's designed
11 to get a negative reaction from the crowd that's
12 there which I thought I made clear to all of
13 them.
14      Q.    Okay. I'm going to turn you now
15 to Reading 8, and I'll represent to you this is
16 the affidavit of probable cause from the criminal
17 complaint you filed. Let me know if you need a
18 second to review it, but I'm just going to ask,
19 you changed the language a little bit in the
20 second paragraph from your narrative to this
21 affidavit. The second sentence: He was carrying
22 a sign with a slogan written on it.
23            Why did you revise the language
24 from an antigay slogan to just a slogan in the
25 affidavit?

Page 125

1      A.    Well, two reasons. Number one, I
2 don't like the cut-and-paste narrative into the
3 affidavit which too often our officers do. The
4 second reason is, I write this first, the RMS
5 report or -- I'm sorry. It used to be called
6 RMS, but our internal report.
7      Q.    When you say "this," I'm going to
8 stop you. You're referring to Reading 3?
9      A.    Yes, sir. Yes. Reading 3. I'm
10 sorry. I wrote this first, and that I do the
11 affidavit. Now, our computer system -- I'm
12 sorry. Our computer system had changed from the
13 time that I was promoted to this event, and I was
14 not -- and like I said before, sergeants don't
15 often do charges. I was not very proficient in
16 this system, so I had to get -- which is another
17 reason I was frustrated because I knew this was
18 going to happen. I had to get a patrolman help
19 me do this.
20            And by the time somebody was
21 available -- it wasn't that long -- and walked me
22 through this system, by the time I got here, I
23 had more time to think about what went on, and I
24 realized, you know what? I can't specifically
25 recall what was written on the sign. Therefore,

32 (Pages 122 - 125)

Page 126

1  this report, which I may have to testify to some
2  day in court, I'm not going to write antigay
3  slogan because I can't specifically remember what
4  the slogan was. That's why I took that out.
5      Q.   The last line says:  I
6  respectfully request Atkins be arraigned for
7  disorderly conduct (M3).
8      A.   Yes.
9      Q.   The decision to charge a
10 misdemeanor was your decision, correct?
11     A.   Yes.
12     Q.   Did you run that by anybody else?
13     A.   I did.  And that's normally --
14 for a low-level offense like this, that's not
15 normally something that we would do.  We normally
16 wouldn't check with somebody.
17          When I was -- when we were
18 escorting Mr. Atkins after he was handcuffed to
19 Cedar Street or probably more after when we were
20 actually on Cedar Street, I'm sorry, waiting for
21 the wagon, I started to think about the charges.
22 Is this going to be a summary or a misdemeanor?
23 I had been -- I've been doing this for a long
24 time, and I've charged disorderly conduct a lot.
25 I know that this is borderline at best.  I get

Page 127

1  that.  And this very easily could have been a
2  summary.  And my inclination was this is going to
3  be a summary offense.
4          It did not change what happened
5  to him that day very much.  He didn't have an ID
6  on him.  He was still going to go -- I didn't
7  want to cite and release him, release him right
8  back into the crowd.  He didn't have an ID.  He
9  was still going to go to central processing which
10 is where he would have been released from.
11          I went inside, and I talked to
12 the shift commander that day.  The shift
13 commander is normally a lieutenant.  However, if
14 a lieutenant is off, a sergeant fills in that
15 role.  In this case, it was Sergeant Mangus.  I
16 said, what do you think about this?  This is what
17 I think I want to do.  He said, I think you
18 should charge the misdemeanor, and it can get
19 pled down to a summary.  I'm like -- I said,
20 well, okay.  I'll charge the misdemeanor, and
21 that's how that was decided.
22     Q.   What were the factors -- let me
23 back up.  I'm going to hand you Section 5503.  We
24 talked earlier about the idea of repeated conduct
25 being a reason to charge disorderly conduct.

Page 128

1  What was the reason you substantiated a
2  misdemeanor here instead of a summary?
3      A.   The last three words here,
4  request to desist.  That's what I based it on.
5      Q.   It was based on the initial
6  interaction you had with Mr. Atkins where you
7  asked him not to yell?
8      A.   Yes.  I would not just go off and
9  arrest somebody.  Certainly -- well, in this
10 circumstance, it certainly didn't warrant it from
11 my point of view, so the request to desist is
12 what I used to make that determination.
13     Q.   You didn't have a device on you
14 on June 3rd to measure volume, did you?
15     A.   No.
16     Q.   You're not measuring decibels or
17 anything else?
18     A.   No.  I don't know that we even
19 have those.
20     Q.   There's no policy in Reading
21 about how loud someone can be on the street
22 during daylight hours, is there?
23     A.   No.  That would be kind of hard
24 to monitor.
25     Q.   And there's no policy at

Page 129

1  permitted events about the distance people have
2  to be for a counterprotest from the permitted
3  event?
4      A.   That -- no.  There's not.  That
5  would be also very difficult, and this is not
6  something -- this is the first time in my career
7  that I've ever dealt with a
8  protester/counterprotester situation, so it's not
9  something that comes up.
10     Q.   Have you ever received any
11 training on dealing with counterprotestors or
12 protesters?
13     A.   Yes.
14     Q.   When was that?
15     A.   I don't remember the exact year.
16 I believe it was the spring of '19.  Now, that
17 training took place at Alvernia, and it was a
18 little bit different in that we were dealing
19 with -- we have a large amount of police
20 officers, and we're dealing with protesters.
21          It wasn't this small police
22 officers which we have which only three at an
23 event and then a protester shows up.  So it
24 wasn't really geared towards what the pride thing
25 was.  It was geared towards, like, we have a

Plaintiff's App. 085

Page 130

1 large police. We have 30 police officers, and
2 we're going to take care of this in riot gear.
3    Q.   We had reference yesterday from
4 Chief Tornielli to an email that was sent out in
5 2020 or 2021 to the department on how to deal
6 with protests. Do you recall receiving that
7 email?
8    A.   I don't remember what he said
9 about it initially. The one -- the one I'm
10 thinking of is the one after this event where he
11 said, hey, roll your body cameras the whole time.
12    Q.   Okay. And you don't remember any
13 other emails from the chief or from the Reading
14 Police Department about how to deal with
15 protests?
16    A.   I don't recall one, although it
17 seems likely that one would have come out in the
18 wake of -- in the aftermath of the George Floyd
19 incident because we did have some issues after
20 that, but, again, it was completely different
21 than this in that there was no counterprotestors.
22    Q.   Okay. Just give me one sec.
23 Chief Tornielli yesterday said that he wasn't
24 sure if anything had occurred before the videos
25 that we watched today between you and Mr. Atkins.

Page 131

1 Is there anything that was not caught on video
2 between you and Mr. Atkins that you think bears
3 on your decision to arrest or bears on the
4 situation?
5    A.   Well, the only thing or the thing
6 that stands out to me is the vantage point of
7 that YouTube video, the person who was filming
8 it, the volume level doesn't -- the microphone
9 doesn't really pick up our initial interaction,
10 what he said that led me to walk over there, and,
11 again, I would not have walked over there without
12 a reason. I'm not that -- I'm not ambitious, I
13 guess. I don't know.
14    Q.   And you don't recall what he
15 said?
16    A.   No. I don't recall specifically.
17    Q.   Is there anything else that was
18 not picked up on video or audio that you think
19 bears on this situation?
20    A.   That's all I can think of right
21 now.
22    Q.   Okay. Is there anything that's
23 not listed in your affidavit of probable cause
24 that you believe gave you probable cause for this
25 arrest?

Page 132

1    A.   No. No.
2        MR. READY: Thank you. That's
3 all the questions I have.
4        MR. CONLEY: I'm going to have
5 some cross. I guess redirect.
6        (A short break was taken.)
7        * * *
8        EXAMINATION
9 BY MR. CONLEY:
10    Q.   Sergeant McClure, I just want to
11 go back and clarify some of the things that you
12 testified about today. Do you recall testifying
13 about your training at the academy regarding the
14 First Amendment?
15    A.   Yes.
16    Q.   And I believe that you testified
17 that you couldn't recall specifically your
18 training. Is that correct?
19    A.   Yes.
20    Q.   But I want to go a little bit
21 beyond that. You understand that the First
22 Amendment provides that you as a police officer
23 can't discriminate based upon viewpoint, correct?
24    A.   Yes.
25    Q.   But you do have discretion to

Page 133

1 place reasonable time, place and manner
2 restrictions on certain types of speech. Is that
3 right?
4    A.   Yes.
5    Q.   Is that within your understanding
6 and training?
7    A.   Yes, sir.
8    Q.   Okay. Applying that forward,
9 when you gave some direction to Damon Atkins
10 about not disrupting the event, was that within a
11 reasonable time, place and manner restriction?
12        MR. READY: Object to form.
13    Q.   You can answer.
14    A.   Yes.
15    Q.   Okay. And then he didn't follow
16 your directive. Is that correct?
17    A.   Yes.
18    Q.   Was that part of the reason that
19 you arrested him for disorderly conduct?
20    A.   Yes.
21    Q.   The content of his speech was
22 irrelevant to the reason that you arrested him
23 for disorderly conduct. Is that correct?
24    A.   Well, I felt the content of his
25 speech was designed to antagonize the crowd,

34 (Pages 130 - 133)

Page 134

1 which is why he was arrested.
2    Q.    Okay.  I should clarify.  It
3 wasn't because of his viewpoint?
4    A.    No.
5    Q.    I think there was some testimony
6 about whether you had reviewed all the policies
7 and procedures that were shown to you today.  Do
8 you recall that?
9    A.    Yes.
10    Q.    And I think at one point you said
11 that you couldn't recall reviewing them or all of
12 them.  I just want to clarify.  You reviewed them
13 upon receipt.  Is that right?
14    A.    Yes.  New updated general orders
15 which are given out a single general order at a
16 time maybe a couple times a year are reviewed
17 upon receipt.  The general orders are given to us
18 at the time I started in a very large binder, and
19 you're given it to an orientation, say read this.
20 Like, the ones that we -- that apply to us on a
21 day-to-day basis were gone over with us.  The
22 other instructions were to read the rest.
23    Q.    Okay.  So when you said that you
24 don't recall reviewing them, you were talking
25 about voluntarily going back and re-reviewing

Page 135

1 them.  Is that about right?
2    A.    Yes.
3    Q.    Okay.  Just for purposes of the
4 record, I believe that you were referred to
5 Reading 18, if you want to turn to that.
6    A.    Yes.
7    Q.    And I believe counsel questioned
8 you about this, referencing at least the permit.
9 Do you recall that?
10    A.    Yes.
11    Q.    Is that actually the permit or is
12 that the permit application?
13    A.    Eighteen is not the permit
14 itself.  No.
15    Q.    Okay.  If you turn to 16, Reading
16 16, is that the permit itself?
17    A.    Yes.  That's the permit.
18    Q.    Okay.
19        MR. READY:  I'm sorry.  Can you
20    say the number you said?
21        MR. CONLEY:  Reading 16.
22        MR. READY:  Reading 16.
23        MR. CONLEY:  Yes.  There's two
24    Reading sixteens.  There's Reading 16-A
25    confidential.  I apologize.  That must

Page 136

1    have been an error in my office.  Reading
2    16 not confidential is the one I'm
3    referring to.  It's not the photograph of
4    his license.
5        MR. READY:  I got it now.  Thank
6    you.
7 BY MR. CONLEY:
8    Q.    You testified about that you
9 should have had your body camera on earlier
10 before your first interaction with who we now
11 understand at least to be Matthew Wear or the man
12 taking the YouTube video.  You mentioned that in
13 hindsight you wanted to have it on earlier?
14    A.    Yes.
15    Q.    Can you explain that to me why
16 you would want to have it on earlier?
17    A.    Well, to capture -- like I said,
18 I turned it on within policy at the time.
19 Looking back on the event and all that transpired
20 afterwards, I wish I would have had it on from
21 the entire time from the very first interaction
22 just to give a better idea to everyone involved
23 that, hey, these warnings had taken place to
24 other people, and they complied.  Just to give a
25 more accurate, complete picture.

Page 137

1    Q.    Okay.
2        MR. CONLEY:  I apologize.  I just
3    need to take a quick break.
4        (A short break was taken.)
5 BY MR. CONLEY:
6    Q.    There was some testimony about
7 you saying, quote, this is not a thing.  Do you
8 recall that?
9    A.    Yes.
10    Q.    Is that something that you use to
11 diffuse a situation?
12    A.    Yes.  I use that phrase a lot.
13    Q.    And as a police officer, you
14 know, is part of your job to diffuse potential
15 situations before they arise?
16    A.    Sure.  Our department, and I'm
17 sure most police departments or any law
18 enforcement agency, is going to encourage people
19 to de-escalate situations.
20    Q.    And is that something that you do
21 based on your training and years of experience?
22    A.    Yes.
23    Q.    Okay.  There was some testimony
24 about whether you asked the people involved in
25 the pride celebration specifically not to harass

1 others or to cross the street. Was there any
2 reason for you to inform the people at the pride
3 event not to harass others or cross the street?
4      A.   No. No.
5      Q.   I believe there was also some
6 testimony regarding -- or at least counsel asked
7 you about the content of what Mr. Atkins was
8 saying in the context of whether you would have
9 arrested him, and we went over that earlier. I
10 just wanted to touch base with you on one thing.
11 If he had been -- I'm sorry. Let me strike that.
12          What I'm referring to is the
13 content of the pride event.
14      A.   Yes.
15      Q.   And you were asked about
16 providing services to that pride event. If the
17 event was a, quote, I hate police, end quote,
18 event, would the city, if it had permitted it,
19 would you have provided the same services?
20      A.   Well, we would have probably
21 provided more services because we would be
22 expecting problems. Our number one thing in
23 traffic that the traffic unit is in charge of
24 with these events is traffic itself. The
25 security aspect -- I hate to say it's secondary

1 because it's always -- that's always present in
2 what we do, but we're tasked with these events
3 for the traffic reason.
4      Q.   Okay. My question is more about
5 the purpose and content of a permitted event.
6 That doesn't change whether the city allows the
7 event. Is that right?
8      A.   It may. If there was a group
9 that was -- had a history of violence, like, say,
10 for instance, a terrorist organization, like,
11 wanted to come into town, no. They would not be
12 allowed a permit.
13      Q.   Okay. But based upon a
14 viewpoint, the city does not change its practice?
15      A.   No.
16      Q.   Okay. You were asked some
17 questions about becoming frustrated. Do you
18 recall that testimony?
19      A.   Yes.
20      Q.   Is it fair to say that your
21 orders had not been followed that day?
22      A.   Only regard with -- to Mr.
23 Atkins.
24      Q.   Sometimes police officers have
25 hard days. Is that fair?

1      A.   That is true.
2      Q.   Sometimes I have a hard day, and
3 I get frustrated, but nobody is viewing body
4 camera footage of me having a frustrating day.
5 That's something that you have to deal with. Is
6 that right?
7      A.   Yes.
8      Q.   Okay. And just because you might
9 be frustrated, that doesn't necessarily mean that
10 you have violated somebody's rights. Is that
11 correct?
12          MR. READY: Object to form.
13      Q.   You can answer. Sorry.
14      A.   That's correct. That's not going
15 to influence my decision-making. Some of the
16 things that I said, specifically shut up isn't
17 something I -- would not normally say, no, but it
18 does not affect my decision-making or deciding to
19 make an arrest. That's got to maintain -- that's
20 got to stay clear at all times.
21      Q.   And specifically regarding saying
22 shut up, I believe that was directed towards Mr.
23 Wear. Is that correct?
24      A.   Yes.
25      Q.   And was he speaking over you at

1 that time?
2      A.   Yes.
3      Q.   And Mr. Atkins, you watched some
4 of the video, but I'm asking from your
5 perspective, when you approached him and you were
6 discussing with him, was he speaking over you?
7      A.   Yes. Yeah. And that's common in
8 these situations where people don't want
9 to -- people don't want to listen to what the
10 police say, and they just keep talking, and that
11 can be -- that can be frustrating.
12      Q.   You were asked some questions
13 about whether you spoke to any people at the
14 pride event or anybody else about whether they
15 were feeling harassed by David Atkins. Do you
16 recall that testimony?
17      A.   Yes.
18      Q.   Do you as a police officer
19 require permission or approval from third parties
20 such as citizens before you make an arrest?
21      A.   In the case of disorderly
22 conduct, no. When we cite disorderly conduct,
23 there has to be a victim. We use City of Reading
24 as a victim. As far as interviewing other people
25 involved, disorderly conduct is such a low-level

36 (Pages 138 - 141)

Page 142

1 offense that it would not be -- I've never even
2 seen it done where people would do any
3 interviewing of other people present.
4 Interviewing witnesses is something you would do
5 for either a major arrest or perhaps something
6 like a car crash, but not for low-level offenses
7 like this.
8     Q.    Suffice it to say, you had
9 probable cause to arrest without interviewing
10 witnesses?
11    A.    Yes.
12    Q.    Okay.  You were asked some
13 questions about the volume of the speech in
14 relation to some of those videos that you had
15 seen today.  Do you have any information or
16 knowledge about the quality -- let me break that
17 up.
18         Let's start with the cell phone
19 video or I believe it was cell phone video, the
20 video taken by Mr. Wear.  Do you have any
21 knowledge or information about the quality of
22 that recording device?
23    A.    I do not.
24    Q.    Do you have any knowledge or
25 information about whether that recording device

Page 143

1 accurately picks up volume?
2     A.    I do not.
3     Q.    Do you have any information about
4 whether that recording device was tampered with
5 in any way before the video was uploaded?
6     A.    I do not.
7     Q.    Do you have any knowledge or
8 information about whether the YouTube video that
9 you saw, whether the quality of the volume and
10 recording was affected by the fact that it was
11 uploaded to the internet?
12    A.    I do not.
13    Q.    Okay.  Do you have any -- let me
14 ask you this:  From your perspective, absent
15 viewing a video of the event that is not from
16 your perspective, was Mr. Atkins yelling?  After
17 you had first spoken to him, was he yelling?
18    A.    Yes.
19    Q.    Okay.  And regardless of what
20 somebody else might interpret a third-party
21 video, from your perspective, the officer on the
22 scene, he was being disorderly?
23    A.    Yes.
24    Q.    And he was ignoring your orders?
25    A.    Yes.

Page 144

1     Q.    And you were asked a lot of
2 questions about the video taken by Matthew Wear.
3 Were you ever standing directly where Matthew
4 Wear was standing while he was taking those
5 videos?
6     A.    No.  I wasn't.
7     Q.    So those videos don't reflect
8 your perspective of the scene, do they?
9     A.    No.
10    Q.    Okay.  Do you know whether what
11 Matthew Wear heard and what his camera or
12 recording device heard was the same as what you
13 heard?
14    A.    No.
15    Q.    Would you have any way of knowing
16 that?
17    A.    No.  I wouldn't.
18    Q.    I want to talk briefly again
19 about the perspective of a body camera.  The
20 camera lens of a body camera or the body camera
21 that you were wearing, is it a fish-eye camera?
22    A.    I'm not sure what that means.
23    Q.    Does it capture a broader -- it
24 changes the perspective so it captures the
25 broader area?

Page 145

1     A.    No.  In fact, they're designed to
2 capture a narrower --
3         (Brief interruption.)
4         (A short break was taken.)
5         MR. CONLEY:  Would you read back
6     the question, and if you want to start
7     over with your answer.
8         (The court reporter read the last
9     question and answer from the record as
10    requested.)
11        THE WITNESS:  Right.  The body
12    cameras as we were told by the company
13    that makes them when we first got them,
14    which I think was '19 or '20, that the
15    perspective is narrower than your field
16    of vision.
17 BY MR. CONLEY:
18    Q.    Okay.  Does it affect distance,
19 the perception of distance?
20    A.    Yes.  They do affect perception
21 of distance and things, buildings.  You know, as
22 we can see on there, City Hall appears distorted.
23 It appears a little bent at the top, and also
24 just because they're not at eye level.  There's
25 no way for us to wear them that way, and most of

37 (Pages 142 - 145)

Plaintiff's App. 089

Page 146

1 us wear them pretty much in the center of our
2 chest.
3       Q.    And you said that City Hall
4 appeared bent at the top in the body camera
5 footage.  I assume it goes without saying, but
6 I'm going to ask:  Is City Hall bent at the top
7 in reality?
8       A.    Not to my knowledge.
9       Q.    Okay.  Did you see on the YouTube
10 video that you viewed taken by Matthew Wear how
11 long that video was?
12      A.    It was five minutes, 25 seconds.
13      Q.    And would you agree with me that
14 Attorney Ready stopped it at four minutes and 57
15 seconds?
16      A.    Yes.  I remember it was four --
17 it was almost five minutes.
18      Q.    So you were not shown the entire
19 video?
20      A.    That's correct.
21      Q.    Okay.  Have you seen any other
22 videos, YouTube videos from Matthew Wear and
23 Barely Preacher Man other than the one you saw
24 today?
25      A.    No.

Page 147

1             MR. CONLEY:  All right.  That's
2 all I have.  Thank you.
3             MR. READY:  A couple follow-up
4 questions.
5                   * * *
6             RE-EXAMINATION
7 BY MR. READY:
8       Q.    What's your understanding of
9 time, place and manner restrictions?
10      A.    Well, there's
11 certainly -- certain things you could say could
12 be affected by, for instance, the time of day.
13 Could you stand on the street corner and play
14 music?  We have a fellow at 6th and Penn who does
15 that all day long and dances to it.
16             Now, if this were happening at
17 night when people are making a complaint about
18 the noise, certainly that's going to -- that's
19 going to affect that.  In the daytime we allow it
20 to go on.  At night after hours, people are going
21 to have more complaints, so there will be
22 restrictions on noise.
23             Distance, again, for instance,
24 if -- people came to City Hall last week to
25 protest about Israel, and I don't recall which

Page 148

1 side that they were on.  I was not there.  But if
2 they're standing, like, in front of City Hall,
3 and they're talking, you know, they're saying
4 what they say, but they're saying it, like, in
5 front of the doors and not allowing people to go
6 in the doors or disrupting, you know, or if
7 they're in the street disrupting traffic or just
8 disrupting the normal flow of events at City Hall
9 or if they went to City Hall inside itself and
10 started to do that, there would certainly be
11 restrictions on that, so yes.  There can be
12 certain restrictions.
13      Q.    You were asked about -- you were
14 asked about whether frustration affected your
15 decisions, and you said it did when you said shut
16 up.  Were there any other times throughout the
17 course of this day that frustration affected your
18 decisions and your interactions with the
19 counterprotestors?
20             MR. CONLEY:  Objection to form.
21 Go ahead.
22      A.    My decision-making, no.  Some of
23 the things -- I want to say the things I said are
24 fairly tame compared to my co-workers, but some
25 of the things I said were not as well thought out

Page 149

1 as -- I'm usually a little more deliberate when I
2 speak out in the street.  And just all the things
3 that were going on that day were clamant to a
4 level of frustration, but, nevertheless, you
5 cannot allow frustration to cloud your judgment
6 in decision-making processes.
7       Q.    Did any organizers of the event
8 or attendees of the event tell you during or
9 after the event that the event was disrupted by
10 any of the counterprotestors?
11      A.    No.  No.  I did not get any
12 feedback that day.
13      Q.    Okay.  How about after that day?
14      A.    Many, many, many months after,
15 somebody involved in this group had said we thank
16 you for taking the action that you did.
17      Q.    Who was that?
18      A.    That was Enrique Castro.
19      Q.    And did he tell you that the
20 events had not started on time or had not
21 proceeded on schedule or had not been able to do
22 something because of any of the
23 counterprotestors?
24      A.    No.  No.  It was very brief.  It
25 was him saying that one sentence.

38 (Pages 146 - 149)

Plaintiff's App. 090

Page 150

1    Q.    Did he see you somewhere?
2    A.    Yes.  We had a meeting for his
3  plans for this summer's pride event.
4    Q.    You were asked about the yelling
5  after you had your first confrontation with Mr.
6  Atkins.
7          (Brief interruption.)
8    Q.    You were asked about what
9  happened after your first interaction with Mr.
10  Atkins that day?
11   A.    Yes.
12   Q.    And there was some discussion
13  with your counsel just now about the yelling.  I
14  just want to confirm, other than the phrase "yo
15  God is not," did you hear Mr. Atkins say anything
16  else after your initial warning to him?
17   A.    Yes.  The stuff he said to me as
18  I was walking away, which I thought he's got a
19  problem with me.  He's talking to me.  That's
20  something we deal with every day, so we can't let
21  that affect...
22   Q.    Other than that, you didn't hear
23  him say anything else toward the protesters?
24   A.    No.
25   Q.    Okay.  I'm going to show you the

Page 151

1  video, the YouTube video we have been watching.
2  I'm going to start it at 4:57.
3          (Video being played.)
4    Q.    Okay.  You've seen the whole
5  video at this point, correct?
6    A.    Yes.
7    Q.    You've seen the whole video at
8  this point.  Is there anything in this video that
9  you believe is not an accurate reflection of what
10  happened that day?
11         MR. CONLEY:  Objection to form.
12   A.    Other than what I said before, it
13  doesn't pick up what he said, Mr. Atkins is who
14  I'm referring to, what the plaintiff said that
15  led me to talk to him in the first place.
16   Q.    Okay.  Anything else that you
17  think is not accurately reflected in that video?
18   A.    No.
19   Q.    Is there anything that we have
20  not discussed today that you think sheds
21  additional light on why you arrested Mr. Atkins
22  or justifies your actions that we have not asked
23  you about?
24         MR. CONLEY:  Objection to form,
25         but you can answer.

Page 152

1    A.    I can't think of anything right
2  now.
3    Q.    Okay.  All right.
4          MR. READY:  That's all I have.
5          MR. CONLEY:  I've got nothing
6  else.  Thank you.  We'll waive read and
7  sign.
8          (Deposition was concluded at
9  12:18 p.m.)

Page 153

1          CERTIFICATE
2
   COMMONWEALTH OF PENNSYLVANIA )
3                                )SS:
   COUNTY OF MONTGOMERY          )
4
5
        I, Lauren Buchak, Notary Public,
6  Registered Merit Reporter and Certified Realtime
   Reporter, do hereby certify that prior to the
7  commencement of the examination, BRADLEY T.
   McCLURE was duly sworn or affirmed by me to
8  testify to the truth, the whole truth and nothing
   but the truth.
9
        I DO FURTHER CERTIFY that the
10  foregoing is a verbatim transcript of the
   testimony as taken stenographically by me at the
11  time, place and on the date hereinbefore set
   forth, to the best of my ability.
12
        I DO FURTHER CERTIFY that I am
13  neither a relative nor employee nor attorney nor
   counsel of any of the parties to this action, and
14  that I am neither a relative nor employee of such
   attorney or counsel, and that I am not
15  financially interested in the action.
16
17
18
19  LAUREN BUCHAK, RMR, CRR
20  Notary ID Number: 1115041
21  Notary Expiration:  February 20, 2028
22  Dated:  April 8, 2024
23
24
25

39 (Pages 150 - 153)

Plaintiff's App. 091

| | |
|---|---|
| **From:** | Audra Schreiner |
| **To:** | Event Response Group |
| **Cc:** | Event Information Group |
| **Subject:** | #047-2023 Pride March & Rally (SE) |
| **Date:** | Tuesday, April 25, 2023 2:19:00 PM |
| **Attachments:** | image____.png |
| | #047-2023 _____ llw (SE).pdf |
| | ID Co_____.pdf |
| | Non-P_____.pdf |

---

Good Afternoon,

I am forwarding the Special Event application#047-2023 for the Pride March & Rally. The above mentioned event is for your information/approval (please see attached). When replying, please CC: Sgt. Bradley McClure.  **Please do not reply all as it will clog up mailboxes, thank you.**

**COI will be forwarded when it is made available.**

**If there are any issues that affect the approval of the said event per your department, please contact the applicant directly so they can be addressed.**

If you have any questions, please feel free to reach out.
Thank you and have a wonderful day! ☺

*Audra*

Audra E. Schreiner
Traffic Secretary
Reading Police Traffic Law Enforcement Unit
City of Reading
815 Washington Street | Room 1-18
Reading, PA 19601
███████████@ReadingPA.gov | www.ReadingPA.gov
Tel:███████████ | Fax: (610) 655-6392



This e-mail and any attachments may contain information that is confidential and/or privileged and prohibited from disclosure or unauthorized use under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosure, copying or distribution or taking of action in reliance upon the contents of this transmission is strictly prohibited.  If you have received this e-mail in error, you are instructed to notify the sender by reply e-mail and delete it to the fullest extent possible once you have notified the sender of the error.

**Plaintiff's App. 092**

Date & Time Received: **Apr. 25, 2023**   By: _____   Application #: **047-2023**



# City of Reading
# Special Event

**This application MUST be submitted 90 days prior to the Event along with the $100 application fee ($50 for non-profit) and the $500 security deposit.**

Name of Event: _Pride March & Rally_

Requested Date(s) for the Event: _June 3rd, 2023_

| Event Activity | Starting Date(s) | Ending Date(s) | Starting Time | Ending Time |
|---|---|---|---|---|
| Set Up | 6/3 | 6/3 | 9 Am | 10 Am |
| Actual Event | 6/3 | 6/3 | 10 Am | 3 pm |
| Tear Down | 6/3 | 6/3 | 3 pm | 4 pm |
| Clean Up | 6/3 | 6/3 | | |

Rain Date(s) for the Event: _N/A_

Location: _Flag raising at city hall followed by March down 8th and up Penn St to city Park._

Purpose: (please explain or attach a copy of your agenda or planned activities) _____

Number of persons expected to attend: _500_

For all non-stationary Events – route to be traveled, starting point and termination point. Also include a statement as to whether the Event will occupy all or only a portion of the width of the street/trail proposed. Include a copy of the proposed route and/or map including assembly and disbanding area and specific details as needed. _8th & Washington to Penn & then up penn st. into City Park_

The approximate number of persons, vehicles, and animals which will constitute the non-stationary Event (please include a description of the vehicles): _2 - 4 Vehicles._

The cost of admission, if any, and whether the Event is public or private: _None._

Conditions and restrictions on the use of alcoholic beverages. Submit a list of all vendors who will provide alcohol: _No Alcohol_

1

**Plaintiff's App. 093**

Sale of food:   Yes _____ (submit copies of health permits)      No  ☒

List all food vendors: _____

Please supply a completed 'Event Vendor Health Permit Application' with required documentation for **each** food vendor and a **$10.00 per vendor fee** for **each** food vendor to the Property Maintenance Division **NO LATER THAN 15 DAYS PRIOR TO THE EVENT**. Submission of the Event Vendor Health Permit Applications and $10.00 per vendor fee (payable to the City of Reading) is due to the Property Maintenance Division at the City of Reading, 815 Washington St., Room 1-30, and Reading PA 19601.

Other sales:  Yes _____            No ___☒___

Attach a list of all sales vendors including Name of Business, Contact Name, Mailing Address, Phone Number, Email and type of business.

Number of volunteers/workers: ___15  Volunteers_____

List company who will remove all trash/garbage and recycling: _Public Works._____

Parking Plan: __City Garages_____

Tents, structures, or entertainment devices: __DJ set up at band shell___

_____

What will be done under the tent? (Ex. Cooking, tables, chairs, lighting, HEATERS or any flame producing devise, etc.) _____

_____

Tents that are **400 Sq. Ft. OR larger**, shall require a Tent Permit from the Fire Department along with **$150 fee.**

Provider of portable toilets and hand washing sinks: ____N/A_____

Professional Event organizer information: ____N/A_____

Security and crowd control plans: _____RPD_____

If security firm, Contact Person: _____N/A_____

      Address: _____

      Phone: _____

Do you require electric hookup? (Be specific): ___yes._____

**Additional fee is applicable.**

2

**Plaintiff's App. 094**

Include certificate of comprehensive general liability insurance in the amount of one million dollars naming the City of Reading as additional insured. Also include other affected entities.

Water/wastewater, disposal of soapy water, rinse water, cooking oil, syrups, etc must be disposed of according to all Federal, State and Local regulations.

For field, court, and facility rentals, please contact the Recreation Commission at 610-655-6201 to tentatively reserve the site. (Rentals will be charged separately and will fall under the additional services.)

## Applicant Information

Applicant Name: Enrique Castro Jr.

Daytime Telephone Number: ▮▮▮▮  Cell Number: ▮▮▮▮

Email: ▮▮▮▮ @ readingpride.org  Fax Number:

Address: (please include City, State, and Zip) 616 Shelta Ave, Temple PA 19560

Organization Name: Reading Pride Celebration

Organization Address: 201 Washington St. STE 513, Rdng PA 19601

Organization Telephone Number: ▮▮▮▮

Contact Name at Organization: Enrique Castro J.

## Person Seeking to Conduct Event (Chairperson)

Name and Title: ~~Executive~~ Enrique Castro , Executive Director

Daytime Telephone Number: ▮▮▮▮  Cell Number: ▮▮▮▮

Address: (please include City, State, and Zip) 201 Washington St. Reading PA 19601

*I declare under penalty of perjury that to the best of my knowledge these statements are true and correct. I understand that this application is a contract between the City of Reading and myself and/or the organization/entity requesting the permit.*

Applicant's Signature:

Please print name: Enrique Castro J.

Date: 4/24/23

**City reserves the right to deny a permit application that is incomplete, lacking the necessary fees or is otherwise not in compliance with applicable law.**

3

**Plaintiff's App. 095**

The Applicant for a Permit shall indemnify and hold harmless the City, its officers, employees, agents, and representatives against all claims or liability and causes of action resulting from injury or damage to persons or property arising out of the Event. ***The Applicant assumes responsibility for all duties and obligations under the Code of Ordinances of the City of Reading, Chapter 576 Vehicles and Traffic, Part 12 Parades, Special Events, and Public Gatherings, including payment for the Event.***

*Notice: The chairman or other person heading or leading this activity SHALL carry the permit upon his/her person during conduct of this activity and make same available upon request of the Chief of Police or his/her designee.*

**For internal purposes:**

o   Police Chief or designee Signature: Sgt. Bradley McClure #68   Date: 04/28/2023

o   Community Site only

o   Special Event permit #: _____   Approved: ___ Partial Denied: ___ Denied: ____

4

**Plaintiff's App. 096**

**MP4 Video File, Bates No. Reading 0055 McClure Body Cam (approx. 64.4 MB) submitted to Judge Gallagher's Chambers via Thumb Drive and DropBox Link**

**MP4 Video File, Bates No. Reading 0056
McClure Body Cam (approx. 127 MB) submitted
to Judge Gallagher's Chambers via Thumb Drive
and DropBox Link**

**AVI Video File, Bates No. Reading 0059 Building Footage (approx. 1.47 GB) submitted to Judge Gallagher's Chambers via Thumb Drive and DropBox Link**



# READING POLICE DEPARTMENT
Deputy Report for Incident 23-021028

|  |  |
|---|---|
| **Nature:** DISORD I | **Address:** 800BLK WASHINGTON ST |
| **Location:** 10C33 | READING PA 19601 |

**Offense Codes:** 90C
**Received By:** Rothermel, Mega     **How Received:** O          **Agency:** RPD
**Responding Officers:** McClure, Bradle, Stuart, Paige, Dupree, Courtne, Wilczynski, Kar
**Responsible Officer:** McClure, Bradle          **Disposition:** ACT 06/03/23
**When Reported:** 10:12:58 06/03/23     **Occurred Between:** 10:12:58 06/03/23 and 10:12:58 06/03/23

| **Assigned To:** | **Detail:** | **Date Assigned:** **/**/** |
|---|---|---|
| **Status:** | **Status Date:** **/**/** | **Due Date:** **/**/** |

**Complainant:**
    **Last:**           **First:**         **Mid:**
    **DOB:** **/**/**      **Dr Lic:**      **Address:**
    **Race:**     **Sex:**     **Phone:**     **City:** ,

## Offense Codes
    **Reported:**                  **Observed:**
**Additional Offense:** 90C Criminal Mischief

## Circumstances
    240 Disorderly Conduct
    304 Report Processed

| **Responding Officers:** | **Unit :** |
|---|---|
| McClure, Bradle | 530 |
| Stuart, Paige | 751 |
| Dupree, Courtne | 752 |
| Wilczynski, Kar | 215 |

**Responsible Officer:** McClure, Bradle          **Agency:** RPD
**Received By:** Rothermel, Mega          **Last Radio Log:** 13:01:30 06/03/23 CMPLT
**How Received:** O OTHER          **Clearance:** PPR PAPERLESS OR PAPER
                                             REPORT
**When Reported:** 10:12:58 06/03/23          **Disposition:** ACT **Date:** 06/03/23
**Judicial Status:**          **Occurred between:** 10:12:58 06/03/23
**Misc Entry:**          **and:** 10:12:58 06/03/23

07/06/23

**Plaintiff's App. 100**

*Deputy Report for Incident 23-021028*                                    *Page 2 of 3*

| Modus Operandi: | Description : | Method : |
|---|---|---|

**Involvements**

| Date | Type | Description | Relationship |
|---|---|---|---|

07/06/23

**Plaintiff's App. 101**

*Deputy Report for Incident 23-021028*

*Page 3 of 3*

**Narrative**

Sgt. Bradley McClure #668
03 June 2023 1150
23-021028

Today at 0900 I was assigned to work a Community Event in the 800 block Washington St. for a Pride flag raising ceremony. There were a few protesters on location. I told them that they had to stay on the opposite side of the street and that they could not be disruptive.  I told them that the group had a permit to hold their event. They complied.

At approximately 1005 another male, later identified as DAMON ATKINS, arrived at the location. He was carrying a sign with an anti-gay slogan written on it. He began to yell to the people at the event. I immediately approached him and told him that, while he was free to stand there on that side of the street and hold his sign, he could not cross the street nor yell comments intended to disrupt the event. ATKINS said he understood.

Less than a minute later he resumed yelling derogatory comments to the people at the event. Because I had already given him warning, I immediately told him he was being arrested for disorderly conduct. Officer Dupree and I handcuffed him escorted him away from the location to await transport to Central Processing.

I filed a criminal complaint charging ATKINS for disorderly conduct ( M3 - engaging in tumultuous behavior)

Nothing further

_____

Responsible LEO:

_____

Approved by:

_____

Date

07/06/23

**Plaintiff's App. 102**

COMMONWEALTH OF
PENNSYLVANIA
COUNTY OF BERKS

**POLICE CRIMINAL COMPLAINT**
**COMMONWEALTH OF PENNSYLVANIA**
**VS.**

Magisterial District Number: 23-1-03

MDJ: Hon.     KYLEY SCOTT
              633 COURT ST
              3RD FL
Address:      READING, PA 19601
Telephone:    610-378-5101

DEFENDANT:
*(NAME and ADDRESS)*:

DAMON                          ATKINS
First Name    Middle Name    Last Name        Gen

### NCIC Extradition Code Type

| | | |
|---|---|---|
| ☐ 1-Felony Full | ☐ 5-Felony Pend. | ☐ C-Misdemeanor Surrounding States   ☐ Distance: |
| ☐ 2-Felony Ltd. | ☐ 6-Felony Pend. Extradition Determ. | ☒ D-Misdemeanor No Extradition |
| ☐ 3-Felony Surrounding States | ☐ A-Misdemeanor Full | ☐ E-Misdemeanor Pending |
| ☐ 4-Felony No Ext | ☐ B-Misdemeanor Limited | ☐ F-Misdemeanor Pending Extradition Determ. |

### DEFENDANT IDENTIFICATION INFORMATION

| Docket Number | Date Filed | OTN/LiveScan Number | Complaint/Incident Number | Request Lab Services? |
|---|---|---|---|---|
| | 06/03/23 | | 23-021028 | ☐ YES ☒ NO |

| GENDER | DOB | | POB | Add'l DOB | Co-Defendant(s) ☐ |
|---|---|---|---|---|---|
| ☒ Male | | | | | |
| ☐ Female | AKA | First Name | Middle Name | Last Name | Gen. |

| RACE | ☒ White | ☐ Asian | ☐ Black | ☐ Native American | ☐ Unknown |
|---|---|---|---|---|---|
| ETHNICITY | ☐ Hispanic | | ☒ Non-Hispanic | | ☐ Unknown |

| HAIR COLOR | ☐ GRY (Gray) | ☐ RED (Red/Aubn.) | ☐ SDY (Sandy) | ☐ BLU (Blue) | ☐ PLE (Purple) | ☒ BRO (Brown) |
|---|---|---|---|---|---|---|
| | ☐ BLK (Black) | ☐ ONG (Orange) | ☐ WHI (White) | ☒ XXX (Unk/Bald) | ☐ GRN (Green) | ☐ PNK (Pink) |
| | ☐ BLN (Blonde / Strawberry) | | | | | |

| EYE COLOR | ☐ BLK (Black) | ☒ BLU (Blue) | ☐ BRO (Brown) | ☐ GRN (Green) | ☐ GRY (Gray) |
|---|---|---|---|---|---|
| | ☐ HAZ (Hazel) | ☐ MAR (Maroon) | ☐ PNK (Pink) | ☐ MUL (Multicolored) | ☐ XXX (Unknown) |

| DNA | ☐ YES ☒ NO | DNA Location | | WEIGHT (lbs.) |
|---|---|---|---|---|
| FBI Number | | MNU Number | | 200 |
| Detainer Fingerprinted | ☐ YES ☐ NO | | | Ft. HEIGHT in. |
| Fingerprint Classification | | | | 6    6 |

### DEFENDANT VEHICLE INFORMATION

| Plate # | State | Hazmat ☐ | Registration Sticker (MM/YY) | Comm'l Veh. Ind. ☐ | School Veh. ☐ | Oth. NCIC Veh. Code | Reg. same as Def. |
|---|---|---|---|---|---|---|---|
| VIN | | Year | Make | Model | Style | Color | ☐ |

Office of the attorney for the Commonwealth   ☐ Approved   ☐ Disapproved Because: _____

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth Prior to filing. See Pa.R.Crim.P. 507).

_____     _____     _____
(Name of the attorney for the Commonwealth)   (Signature of the attorney for the Commonwealth)   (Date)

I,  **MCCLURE, BRADLEY T**                                         668
    (Name of the Affiant)                          PSP/MPOETC Assigned Affiant ID Number and Badge #
of  **Reading Police Department**                                 PA0061400
    (Identify Department or Agency Represented and Political Subdivision)   (Police Agency CRI Number)
    do hereby state: (check appropriate box)

1.  ☒  I accuse the above named defendant who lives at the address set forth above
    ☐  I accuse the defendant whose name is unknown to me but who is described as _____

    ☐  I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have
       therefore designated as John Doe or Jane Doe

    with violating the penal laws of the Commonwealth of Pennsylvania at   [ 23-1-03 ]
                                                                          (Subdivision Code)   (Place-Political Subdivision)
    **800 BLOCK WASHINGTON ST, READING, BERKS COUNTY, PA**

    in _____**BERKS**_____ County [ **06** ] on or about _____**06/03/2023 AT 10:08 AM**_____
                                     (County Code)                    (Offense Date)

AOPC 412A - Rev. 07/18

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed:<br>06/03/2023 | OTN/LiveScan Number | Complaint/Incident Number<br>23-021028 |
|---|---|---|---|
| Defendant Name | First:<br>DAMON | Middle: | Last:<br>ATKINS |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered _____ through _____ .

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.

**(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

_____     06/03/2023     SGT. Bradley McClure #668
                            (Date)                    (Signature of Affiant)

AND NOW, on this date _____ I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

_____     _____     ┌──────────┐
(Magisterial District Court Number)     (Issuing Authority)     │   SEAL   │
                                                                └──────────┘

AOPC 412A - Rev. 07/18

**Plaintiff's App. 104**

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed:<br>06/03/2023 | OTN/LiveScan Number | Complaint/Incident Number<br>23-021028 |
| --- | --- | --- | --- |
| Defendant Name | First:<br>DAMON | Middle: | Last:<br>ATKINS |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate<br>Offense | ☐ | Attempt<br>18 901 A | ☐ | Solicitation<br>18 902 A | ☐ | Conspiracy<br>18 903 | Number of Victims Age 60 or Older _____ |
| --- | --- | --- | --- | --- | --- | --- | --- |

| ☐ | 5503 | (a)(1) | of the | PA Crimes Code | | | | 90C | 240 | 90C |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Lead? | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Code | AOPC/UCR/NIBRS Code |

| PennDOT Data<br>(if Applicable) | Accident<br>Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
| --- | --- | --- | --- | --- | --- |

Statute Description (include the name of the statute or ordinance):
PACC 5503(a)(1)  Disorderly ConductIN THAT, on or about said date, THE DEFENDANT, with intent

Acts of the accused associated with this Offense:

PACC 5503(a)(1)  Disorderly Conduct

IN THAT, on or about said date, THE DEFENDANT, with intent to cause substantial public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he engages in fighting or threatening, or in violent or tumultuous behavior. The defendant, despite being warned by police just moments prior, yelled derogatory comments at an organization that was holding a permitted event, in violation of Section 5503(a)(1) of the PA Crimes Code.

AOPC 412A - Rev. 07/18

**Plaintiff's App. 105**

*CONFIDENTIAL*                             **Confidential Information Form**
                                                              **Criminal Complaint**

Complete the defendant's SSN Information if known. If this form is submitted as part of a Criminal Complaint, the NCIC Cautions/Medical Conditions and Scars/Marks/Tattoos should also be completed if known.

| Docket Number: | Date Filed: 06/03/2023 | OTN/LiveScan Number | | Complaint/Incident Number 23-021028 |
| --- | --- | --- | --- | --- |
| Defendant Name | First: DAMON | Middle: | | Last: ATKINS |

### NCIC Cautions and Medical Conditions (Check up to 9)

| | | | | |
| --- | --- | --- | --- | --- |
| ☐ 00 | ☐ 20 | ☐ 50 | ☐ 70 | ☐ 01 |
| ☐ 05 | ☐ 25 | ☐ 55 | ☐ 80 | |
| ☐ 10 | ☐ 30 | ☐ 60 | ☐ 85 | |
| ☐ 15 | ☐ 40 | ☐ 65 | ☐ 90 | |

| Scars, Marks, Tattoos NCIC Codes | |
| --- | --- |

Pursuant to the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania*, the Confidential Information Form shall accompany a filing where confidential information is required by law, ordered by the court, or otherwise necessary to effect the disposition of a matter. This form, and any additional pages, shall remain confidential, except that it shall be available to the parties, counsel of record, the court, and the custodian. This form, and any additional pages, must be served on all unrepresented parties and counsel of record.

| This Information Pertains To: | Confidential Information: | Reference in Filing: |
| --- | --- | --- |
| ATKINS, DAMON<br>(full name of adult)<br>OR<br>This information pertains to a minor with the initials of _____ and the full name of<br><br>(full name of minor)<br>and date of birth of: _____ | Social Security Number (SSN):<br><br>Financial Account Number (FAN):<br><br>Driver's License Number (DLN):<br><br>State of Issuance (DLN):<br><br>Expires (DLN):<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN1<br>Alternative Reference:<br>FAN1<br>Alternative Reference:<br>DLN1<br><br><br>Alternative Reference:<br>SID1 |

Additional page(s) attached. _____ total pages are attached to this filing.

I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

*Bradley McClure*
Signature of Attorney or Affiant

Name: BRADLEY MCCLURE

Address: 815 WASHINGTON St.
READING, PA 19601

Date: 06/03/2023

Attorney Number: (If applicable) _____

Telephone: _____

Email: _____

*CONFIDENTIAL*

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed:<br>06/03/2023 | OTN/LiveScan Number | | Complaint/Incident Number<br>23-021028 |
|---|---|---|---|---|
| Defendant Name | First:<br>DAMON | | Middle: | Last:<br>ATKINS |

## AFFIDAVIT OF PROBABLE CAUSE

On June 03,2023 at 0900 I was assigned to work a Community Event in the 800 block of Washington St. The event was a flag raising ceremony at City Hall for the beginning of Pride Month. This event was approved by the City and the organizers were issued a permit. There were a few protesters on location. I told them that they had to stay on the opposite side of the street and that they could not be disruptive.

At approximately 10:05 another male, later identified as DAMON ATKINS, arrived at the location. He was carrying a sign with a slogan written on it that showed his opposition to the event. He began to yell to the people at the event. I immediately approached him and told him that, while he was free to stand on that side of the street and hold his sign, he could not cross the street nor yell comments intended to disrupt the event. ATKINS said he understood.

Less than a minute later he resumed yelling derogatory comments to the people at the event. Because I had already given him warning, I immediately told him he was being arrested for disorderly conduct. Officer Dupree and I handcuffed him escorted him away from the location to await transport to Central Processing.

I respecfully request ATKINS be arraigned for disorderly conduct (M3)

I, MCCLURE, BRADLEY T                , BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

*SGT. Bradley McClure #668*
(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____, _____

_____ Date    _____, Magisterial District Judge

My commission expires first Monday of January,

SEAL

**Plaintiff's App. 107**

AOPC 411C - Rev. 07/18



# COMMONWEALTH WITNESS LIST

Page: [1]   of   [1]

Assignment No: 23-021028

Offense Date: June 03, 2023

Primary Offense: Disorderly Conduct

The Commonwealth of Pennsylvania V: Damon Atkins

Prosecutor's Name: Sgt. Bradley McClure #668

## WITNESSES:

| Below for ALL court | Below for TRIAL only |
|---|---|
| Name: | Name: |
| Address: | Address: |
| Address: | Address: |
| Phone: | Phone: |
| Name: | Name: |
| Address: | Address: |
| Address: | Address: |
| Phone: | Phone: |
| Name: | Name: |
| Address: | Address: |
| Address: | Address: |
| Phone: | Phone: |
| Name: | Name: |
| Address: | Address: |
| Address: | Address: |
| Phone: | Phone: |

X *Bradley McClure #668*

Sgt. Bradley McClure #668          06/03/2023
Reviewing Officer & Comp #          Date

X *Bradley McClure #668*

SGT. BRADLEY MCCLURE #668          06/03/2023
Reviewing Supervisor & Comp #          Date

**Plaintiff's App. 108**

COMMONWEALTH OF
PENNSYLVANIA
COUNTY OF BERKS

**POLICE CRIMINAL COMPLAINT**
**COMMONWEALTH OF PENNSYLVANIA**
**VS.**

Magisterial District Number: 23-1-03

MDJ: Hon. KYLEY SCOTT

Address: 633 COURT ST
3RD FL
READING, PA 19601

Telephone: 610-378-5101

DEFENDANT: *(NAME and ADDRESS):*

DAMON                                    ATKINS
First Name          Middle Name      Last Name                    Gen

### NCIC Extradition Code Type

| | | |
|---|---|---|
| ☐ 1-Felony Full | ☐ 5-Felony Pend. | ☐ C-Misdemeanor Surrounding States  ☐ Distance: |
| ☐ 2-Felony Ltd. | ☐ 6-Felony Pend. Extradition Determ. | ☒ D-Misdemeanor No Extradition |
| ☐ 3-Felony Surrounding States | ☐ A-Misdemeanor Full | ☐ E-Misdemeanor Pending |
| ☐ 4-Felony No Ext | ☐ B-Misdemeanor Limited | ☐ F-Misdemeanor Pending Extradition Determ. |

### DEFENDANT IDENTIFICATION INFORMATION

| Docket Number | Date Filed 06/03/23 | OTN/LiveScan Number | Complaint/Incident Number 23-021028 | Request Lab Services? ☐ YES ☒ NO |
|---|---|---|---|---|

| GENDER ☒ Male ☐ Female | DOB | POB | Add'l DOB | Co-Defendant(s) ☐ |
|---|---|---|---|---|
| AKA | First Name | Middle Name | Last Name | Gen. |

| RACE | ☒ White | ☐ Asian | ☐ Black | ☐ Native American | ☐ Unknown |
|---|---|---|---|---|---|
| ETHNICITY | ☐ Hispanic | | ☒ Non-Hispanic | ☐ Unknown | |

| HAIR COLOR | ☐ GRY (Gray) | ☒ RED (Red/Aubn.) | ☐ SDY (Sandy) | ☐ BLU (Blue) | ☐ PLE (Purple) | ☒ BRO (Brown) |
|---|---|---|---|---|---|---|
| | ☐ BLK (Black) | ☐ ONG (Orange) | ☐ WHI (White) | ☒ XXX (Unk/Bald) | ☐ GRN (Green) | ☐ PNK (Pink) |
| | ☐ BLN (Blonde / Strawberry) | | | | | |

| EYE COLOR | ☐ BLK (Black) | ☒ BLU (Blue) | ☐ BRO (Brown) | ☐ GRN (Green) | ☐ GRY (Gray) |
|---|---|---|---|---|---|
| | ☐ HAZ (Hazel) | ☐ MAR (Maroon) | ☐ PNK (Pink) | ☐ MUL (Multicolored) | ☐ XXX (Unknown) |

| DNA ☐ YES ☒ NO | DNA Location | | WEIGHT (lbs.) 200 |
|---|---|---|---|
| FBI Number | | MNU Number | |
| Defendant Fingerprinted ☐ YES ☐ NO | | | Ft. HEIGHT in. |
| Fingerprint Classification | | | 6      6 |

### DEFENDANT VEHICLE INFORMATION

| Plate # | State | Hazmat ☐ | Registration Sticker (MM/YY) | Comm'l Veh. Ind. ☐ | School Veh. ☐ | Oth. NCIC Veh. Code | Reg. same as Def. |
|---|---|---|---|---|---|---|---|
| VIN | | Year | Make | Model | Style | Color | ☐ |

Office of the attorney for the Commonwealth  ☐ Approved  ☐ Disapproved Because:

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth Prior to filing. See Pa.R.Crim.P. 507).

(Name of the attorney for the Commonwealth)          (Signature of the attorney for the Commonwealth)          (Date)

I, **MCCLURE, BRADLEY T**
(Name of the Affiant)                                                                                   668
of **Reading Police Department**                                            PSP/MPOETC-Assigned Affiant ID Number and Badge #
(Identify Department or Agency Represented and Political Subdivision)                **PA0061400**
do hereby state: (check appropriate box)                                        (Police Agency CRI Number)

1.  ☒ I accuse the above named defendant who lives at the address set forth above

    ☐ I accuse the defendant whose name is unknown to me but who is described as _____

    ☐ I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have
    therefore designated as John Doe or Jane Doe

    with violating the penal laws of the Commonwealth of Pennsylvania at   [ 23-1-03 ]
                                                                        (Subdivision Code)        (Place-Political Subdivision)
    **800 BLOCK WASHINGTON ST, READING, BERKS COUNTY, PA**

    in _____**BERKS**_____ County [  **06**  ] on or about _____ 06/03/2023 AT 10:08 AM _____
                                          (County Code)                        (Offense Date)

AOPC 412A - Rev. 07/18

Page ___ of ___

**Plaintiff's App. 109**

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: 06/03/2023 | OTN/LiveScan Number | Complaint/Incident Number 23-021028 |
|---|---|---|---|
| Defendant Name | First: DAMON | Middle: | Last: ATKINS |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered _____ through _____ .

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.

**(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

_____        06/03/2023        SGT. Bradley McClure #668
                                    (Date)              (Signature of Affiant)

AND NOW, on this date _____ I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

_____        _____
(Magisterial District Court Number)        (Issuing Authority)        

SEAL

AOPC 412A - Rev. 07/18

**Plaintiff's App. 110**

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: 06/03/2023 | OTN/LiveScan Number | Complaint/Incident Number 23-021028 |
|---|---|---|---|

| Defendant Name | First: DAMON | Middle: | Last: ATKINS |
|---|---|---|---|

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate Offense | ☐ | Attempt 18 901 A | ☐ | Solicitation 18 902 A | ☐ | Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|---|---|---|

| ☐ Lead? | 5503 Offense # Section | (a)(1) Subsection | of the | PA Crimes Code PA Statute (Title) | Counts | Grade | 90C NCIC Code | 240 | 90C AOPC/UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|

| PennDOT Data (if Applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (Include the name of the statute or ordinance):
PACC 5503(a)(1)  Disorderly ConductIN THAT, on or about said date, THE DEFENDANT, with intent

Acts of the accused associated with this Offense:

PACC 5503(a)(1)  Disorderly Conduct

IN THAT, on or about said date, THE DEFENDANT, with intent to cause substantial public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he engages in fighting or threatening, or in violent or tumultuous behavior. The defendant, despite being warned by police just moments prior, yelled derogatory comments at an organization that was holding a permitted event, in violation of Section 5503(a)(1) of the PA Crimes Code.

AOPC 412A - Rev. 07/18

**Plaintiff's App. 111**

**CONFIDENTIAL**



**Confidential Information Form**
**Criminal Complaint**

Complete the defendant's SSN Information if known. If this form is submitted as part of a Criminal Complaint, the NCIC Cautions/Medical Conditions and Scars/Marks/Tattoos should also be completed if known.

| Docket Number: | Date Filed: 06/03/2023 | OTN/LiveScan Number | | Complaint/Incident Number 23-021028 |
|---|---|---|---|---|
| Defendant Name | First: DAMON | Middle: | | Last: ATKINS |

**NCIC Cautions and Medical Conditions (Check up to 9)**

| | | | | |
|---|---|---|---|---|
| ☐ 00 | ☐ 20 | ☐ 50 | ☐ 70 | ☐ 01 |
| ☐ 05 | ☐ 25 | ☐ 55 | ☐ 80 | |
| ☐ 10 | ☐ 30 | ☐ 60 | ☐ 85 | |
| ☐ 15 | ☐ 40 | ☐ 65 | ☐ 90 | |

Scars, Marks, Tattoos
NCIC Codes

Pursuant to the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania*, the Confidential Information Form shall accompany a filing where confidential information is required by law, ordered by the court, or otherwise necessary to effect the disposition of a matter. This form, and any additional pages, shall remain confidential, except that it shall be available to the parties, counsel of record, the court, and the custodian. This form, and any additional pages, must be served on all unrepresented parties and counsel of record.

| This Information Pertains To: | Confidential Information: | Reference in Filing: |
|---|---|---|
| ATKINS, DAMON | Social Security Number (SSN): | Alternative Reference: SSN1 |
| (full name of adult) OR | Financial Account Number (FAN): | Alternative Reference: FAN1 |
| This information pertains to a minor with the initials of _____ and the full name of | Driver's License Number (DLN): | Alternative Reference: DLN1 |
| (full name of minor) and date of birth of: _____ | State of Issuance (DLN): Expires (DLN): | |
| | State Identification Number (SID): | Alternative Reference: SID1 |

Additional page(s) attached. _____ total pages are attached to this filing.

I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

Signature of Attorney or Affiant: *Bradley McClure*     Date: 06/03/2023

Name: BRADLEY MCCLURE

Address: 815 WASHINGTON ST.   READING, PA 19601

Attorney Number: (If applicable)
Telephone:
Email:

**CONFIDENTIAL**

AOPC 412A - Rev. 07/18

**Plaintiff's App. 112**

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed:<br>06/03/2023 | OTN/LiveScan Number | | Complaint/Incident Number<br>23-021028 |
|---|---|---|---|---|
| Defendant Name | First<br>DAMON | Middle: | | Last:<br>ATKINS |

## AFFIDAVIT OF PROBABLE CAUSE

On June 03,2023 at 0900 I was assigned to work a Community Event in the 800 block of Washington St. The event was a flag raising ceremony at City Hall for the beginning of Pride Month. This event was approved by the City and the organizers were issued a permit. There were a few protesters on location. I told them that they had to stay on the opposite side of the street and that they could not be disruptive.

At approximately 10:05 another male, later identified as DAMON ATKINS, arrived at the location. He was carrying a sign with a slogan written on it that showed his opposition to the event. He began to yell to the people at the event. I immediately approached him and told him that, while he was free to stand on that side of the street and hold his sign, he could not cross the street nor yell comments intended to disrupt the event. ATKINS said he understood.

Less than a minute later he resumed yelling derogatory comments to the people at the event. Because I had already given him warning, I immediately told him he was being arrested for disorderly conduct. Officer Dupree and I handcuffed him escorted him away from the location to await transport to Central Processing.

I respecfully request ATKINS be arraigned for disorderly conduct (M3)

I, MCCLURE, BRADLEY T , BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

*SGT. Bradley McClure #668*
(Signature of Affiant)

Sworn to me and subscribed before me this _____day of _____, _____

_____ Date _____, Magisterial District Judge

My commission expires first Monday of January,

SEAL

**Plaintiff's App. 113**

AOPC 411C - Rev. 07/18



# COMMONWEALTH WITNESS LIST

Page: 1 of 1

Assignment No: 23-021028

Offense Date: June 03, 2023

Primary Offense: Disorderly Conduct

The Commonwealth of Pennsylvania V: Damon Atkins

Prosecutor's Name: Sgt. Bradley McClure #668

## WITNESSES:

| Below for ALL court | Below for TRIAL only |
|---|---|
| Name: | Name: |
| Address: | Address: |
| Address: | Address: |
| Phone: | Phone: |
| Name: | Name: |
| Address: | Address: |
| Address: | Address: |
| Phone: | Phone: |
| Name: | Name: |
| Address: | Address: |
| Address: | Address: |
| Phone: | Phone: |
| Name: | Name: |
| Address: | Address: |
| Address: | Address: |
| Phone: | Phone: |

X _Bradley McClure #668_

Sgt. Bradley McClure #668          06/03/2023
Reviewing Officer & Comp #              Date

X _Bradley McClure #668_

SGT. BRADLEY MCCLURE #668          06/03/2023
Reviewing Supervisor & Comp #              Date

**Plaintiff's App. 114**



COPY

Dennis J. Skaylinn
First Assistant District Attorney

OFFICE OF THE
BERKS COUNTY **DISTRICT ATTORNEY**
633 COURT STREET
READING, PENNSYLVANIA 19601-4317
TELEPHONE: 610-478-6000
FAX: 610-478-6002
www.co.berks.pa.us/depol/da

Michael J. Gombar
Chief County Detective

John T. Adams
District Attorney

Claudia Ferko
Deputy Director

June 7, 2023

Via Facsimile Transmission – (610) 378-0441

Magisterial District Judge Kyley Scott
Berks County Services Center
633 Court Street, 3rd Floor
Reading, PA 19601

Re:   Commonwealth of Pennsylvania v. Damon Atkins
      Docket Number: CR-139-23
      OTN: R 486972-3

Dear MDJ Scott:

The above-captioned criminal complaint was filed on June 3, 2023, and the defendant is scheduled for a preliminary hearing on June 16, 2023. Due to insufficient evidence and prosecutorial discretion, please accept this letter as a request for the withdrawal of the above-captioned charges docketed to the above docket number.

If you have any questions or concerns, please feel free to contact me.

Sincerely,

JOHN T. ADAMS
District Attorney
Berks County, Pennsylvania

JTA:js

cc: Sgt. Bradley T. McClure, Reading Police Department – (Incident #23-021020)
    Chief Richard Tornielli, Reading Police Department